D. B. Karron, Ph. D.
348 East Fulton Street
Long Beach, New York 11561
E-Mail to drdbkarron@gmail.com
Facsimile +1 (516) 308 - 1982
Voice +1 (516) 515 - 1474

Monday, June 03, 2013 at 14:14:50 Hours

Second Circuit Court of Appeals
Thurgood Marshall U.S. Courthouse.
40 Foley Square.
New York, NY 10007
Attention Anna Greenidge,  caseclosing@ca2.uscourts.gov

Dear Ms. Greenige;

Attached is my combined brief Motion Information Form T-1080 for

1) Leave to file Out of Time
2) Leave for Reconsideration
3) Leave to file Appendix
4) for Certificate of Appealability
5) for CJA representation/assistance

I believe the courts requirement for extraordinary circumstances are met by the issuance of a blockbuster game changing Brady disclosure on the same day as the Courts final deadline for me to submit.

Because of the complexity and technical issues required to brief the court on the new merits for my case, I request that the court issue a COA based on the Brady Disclosure, or in the alternative permit myself and the prosecution to negotiate a new briefing schedule with the courts consent.

Because of the shortness of time with this case going to mandate, I am submitting this brief without an exhibits appendix; I will submit it tonight with the citations to the exhibits and the exhibits tonight.

This is just too big of a case for me to do out of time, and I'm already out of time. I hope the new merit is now obvious.

Sincerely,

D. B. Karron
Cc: Steven Kwok  Steve.Kwok@usdoj.gov
     Christian Everdell christian.everdell@usdoj.gov

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**
Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

**MOTION INFORMATION STATEMENT**

**Docket Number(s):** 12-2297 pr       Caption [use short title]

**Motion for:** Additional 90 days for reconsideration motion

Set forth below precise, complete statement of relief sought:

Extraordinary Circumstances of boffo late Brady

Disclosure on the day of the Courts final extension;

Leave to: File Late, Reconsider, file Appendx, for

CoA or Re-brief this appeal (do-Over) with CJA

Karron v USA

**MOVING PARTY:** Karron     **OPPOSING PARTY:** USA

☐ Plaintiff     ☐ Defendant
☑ Appellant/Petitioner     ☐ Appellee/Respondent

**MOVING ATTORNEY:** pro se     **OPPOSING ATTORNEY:** S. Kwok and C. Everdell

[name of attorney, with firm, address, phone number and e-mail]

348 East Fulton Street
Long Beach, NY 11561
Telephone (516) 515 1474
e-mail : dbkarron@gmail.com

1 St. Andrews Place
New York, NY 10003
Telephone: 212
e-mail: steve.kwok@usdoj.gov, christian.everdell@usd

**Court-Judge/Agency appealed from:** SDNY/Patterson

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed ☐ Opposed ☑ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☐ No ☑ Don't Know

Is oral argument on motion requested? ☑ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? ☐ Yes ☑ No If yes, enter date: _____

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has request for relief been made below? ☐ Yes ☑ No
Has this relief been previously sought in this Court? ☐ Yes ☑ No
Requested return date and explanation of emergency: Fast moving

events in Washington require overhaul of appeal.

_____

**Signature of Moving Attorney:**
/s/ D. B. Karron     **Date:** June 3, 2013     Service by: ☐ CM/ECF ☑ Other [Attach proof of service]

---

**ORDER**

**IT IS HEREBY ORDERED THAT** the motion is **GRANTED   DENIED**.

**FOR THE COURT:**
CATHERINE O'HAGAN WOLFE, Clerk of Court

Date: _____     By: _____

**Form T-1080** (rev. 7-12)

# 12-2297pr

*To be argued by:* D. B. KARRON

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

Docket No. 12-2297pr



DANIEL B. KARRON,

*Petitioner - Appellant,*

—v.—

UNITED STATES OF AMERICA,

*Respondent - Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR LEAVE TO FILE OUT OF TIME
BRIEF FOR RECONSIDERATION
BRIEF FOR CERTIFICATE OF APPEALABILITY
FOR THE PETITIONER - APPELLANT**

D. B. Karron
**pro se**
348 East Fulton Street
Long Beach, New York
11561
(516) 515- 1474

# Table of Contents

# Table of Contents

Table of Contents ....................................................................................................................... i

Table of Tables ....................................................................................................................... iii

Table of Authorities ............................................................................................................... iii

    Cases ................................................................................................................................. iii

    Statutes ............................................................................................................................. iii

    Regulations ....................................................................................................................... iii

    Other Authorities ............................................................................................................. iii

Statement of an Extraordinary Event ..................................................................................... 1

The Extraordinary Event of April 30, 2013 ............................................................................. 2

Impeaching Evidence would have changed the mind a reasonable jurist ............................... 2

RULE 609. IMPEACHMENT BY EVIDENCE OF A CRIMINAL CONVICTION ................................. 3

18 U.S.C. § 1018 .................................................................................................................... 4

The Disgraced former special Agents conspired to Obstruct ................................................. 5

Guilty Pleas and Statements of Facts cast doubt on Karron's Conviction ................................. 5

Admission to Offenses of Conviction ..................................................................................... 6

Prosecutions assertion that this new information as no bearing on Karron's conviction is wrong. ........... 6

Karron could not have known about Ondrik and Yamatani investigation and plea agreements in a timely fashion ................................................................................................................................. 7

CoA should issue or new re-briefing schedule set .................................................................. 7

Karron was not only target of disgraced pair's malfeasance .................................................. 7

POPA members targeted for timesheet fraud admitted to by Ondrik and Yamatani ................. 9

Ondrik pursues an innocent USPTO Employee ....................................................................... 9

i

The rogue special agents operated with impunity before 2009 ...................................................... 9

Notification to Karron sent overnight on May 29 ........................................................................ 7

Notification was untimely ........................................................................................................... 7

The Local Rule 27.1(f) extraordinary event is the surprise notification of May 29 ..................... 8

Why additional time is required to-rebrief this court in this new light. ...................................... 8

The disgraced former agent Ondrik swear out multiple Affidavits over the years in Karron's case. .... **Error! Bookmark not defined.**

OIG and FBI advise Prosecution of no findings in Karron's Case ................................................. 6

Ondrik and Yamatani prior cases. .............................................................................................. 10

Most of the Plea agreement is sealed or unavalable ................................................................. 10

    Ondrik Federal Docket Extracts ............................................................................................. 10

    Yamatani Docket Salient Extracts ........................................................................................... 11

Salient Extracts from ATTACHMENT A - STATEMENT OF FACTS: KIRK YAMATAN ....................... 16

Standard of Review for Reconsideration .................................................................................... 12

Standard of Review for Certificate of Appealability ................................................................... 12

    What is required to make a "substantial showing of the denial of a constitutional right"? ............ 13

Standards of Decision for Successful Reconsiderations .............................................................. 14

The Reasonable Jurist Standard ................................................................................................. 14

    Procedure and "Reasonable Jurists Standard" ...................................................................... 15

    GX114 and a Reasonable Jurist ............................................................................................... 15

    Would a Reasonable Jurist convict based on all the facts surrounding about the evidence ? .............. 16

**Ondrik altered GX114 to make it inculpatory but out of balance** .... **Error! Bookmark not defined.**

    **Argument** ........................................................................ **Error! Bookmark not defined.**

    **ANALYSIS OF GX114 ERRORS** ................................................ **Error! Bookmark not defined.**

      SPECIFIC PROBLEMS WITH GX114 ................................. **Error! Bookmark not defined.**

The RENT paid to KARRON was reclassified as SALARY ................. **Error! Bookmark not defined.**

**The Two Author Hypothesis** ........................................................... **Error! Bookmark not defined.**

**Brady v Maryland** ........................................................................ **Error! Bookmark not defined.**

**Tracing the First Dollar in Allocable and Allocated Payments: What is Legal and Illegal?**
.................................................................................. **Error! Bookmark not defined.**

Conclusion .................................................................................................................. 16

Signature ..................................................................................................................... 17

Appendix ..................................................................................................................... 18

    Certificate of Service .............................................................................................. 19

Exhibits ........................................................................................................................ 20

# Table of Tables

# Table of Authorities

## Cases

## Statutes

## Regulations
## Other Authorities

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket No. 12-2297pr

DANIEL B. KARRON,

*Petitioner - Appellant,*

—v.—

UNITED STATES OF AMERICA,

*Respondent - Appellee.*

## BRIEF FOR LEAVE TO FILE OUT OF TIME
## BRIEF FOR RECONSIDERATION
## BRIEF FOR CERTIFICATE OF APPEALABILITY
### FOR PETITIONER-APPELLANT

## Statement of an Extraordinary Event

The Petitioner-Appellant (Karron) was just[1] made aware by the Respondent-Appellee (Prosecution) of a pair of Federal District Court cases detailing criminal events that had been investigated in secret since 2009.

A game changing event has occurred on April 30, 2013. The pair of Department of Commerce Special Agents who was responsible for Karron's conviction each agreed to pea guilty to fraud.

The moral turpitude evidenced by these cases of a multi-year collusion in fraud by the disgraced pair of former federal agents must not have sprung into their otherwise moral minds on New Years' Day of 2009.

The circumstance of their admitted repeated obstructive actions are made even more reprehensible by their aborted attempt to take refuge in whistleblower protective laws. At the end of the Department of Commerce Inspector Generals' investigation, it was revealed that all the disgraced pair

---

[1] on May 29, 2013, see the Fedex delivery receipt and delivery history in Exhibit <<FEDEX DELIVERY PROOF>>

1

of Special Agents were blowing was a malicious protective false smoke screen.

## The Extraordinary Event[2] of April 30, 2013

Two former special agents with the U.S. Department of Commerce, Office of Inspector General, Rachel Ondrik, age 35, of Frederick, Maryland, and Kirk, Yamatani, age 38, of Ashburn, Virginia, pleaded guilty submitting false claims […and …] resigned their positions on March 29, 2013, as part of their plea agreements.  These were the very same pair of Special Agents who instigated, conspired, initiated, spearheaded, drove and supported the prosecution of Karron.  This relentless prosecution spanned almost a decade from 2003-to the present in Karron's criminal conviction and collateral civil attack summary judgment for the staggering amount of some four million dollars.

Between June 2009 and February 2011, Ondrik and Yamatani also admitted to have committed time and attendance fraud against DOC-OIG. Further, Ondrik and Yamatani have negotiated a plea bargain whereby each will be sentenced to a term of probation and ordered to pay a fine of $28,000. In addition, each defendant will be required to pay $14,000 in restitution to the government.  Sentencing has been scheduled for June 19, 2013, some 18 days hence.  (Exhibit <<FBI PRESS RELEASE>>, FBI Press release of April 30, 2013).

## Impeaching New Evidence would have changed the mind a reasonable jurist

When a witness in a criminal trial is revealed to have been convicted of a crime, the jury is normally given special instructions to fit the circumstances.  An example circumstance is Impeachment by Evidence of Untruthful Character[3], Impeachment by Prior Conviction[4], and Inference from Fact That Witness Not Called[5].

---

[2] FBI Press Release. http://www.fbi.gov/baltimore/press-releases/2013/two-former-special-agents-with-department-of-commerce-office-of-inspector-general-plead-guilty-to-submitting-false-claims-for-relocation-expenses-and-to-time-and-attendance-fraud
[3] Pattern Criminal Jury Instructions (1987) Section 31
[4] Pattern Criminal Jury Instructions (1987) Section 30.
[5] Pattern Criminal Jury Instructions (1987) Section 39.

The disgraced former Federal Special Agents Ondrik and Yamatani were not called by the defense or the Prosecution as witnesses. They did, however, attend every day of the trial and sentencing hearings, sitting with the Prosecution.

1. Disgraced former Special Agent Ondrik countersigned at least witness interview statement. One we managed to obtain is Exhibit <<ONDRIK AFFADAVIT1 GOLDBERG>>. Testimony by Prosecution witness contained common phraseology that runs contrary to the hallmark of truth. It is beyond the scope of this brief to attempt to argue that Ondrik and Yamatani coached or suborned witnesses, but it is a common diagnostic in other tainted cases of this disgraced pair. One can reasonably expect that all witnesses for the Prosecution and against Karron made at least one statement signed or countersigned by Ondrik and/or Yamatani.

2. Disgraced former Special Agent Ondrik signed the sealed affidavit in support of the kickoff Seizure of everything that Karron owned. (See Exhibit <<ONDRIK AFFIDAVIT2>>)

3. Disgraced former Special Agent Ondrik s signed a declaration in support of the Prosecutions opposition to Karron's 2255 hearing in 2010. (See Exhibit <<ONDRIK AFFIDAVIT3>>). This signing was during the period Ondrik admitted making false writing and obstructive conduct.( See Exhibit << ONDRIK STATEMENT OF FACT>>)

Had it been known at the time of Karron's trial that Ondrik and Yamamoto were of untruthful character, there is a significant probability that the Jury would have found differently.

If the trial were to be held today, knowing what we know now the outcome would be different. If the trial were held today, and if given the opportunity by this court, for the grant of a Certificate of Appealability the outcome would be different from the Verdict of 2008. Finally, if a hearing would be granted, and Karron afforded the opportunity to conduct Discovery, that the outcome of a hearing today would be different from 2008.

# RULE 609. Impeachment by Evidence of a Criminal Conviction

F.R.E. 609 (a)(2) applies to attacking a witness's character for truthfulness by evidence of a criminal conviction:

> [F]or any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving — or the witness's admitting — a dishonest act or false statement.  Rule 609 (a)(2) (http://www.law.cornell.edu/rules/fre/rule_609)

> As a means of impeachment, evidence of conviction of crime is significant only because it stands as proof of the commission of the underlying criminal act. […] The weight of traditional authority has been to allow use of felonies generally, without regard to the nature of the particular offense, and of ***crimen falsi* without regard to the grade of the offense.** This is the view accepted by Congress in the *1970 amendment of §14–305 of the District of Columbia Code, P.L. 91–358, 84 Stat. 473. Uniform Rule 21* and *Model Code Rule 106* **permit only crimes involving "dishonesty or false statement."** (http://www.law.cornell.edu/rules/fre/rule_609) [Emphasis Added]

> Subdivision (a). For purposes of impeachment, crimes are divided into two categories by the rule:

> (1) those of what is generally regarded as felony grade, without particular regard to the nature of the offense, and

> (2) **those involving dishonesty or false statement, without regard to the grade of the offense**. (http://www.law.cornell.edu/rules/fre/rule_609)

In this instance, Ondrik and Yamatani each pled guilty to 18 U.S.C. § 1018, a misdemeanor offense of false official writings.  The element of admitted falsity satisfies the requirement of F.R.E. 609(a)(2) above.

## 18 U.S.C. § 1018

18 USC § 1018 - Official certificates or writings statute states:

> Whoever, being a public officer or other person authorized by any law of the United States to make or give a certificate or other writing, knowingly makes and delivers as true such a certificate or

writing, containing any statement which he knows to be false, in a case where the punishment thereof is not elsewhere expressly provided by law, shall be fined under this title or imprisoned not more than one year, or both.

This is a misdemeanor fraud that falls into the category of FRE above 609(a)(2).

## The Disgraced former special Agents conspired to Obstruct

These disgraced former special agents conspired to an admitted a multi year known history of not just careless, casual, or willful ignorance, but attempted a vindictive, spiteful, and destructive campaign against their management. The extreme moral turpitude evidenced by such reprehensible behavior is evidenced through the period of Karron's investigation (2004-2008) in their other prosecutions. (See Exhibit <<FBI PRESS RELEASE>>)

## Guilty Pleas and Statements of Facts cast doubt on Karron's Conviction

The newly released statements of fact and guilty pleas cast sufficient shadows of doubt on the reliability of Karrons' convictions.  These two findings of fact merit this Courts' grant of a Certificate of Appealability to Karron.  (See Exhibit <<ONDRIK STATEMENT OF FACT>> and Exhibit <<YAMATANI STATEMENT OF FACT>>) This is because the Prosecutions' foundational affidavits were sworn to by the disgraced former Special Agent Ondrik.

The pivotal Prosecution exhibit GX114 can no longer be relied upon as true.  The internal contradictions in the Exhibit indicate it was authored (doctored) by two people in isolation.  This was discussed at length by Karron in its briefing to the District Court. (See <<CITATION 2255 REVISED RESUBMITTED BRIEF>>, and also <<CITATION GX114 IN DEPTH>>  It is not in the punctilious and numerate character of the Prosecution auditor to have produced this exhibit.  A CPA would have supported GX114 with detailed step by step workpapers. It was observed by the Defense and Court during trial and sentencing, there is no way to support these numbers by the supporting schedule in GX110. <<RUBINSTEIN OBSERVES>><<PATTERSON CALLS IT A MESS>>.  The only person could have done this kind of innumerate editing is now show to have a

history of doing false writing is the former disgraced Special Agent Ondrik. GX114 does not add up and appears to be partially made up.

This exhibit was pivotal because it was called back by the jury during deliberations. Had it been made known to the jury that Exhibit 114 was edited by someone to make it inculpatory, and that someone could only be the disgraced former Special Agent Ondrik, and it was in her character to do so, the outcome of the Karron trial would have been different.

Because of these facts there is sufficient merit for this court to grant a Certificate of Appealability and the case remanded to the District Court for the conduct of discovery and a 2255 hearing.

## Admission to Offenses of Conviction

1. The Defendant [Ondrik] agrees to plead guilty to a criminal information that will charge her with submission of a false official writing by an officer of the United States, in violation of 18U.S.C. § 1018, a Class A misdemeanor. The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court *(Case 8:13-cr-00148-CBD Document 5 Filed 04/30/13)*

1. The Defendant [Yamatani] agrees to plead guilty to a criminal information that will charge her with submission of a false official writing by an officer of the United States, in violation of 18 U.S.C. § 1018, a Class A misdemeanor. The Defendant admits that she is, in fact, guilty of that offense and will so advise the Court. (<<CITATION TO DOCKET>>)

## OIG and FBI advise Prosecution of no findings in Karron's Case

## Prosecutions assertion that this new information as no bearing on Karron's conviction is wrong.

The Prosecution's blandly asserts (below) that the stunning most recent turn of events has no bearing on Karron's conviction. Had they truly believed this then they would not be so compelled as to make a *Brady v Maryland*[6] disclosure to Karron.

---

[6] Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 154 (1972).

The Department of Commerce Office of Inspector General ("OIG") and the Federal Bureau of Investigation ("FBI") have advised us that they did not uncover any evidence that the conduct described in the enclosed court documents predated the charged offense period of 2009 through 2011. Accordingly, no evidence was uncovered that any such conduct affected the investigation of your case. Exhibit <<MAY 29 BRADY LETTER>>)

By their actions they refute their own statement. By this disclosure they admit to these recent turn of events as having a bearing on Karron's criminal conviction in 2008. The Prosecution seems to have hewed to a "better late than never" in an 'excess of caution' doctrine. The Prosecution's disclosure was untimely. The notification was made to Karron on the day after this Court set as the final briefing deadline. This was possibly a bad faith attempt to use the courts deadline to end Karron's appeal reconsideration.

## Karron could not have known about Ondrik and Yamatani investigation and plea agreements in a timely fashion.

There is no possibility that an exercise of diligence on the part of Karron, that this information could have been obtained in a timely fashion to brief this Court. Karron was not tracking Ondrik or Yamatani; there was no reason to; there was no way Karron could have known that Ondrik and Yamatani were targets of a multiyear secret IG investigation.

Had Karron been informed of these blockbuster events as they were made public on April 30, instead of on May 29, Karron's briefing to the court could have been (more) timely and significantly more meritorious.

## Notification to Karron sent overnight on May 29

The Prosecution notified Karron of this exculpatory occurrence yesterday, on May 30. Exhibit 2 is the cover letter in what is to be construed as a disclosure, as required by *Brady v Maryland* made by the Prosecution to Karron,

## Notification was untimely

Had the prosecution given Karron timely notification of this

7

extraordinary event, a timely motion for reconsideration would have including this exculpatory information.  It is a diagnostic that the Prosecution must have considered this information exculpatory as to have made notification; but the notification was made just after it could have been of use to Karron.

## Why additional time is required to-rebrief this court in this new light.

Karron requests at least 90 days additional time; essentially, that the clock be reset and this motion for a Certification of Appealability be reset for the following reasons:

1. The Prosecutions disclosure cites sealed and unavailable additional statements of fact that need to be evaluated by Karron.
2. FOIA requests need to be made not just for DoC NIST ATP, but now to the DoC OIG for correspondence with the disgraced special agents for an expanded period of time from 2003 through 2011,
3. FOIA requests or some other mechanism need to be made to the Department of Justice (DoJ) for its correspondence with the disgraced Special Agents with respect to the investigation of Karron from 2003 through 2008 when Karron was convicted.

## The Local Rule 27.1(f) extraordinary event is the surprise notification of May 29

Second Circuit Local Rule (LR) 27.1(f) spells out that the court will not grant a motion to extend the time to file a brief absent an extraordinary circumstance.  The court gives an example such as a serious personal illness or a death in the immediate family.  Karron suggests the surprise late notification of the game changing events disclosed at the courts final deadline is such an extraordinary events under LR 27.1(f).

## Karron was not only target of disgraced pair's malfeasance.

Karron was not the only target of Ondrik and Yamatani.  Other targets suffered injustices by the multiple breaches of the public trust by the pair of disgraced Special Agents.  The Department of Commerce (DoC) Patent and Trademark Office (PTO) Patent Office Professional Association (POPA) on multiple occasions defended their members from vicious attacks against

8

allegations of timesheet fraud.  In most cases the employee members left the Patent Office in disgrace or just left after winning against Ondrik in District Court.

## POPA members targeted for timesheet fraud admitted to by Ondrik and Yamatani

Timesheet fraud and theft of government services by Patent Office employees is one the offense that the disgraced pair of former Special Agents Ondrik and Yamatani admitted to committing in their plea agreement.  The extreme depth of immorality in their prosecution of innocent employees for the crimes they would later admit to.  They destroyed the careers of possibly dozens of highly intelligent, extremely educated USPTO employees while quite possibly committing these and other crimes as yet undetected.

### Ondrik pursues an innocent USPTO Employee.

In one documented case, Ondrik prosecuted an MD JD Patent Office employee relentlessly, to the disgust of POPA.  When she could not get a prosecutor in the Federal System to prosecute her quarry, she found a state prosecutor who obliged to prosecute: and lost.  Further, these rogue Special Agents seemed to target the best and the brightest in the Department of Commerce.  Together this pair made government employment or sponsorship a nightmare. She thwarted the USPTO efforts to attract quality personnel by abusing obsolete labor laws, where the employee had specific permission from her management, to telecommute from home while pregnant.  She enforced rules more appropriate for US Post Office employees not professional intellectual employees.

She attacked and cowed contractors and grantees who never dreamed they were doing anything culpable.  She thwarted management negotiations by scaring DoC employees.

## The rogue special agents operated with impunity before 2009

Awe we can see from the problems reported by POPA, the problems with these former special agents pre-dated 2009; well into the period of the Karron prosecution.

# Federal Special Agents operate with a high level of trust and personal responsibility

OIG Special Agents operate with a very high level of trust and personal responsibility.  They were they were covered by the United States Office of Personnel Management's series 1811, which sets forth requirements for positions that supervise, lead, or perform work involving the planning, conducting, or managing of investigations related to violations of federal criminal laws.  Work in this level requires detailed knowledge of criminal investigative techniques, rules of criminal procedures, laws, and precedent court decisions concerning the admissibility of evidence, constitutional rights, search and seizure, and related issues in the conduct of investigations.  These two rogue agents not only knew they were doing wrong, they knew the rules well enough to evade detection.

## Inculpatory Circumstances of Plea Agreements

A closer reading of the admitted statements of fact and the FBI and IG public statements reveals that Ondrik and Yamatani not only made fraudulent claims for services not rendered, but perseverated in these false claims, and obstructed their investigation in ways most morally repugnant.

These attacks against a new FOIA disclosure needs to be made not just to the Department of Commerce (DoC) NIST ATP grant program but to the DoC IG and DoJ.  Karron must not be denied the investigation of the disgraced special agents who disgraced Karron.

## Ondrik and Yamatani prior cases.

PACER reveals multiple cases involving Ondrik and Yamatina.

Ondrik search on Pacer (a free copy is available on RECAP)

Yamatani search on Pacer (a free copy is available on RECAP)

## Most of the Plea agreement is sealed or unavalable

### Ondrik Federal Docket Extracts

Ondrik Docket  (A free copy is here on RECAP)

U.S. District Court District of Maryland (Greenbelt)

CRIMINAL DOCKET FOR CASE #: 8:13-cr-00148-CBD-1Case title: USA v. Ondrik

04/30/2013  3      Initial Appearance as to Rachel Ondrik (Defendant informed of Rights.) held on 4/30/2013, Arraignment as to Rachel Ondrik (1) Count 1 held on 4/30/2013, Plea entered by Rachel Ondrik (1) Count "Guilty" as to Count 1 before Magistrate Judge Charles B. Day.

(attempts to retrieve Item 3 result in a message: You do not have permission to view this document.)

04/30/2013  Document # 6      -SEALED- PLEA SUPPLEMENT as to Rachel Ondrik (jcs, Deputy Clerk)

(attempts to retrieve Item 6 result in a message: This document is not available.)

### Yamatani Docket Salient Extracts

Yamatani Docket (a free copy is here on RECAP)

04/30/2013  3      Initial Appearance as to Kirk Yamatani (Defendant informed of Rights.) held on 4/30/2013, Arraignment as to Kirk Yamatani (1) Count 1 held on 4/30/2013, Plea entered by Kirk Yamatani "Guilty" as to Count 1 before Magistrate Judge Charles B. Day.

(attempts to retrieve Item 3 result in a message: You do not have permission to view this document.)

04/30/2013  6      -SEALED- PLEA SUPPLEMENT as to Kirk Yamatani

(attempts to retrieve This document is not available.)

## Standard of Review for Reconsideration

The Petitioner-Appellant ("Petitioner") is cognizant that Motions for Reconsideration

"will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."[7].

Further, the Petitioner is aware of the three major grounds for granting a motion for reconsideration in the Second Circuit.[8] [9]  They are:

(1) an intervening change of controlling law,

(2) the availability of new evidence, or

(3) the need to

[3.1] correct a clear error or

[3.2] prevent manifest injustice

[Added sub enumeration to sub clauses in (3)

## Standard of Review for Certificate of Appealability

The motion for a COA filed in this Court must include:

(1) the Court's Form T-1080 Motion Information Statement,

(2) a copy of the district judge's decision denying the COA, and

(3) a statement that

---

[7] Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)
[8] Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) citing 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4478
[9] Bank of New York v. Bell, 2011 U.S. Dist. LEXIS 3850 (D. Conn. Jan. 14, 2011)

(a) identifies each issue to be raised on appeal and the relevant facts and

(b) makes a substantial showing of the denial of a constitutional right as to each issue.

## What is required to make a "substantial showing of the denial of a constitutional right"?

The standard for appealability under 28 U.S.C. §2253(c)(2) depends upon whether the district court has rejected the issue sought to be appealed on it's

a) merits or on

b) procedural grounds.

With respect to constitutional claims rejected on their merits, the Supreme Court has applied to Certificates of Appealability the standard for granting certificates of probable cause set forth in *Barefoot v. Estelle*[10] and followed in the AEDPA.[11] Under this standard, the appellant must make a showing that each issue he or she seeks to appeal is at least

"debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further."[12]

The "substantial showing" standard "does not compel a petitioner to demonstrate that he or she would prevail on the merits."[13]

As to claims denied on procedural grounds (that is, where the district court has not reached the merits), the Court in *Slack v McDaniel* clarified that the Certificate of Appealability standard is different and easier to meet:

(1) "whether jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right" (in other words, does the petition at least allege a valid claim, even though it hasn't

---

[10] Barefoot v. Estelle 463 U.S. 880 (1983)
[11] Slack v. McDaniel, 529 U.S. 473 (2000)
[12] Barefoot, 463 U.S. at 893 n.4) (internal quotations omitted; bracketed insertions original).
[13] *ibid*

been proven yet), and

(2) whether "jurists of reason would find it debatable whether the district court was correct in its procedural ruling."[14]

## Standards of Decision for Successful Reconsiderations

The Second Circuit has limited reconsideration of earlier District Court decisions.

'by treating those decisions as law of the case, which gives a district court discretion to revisit earlier rulings in the same case, subject to the caveat that 'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'[15]  The Second Circuit requires, as a rule, one of three tests to be satisfied: ''an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice.' (See *above.*)

In Alvarez v. QPI Multipress[16], a civil products liability action, the District Court had granted the defendant manufacturer's motion for summary judgment.  The plaintiff sought reconsideration asserting (i) the "availability of new evidence" and (ii) "the need to . . . prevent a manifest injustice" to support his motion for reconsideration — because, through a clerical oversight, one page of his expert's affidavit had been omitted from the plaintiff's opposition papers.  The Court held that, even though most of the points had been made elsewhere in plaintiff's opposition papers,

'in an abundance of caution and in order to prevent any manifest injustice that might result from the Court's failure to examine all of the relevant information,"

The Court granted the motion for reconsideration and reversed its grant of summary judgment in favor of the defendant manufacturer.

## The Reasonable Jurist Standard

---

[14] Slack v. McDaniel, 529 U.S. at 478.
[15] Official Comm. of Unsecured Creditors v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003)
[16] Alvarez v. QPI Multipress, Inc., 2007 U.S. Dist. LEXIS 48588 (N.D.N.Y. July 5, 2007)

**Procedure and "Reasonable Jurists Standard"**

Petitioner may appeal the District Court's denial of her § 2255 motion[17], by first obtaining a "Certificate of Appealability"(CoA) [18]. A CoA[19] issues when the applicant makes a substantial showing of the denial of a Constitutional Right:

A "substantial showing of the denial of a constitutional right" requires a demonstration "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were" adequate to deserve encouragement to proceed further." The Supreme Court in Slack[20] [21] wrote:

> [R]easonable jurists could conclude that the District Court's abuse of the writ holding was wrong, for we have determined that a habeas petition filed after an initial petition was dismissed under Rose v. Lundy [22]without an adjudication on the merits [23]

This brief in support of the Petitioner's Application of Appealability argues that the District Court Opinion denial of the writ was made without "an adjudication on the merits"[24].

**GX114 and a Reasonable Jurist**

---

[17] 28 U.S.C. § 2253 (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings. (c)
(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
(B) the final order in a proceeding under section 2255.
(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2). (http://www.law.cornell.edu/uscode/text/28/2253)
[18] Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), the right to appeal the denial of a § 2255 motion is governed by the certificate of appealability requirements of 28 U.S.C. § 2253(c).
[19] 28 U.S.C. § 2253(c)(2)
[20] Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, *below*).
[21] Barefoot v. Estelle, 463 U.S. 880, 893 & n.4 (1983)
[22] Rose v. Lundy - 455 U.S. 509 (1982)
[23] Slack v. McDaniel, 529 U.S. 473, 484 (2000)
[24] ibid

Had a "Reasonable Jurist"[25] [26] been made aware of the contravening of superior rules and law, and the new facts derived from novel analysis of the inculpatory exhibit GX114, they would not have found the Petitioner guilty.

**Would a Reasonable Jurist convict based on all the facts surrounding about the evidence ?**

A "Reasonable Jurist" would find, as the judge contemporaneous observed, the only hard evidence against Karron was 'a mess'.  .  Had the facts pointed out *below*, been brought to the jury at the criminal trial, there would be no misappropriated rent.  Had the contravening superior law been applied as to the base for allowable budget changes been applied there would have been no misappropriation.

The Government auditor (Belinda Riley) correctly reclassified it as payroll to Karron.  The numbers done and can't lie;  The rent is counted twice in GX114, once as salary and again as disallowed rent.

Had a "Reasonable Jurist" been shown that Karron intentionally and willfully contributed almost all of her *bona fide* salary to pay for required co-funding and otherwise disallowed or disallowable costs, no misappropriation of Government funds could have possibly occurred.[27]  For argument pointed below, the constitutional rights of the petitioner were violated and the petitioner is entitled to relief.

## CoA should issue or new re-briefing schedule set

For this and other reasons, Karron's CoA should issue or the clock be reset for both Karron and the Prosecution to re-brief this court.  If the courts

---

[25] BEARD V. BANKS (02-1603) 542 U.S. 406 (2004) 316 F.3d 228," that a reasonable jurist could have drawn a distinction on this basis. Ante, at 8. This approach gives considerable weight to a reasonable jurist's analytical capacity to pick out arguably material differences between sets of facts"

[26] Teague v. Lane, 489 U.S. 288 (1989) (quoted in ibid)

[27] Our argument is easily demonstrated to any reasonable jurist as true with just a little arithmetic, is that the Governments proffered GX114 exhibit audits do not add up and appear partially made up: they include malicious fabrications.  We do not have to delve into the methods used by an expert witness under Federal R. Evidence 702 and Federal R. Evidence 703 ("If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.").  If cursory examination shows the sums don't add up except by inclusion of the Rent as salary, and the rent is repeated twice in the grand column sum, we have met the burden of evidence.  Karron went to prison and is paying restitution on this illegal misappropriated "rent" when it was otherwise reclassified as *bona fide* Payroll.

16

elects for a re-briefing, new deadline schedule must be negotiated at this late date in light of the fast moving events surrounding this investigation and additional ongoing congressional and private investigations into other acts of malfeasance just now emerging coming to light out of the disgraced pair of agents.

## Conclusion

Karrons' Leave for Filing Out of Time should be granted for reason of an acceptable extraordinary circumstance:

This Court should reconsiders its denial of a grant of Certificate of Appealability and reverse its decision because of the doubts cast by new evidence in the late revelation that the Special Agents who made the Prosecutions' case against Karron disgraced themselves with such moral turpitude as to have rendered the pair of verdicts in Karron's cases unreliable.

## Signature

D. B. Karron, *pro se*

Dated: June 1, 2013 in formerly flooded Long Beach, New York

# Appendix

Certificate of Service

# United States Court of Appeals

Daniel B. Karron,
*Petitioner - Appellant*

v.

United States of America,
*Respondent - Appellee.*

CERTIFICATE OF SERVICE
12-2297pr

I, D. B. Karron hereby certify under penalty of perjury that on June 3, 2012, I served a copy of the attached Brief
___ United States Mail
___ Federal Express
___ Overnight Mail
___ Facsimile
_X_ E-mail to Steve.Kwok@usdoj.gov, christian.everdell@usdoj.gov
_X_ Hand delivery
on the following parties

For the United States of America
Katherine Polk Failla, Assistant United States Attorney,
Chi Tsun Steve Kwok, Assistant United States Attorney
United States Attorney's Office, Southern District of New York
1 Saint Andrew's Plaza, Room 844
New York, NY 10007

Signed, August 1, 2012 in Long Beach, New York

/s/_____
D B. Karron,
*pro se*
348 East Fulton Street
Long Beach, NY 11561

19

# Exhibits

# Exhibit 1

Description

# Exhibit 1





## FEDERAL BUREAU OF INVESTIGATION

### Baltimore Division

Home • Baltimore • Press Releases • 2013 • Two Former Special Agents with Department of Commerce-Office of Inspector General Plead Guilty to Submitting False…

# Two Former Special Agents with Department of Commerce-Office of Inspector General Plead Guilty to Submitting False Claims for Relocation Expenses and to Time and Attendance Fraud

**U.S. Attorney's Office**
April 30, 2013

**District of Maryland**
(410) 209-4800

GREENBELT, MD—Two former special agents with the U.S. Department of Commerce, Office of Inspector General, Rachel Ondrik, age 35, of Frederick, Maryland, and Kirk Yamatani, age 38, of Ashburn, Virginia, pleaded guilty today to submitting false claims for relocation expenses. Ondrik and Yamatani resigned their positions with the Department of Commerce on March 29, 2013, as required by their plea agreements.

The guilty plea was announced by United States Attorney for the District of Maryland Rod J. Rosenstein; Special Agent in Charge Stephen E. Vogt of the Federal Bureau of Investigation; and Todd Zinser, Inspector General for the U.S. Department of Commerce (DOC).

"Today's announcement is the result of significant efforts by the U.S. Attorney's Office, the FBI, and my office to hold law enforcement agents accountable for years of criminal misconduct," said Inspector General Todd Zinser of the U.S. Department of Commerce. "In addition to the fraud perpetrated on the U.S. taxpayers, these now former employees also retaliated by carrying out a destructive campaign of disparagement and false allegations against the Office of Inspector General (OIG)." Mr. Zinser added, "I commend the U.S. Attorney's Office and the FBI for their diligent efforts and perseverance in conducting this investigation."

According to their plea agreements, in 2009, Ondrik and Yamatani transferred from the DOC OIG's Atlanta, Georgia office to Washington, D.C. Ondrik and Yamatani were authorized relocation benefits, including a househunting trip, en route travel, and temporary quarters living expenses. E-mails between Ondrik and Yamatani show that both agents were aware of the rules governing their relocations and reimbursements for related expenses, yet both attempted to secure payment from the DOC in amounts significantly exceeding what was authorized and submitted claims for relocation related trips they did not take.

For example, Ondrik and Yamatani claimed $4,058.75 and $3,589, respectively, for househunting trips, when in fact, they did not make a househunting trip during the time claimed. Ondrik and Yamatini each also falsely claimed more than $1,500 for travel to their new duty station and falsely claimed reimbursement for temporary quarters living expenses in an amount that was approximately three times what they were authorized. In all, Ondrik and Yamatani each submitted at least three false vouchers seeking reimbursement for $39,563.25 and $36,305.57, respectively. When Ondrik and Yamatani's claims for reimbursement were denied as being over what the travel regulations allowed, Ondrik and Yamatani persisted in their claims. On several occasions between 2009 and 2011, Ondrik and Yamatani reaffirmed the earlier false statements in their vouchers and made false statements regarding the circumstances of their claims for reimbursement.

Between June 2009 and February 2011, Ondrik and Yamatani also committed time and attendance fraud against DOC-OIG, claiming to have worked hours that they did not actually work. The loss to the government attributable to each defendant's conduct was approximately $14,000.

The defendants and the government have agreed that if the court accepts the plea agreement, Ondrik and Yamatani will each be sentenced to a term of probation and ordered to pay a fine of $28,000. In addition, each defendant will be required to pay $14,000 in restitution to the government. U.S. Magistrate Judge Charles B. Day has scheduled sentencing for June 19, 2013, at 2:30 p.m.

United States Attorney Rod J. Rosenstein praised the FBI and DOC-OIG for their work in the investigation. Mr. Rosenstein thanked Assistant U.S. Attorneys Adam K. Ake and Robert K. Hur, who are prosecuting the case.

**Baltimore Division Links**

**Baltimore Home**

**Contact Us**
- Overview
- Territory/Jurisdiction

**News and Outreach**
- Press Room | Stories
- In Your Community

**About Us**
- Our People & Capabilities
- What We Investigate
- Our Partnerships
- Baltimore History

**Wanted by the FBI - Baltimore**

**FBI Jobs**

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House

FBI.gov is an official site of the U.S. government, U.S. Department of Justice

# Exhibit 2

Description

# Exhibit 2



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 29, 2013

**BY FEDEX**

Daniel B. Karron, Ph.D.
348 East Fulton Street
Long Beach, NY 11561

Re:  **United States v. Daniel B. Karron**
**07 Cr. 541 (RPP)**
**11 Civ. 1874 (RPP)**

Dear Dr. Karron:

   We understand you are not, or are no longer, represented by counsel in the above matters.  We are accordingly addressing this letter to you directly.  You may wish to consult with counsel regarding what significance, if any, the following information may have for the above proceedings.

   Specifically, at the time of your prosecution, Rachel Ondrik and Kirk Yamatani were Special Agents of the United States Department of Commerce, Office of Inspector General. They participated in that capacity in the investigation of your case and assisted us in its prosecution.

   Since that time, on April 30, 2013, Rachel Ondrik and Kirk Yamatani each pled guilty to one count of Government voucher fraud, a Class A misdemeanor, in violation of Title 18, United States Code, Section 1018.  The cases were prosecuted by the United States Attorney's Office for the District of Maryland.  See United States v. Rachel Ondrik, 13 Cr. 148 (CBD) (D. Md.), and United States v. Kirk Yamatani, 13 Cr. 149 (CBD) (D. Md.).  Copies of the charging instruments, plea agreements, and statements of facts are enclosed.

   The Department of Commerce Office of Inspector General ("OIG") and the Federal Bureau of Investigation ("FBI") have advised us that they did not uncover any evidence that the conduct described in the enclosed court documents predated the charged offense period

Daniel B. Karron
May 29, 2013
Page 2

of 2009 through 2011.  Accordingly, no evidence was uncovered that any such conduct affected
the investigation of your case.

Very truly yours,

PREET BHARARA
United States Attorney

By:

Chi T. Steve Kwok
Christian R. Everdell
Assistant United States Attorneys
(212) 637-2415/2556

Enclosures

2

# Exhibit 3

Description

# Exhibit 2

# UNITED STATES COURT OF APPEALS
# FOR THE
# SECOND CIRCUIT
_____

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 29th day of April, two thousand and thirteen.

Before:     Denny Chin,
                 *Circuit Judge*.
_____

Daniel B. Karron,

Petitioner-Appellant,

v.

United States of America,

Respondent-Appellee.

_____

**ORDER**
Docket No. 12-2297

IT IS HEREBY ORDERED that the appellant's motion for an extension of time to file a motion for reconsideration is GRANTED to the following extent: the motion for reconsideration must be filed on or before May 29, 2013.  This is the FINAL extension.

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court



# Exhibit 4

Description

# Exhibit 2

**5PH1**

# FedEx Express

**Package US Airbill**

FedEx Tracking Number: **8029 8786 8054**

Form 0215
ID No. **0215**

## 1 From

Date

Sender's Name _____ Phone _____

Company _____

Address _____
Dept./Floor/Suite/Room

City _____ State _____ ZIP _____

## 2 Your Internal Billing Reference

## 3 To

Recipient's Name _____ Phone _____

Company _____

Address _____
We cannot deliver to P.O. boxes or P.O. ZIP codes.
Dept./Floor/Suite/Room

**HOLD Weekday**
FedEx location address
REQUIRED. NOT available for
FedEx First Overnight.

**HOLD Saturday**
FedEx location address
REQUIRED. Available ONLY for
FedEx Priority Overnight and
FedEx 2Day to select locations.

Address _____
Use this line for the HOLD location address or for continuation of your shipping address.

City _____ State _____ ZIP _____

8029 8786 8054

## 4 Express Package Service          * To most locations.

**Packages up to 150 lbs.**
For packages over 150 lbs, use the
FedEx Express Freight US Airbill.

NOTE: Service order has changed. Please select carefully.

### Next Business Day

☐ FedEx First Overnight
Earliest next business morning delivery to select
locations. Friday shipments will be delivered on
Monday unless SATURDAY Delivery is selected.

☐ FedEx Priority Overnight
Next business morning.* Friday shipments will be
delivered on Monday unless SATURDAY Delivery
is selected.

☒ FedEx Standard Overnight
Next business afternoon.*
Saturday Delivery NOT available.

### 2 or 3 Business Days

☐ FedEx 2Day A.M.
Second business morning.*
Saturday Delivery NOT available.

☐ FedEx 2Day
Second business afternoon.* Thursday shipments
will be delivered on Monday unless SATURDAY
Delivery is selected.

☐ FedEx Express Saver
Third business day.*
Saturday Delivery NOT available.

## 5 Packaging          * Declared value limit $500.

☐ FedEx Envelope*     ☐ FedEx Pak*     ☐ FedEx Box     ☐ FedEx Tube     ☐ Other

## 6 Special Handling and Delivery Signature Options

☐ SATURDAY Delivery
NOT available for FedEx Standard Overnight, FedEx 2Day A.M., or FedEx Express Saver.

☐ No Signature Required
Package may be left without
obtaining a signature for delivery.

☐ Direct Signature
Someone at recipient's address
may sign for delivery. Fee applies.

☐ Indirect Signature
If no one is available at recipient's
address, someone at a neighboring
address may sign for delivery. For
residential deliveries only. Fee applies.

**Does this shipment contain dangerous goods?**

☐ No     ☐ Yes As per attached Shipper's Declaration     ☐ Yes Shipper's Declaration not required     ☐ Dry Ice Dry Ice, 9, UN 1845 _____ kg

Dangerous goods (including dry ice) cannot be shipped in FedEx packaging
or placed in a FedEx Express Drop Box.

☐ Cargo Aircraft Only

## 7 Payment Bill to:

Enter FedEx Acct. No. or Credit Card No. below.

☐ Sender Acct. No. in Section 1 will be billed.     ☐ Recipient     ☐ Third Party     ☐ Credit Card     ☐ Cash/Check

Total Packages _____ Total Weight _____ lbs     Credit Card Auth. _____

*Our liability is limited to US$100 unless you declare a higher value. See the current FedEx Service Guide for details.



**611**

Rev. Date 2/12 • Part #163134 • ©1994–2012 FedEx • PRINTED IN U.S.A. SRS

---



**FedEx**

TRK# [0215] **8029 8786 8054**

**THU – 30 MAY 3:00P**
**STANDARD OVERNIGHT**

RT **537** 9

8054
05.30

C POUA

**11561**
NY-US
**JFK**

FZ

rmps 196943 29MAY13 WTCA 519C1/D777/93A8



June 1,2013

Dear Customer:

The following is the proof-of-delivery for tracking number **802987868054**.

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered to:** | Residence |
| **Signed for by:** | Signature not required | **Delivery location:** | NY |
| **Service type:** | FedEx Standard Overnight | **Delivery date:** | May 30, 2013 11:51 |
| **Special Handling:** | Deliver Weekday | | |
| | Residential Delivery | | |

NO SIGNATURE IS AVAILABLE
FedEx Express proof-of-delivery details appear below; however, no signature is currently available for this shipment.
Please check again later for a signature.

---

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 802987868054 | **Ship date:** | May 29, 2013 |

| | |
|---|---|
| **Recipient:** | **Shipper:** |
| NY US | NEW YORK, NY US |

Thank you for choosing FedEx.



AKA/RKH: USAO 2013R00241

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *    CRIMINAL NO. AW 13 CR 0148 |
| | * |
| RACHEL ONDRIK, | *    **(Submission of False Official Writing,** |
| | *    **18 U.S.C. § 1018)** |
| Defendant | * |
| | * |

\*\*\*\*\*\*\*

## INFORMATION

The United States Attorney for the District of Maryland charges that:

On or about August 20, 2009, in the District of Maryland, the defendant,

### RACHEL ONDRIK,

a public officer of the United States, made and delivered as true a writing containing a statement

she knew to be false, that is, a voucher made and presented to the Department of Commerce's

National Institute of Standards and Technology which contained false information regarding a

house-hunting trip for which she claimed reimbursement.

18 U.S.C. § 1018

Rod J. Rosenstein / AW
United States Attorney

Dated: March 29, 2013

# Exhibit 3

——— FILED          ——— ENTERED
——— LOGGED        ——— RECEIVED

APR 3 0 2013

**U.S. Department of Justice** AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY
DEPUTY

*United States Attorney*
*District of Maryland*
*Southern Division*

---

*Rod J. Rosenstein*
*United States Attorney*

*Adam K. Ake*
*Assistant United States Attorney*

*400 United States Courthouse*
*6500 Cherrywood Lane*
*Greenbelt, MD 20770-1249*

*MAIN: 301-344-4433*
*FAX: 301-344-4516*
*TTY/TDD: 301-344-2426*
*Adam.Ake@usdoj.gov*

March 18, 2013

Thomas Abbenante, Esq.
1919 Pennsylvania Avenue NW
Suite 800
Washington, DC 20006-3402

        Re:    United States v. Rachel Ondrik,
               Crim. No. [to be determined]

Dear Mr. Abbenante:

        This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). This offer is contingent on the Defendant resigning her position with the Department of Commerce and withdrawing any pending administrative complaints she has lodged against the agency or its personnel. If the Defendant accepts this offer, please have her execute it in the spaces provided below. If this offer has not been accepted by March 25, 2013, it will be deemed withdrawn. The terms of the agreement are as follows:

Offense of Conviction

        1.      The Defendant agrees to plead guilty to a criminal information that will charge her with submission of a false official writing by an officer of the United States, in violation of 18 U.S.C. § 1018, a Class A misdemeanor. The Defendant admits that she is, in fact, guilty of that offense and will so advise the Court.

Elements of the Offense

        2.      The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: (1) the defendant, an

Revised 11/5/09

officer of the United States, made and delivered as true a writing; and (2) the defendant knew the writing she submitted contained a false statement.

## Penalties

3.      The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: one year of imprisonment, one year of supervised release, and a fine of up to $100,000. In addition, the Defendant must pay $25 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order her to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1]  If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if she serves a term of imprisonment, is released on supervised release, and then violates the conditions of her supervised release, her supervised release could be revoked–even on the last day of the term—and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.      The defendant understands that by entering into this agreement, she surrenders certain rights as outlined below:

a.      If the defendant had persisted in her plea of not guilty, she would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the defendant, this Office, and the Court all agreed.

b.      If the defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the defendant could be found guilty of any count. The jury would be instructed that the defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the defendant went to trial, the government would have the burden of proving the defendant guilty beyond a reasonable doubt. The defendant would have the right to confront and cross-examine the government's witnesses. The defendant would not have to present any defense witnesses or evidence whatsoever. If the defendant wanted to call witnesses in her

---

[1]      Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

defense, however, she would have the subpoena power of the Court to compel the witnesses to attend.

       d.     The defendant would have the right to testify in her own defense if she so chose, and she would have the right to refuse to testify. If she chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from her decision not to testify.

       e.     If the defendant were found guilty after a trial, she would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against her. By pleading guilty, the defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

       f.     By pleading guilty, the defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the defendant understands that she may have to answer the Court's questions both about the rights she is giving up and about the facts of her case. Any statements the defendant makes during such a hearing would not be admissible against her during a trial except in a criminal proceeding for perjury or false statement.

       g.     If the Court accepts the defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find her guilty.

       h.     By pleading guilty, the defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The defendant recognizes that if she is not a citizen of the United States, pleading guilty may have consequences with respect to her immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including her attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that she wants to plead guilty regardless of any potential immigration consequences.

<u>Advisory Sentencing Guidelines Apply</u>

       5.     The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.      This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

        a.      The base offense level is 6, pursuant to U.S.S.G. § 2B1.1(a)(2).

        b.      A 4-level upward adjustment applies because the offense involved a loss that exceeded $10,000 but did not exceed $30,000, pursuant to § 2B1.1(b)(1)(C).

        c.      A 2-level upward adjustment applies, pursuant to U.S.S.G. § 3C1.1, because the Defendant obstructed or impeded the administration of justice. The adjusted offense level is 12.

        d.      This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for her criminal conduct. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about her involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw her plea of guilty. The final offense level is 10.

7.      The Defendant understands that there is no agreement as to her criminal history or criminal history category, and that her criminal history could alter her offense level if she is a career offender or if the instant offense was a part of a pattern of criminal conduct from which she derived a substantial portion of her income.

8.      This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range and application of the 18 U.S.C. § 3553(a) factors, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines or in 18 U.S.C. § 3553(a) will be raised or are in dispute. If the Defendant wishes to argue for any factor that could take the sentence outside of the advisory guidelines range, she will notify the Court, the United States Probation Officer and government counsel at least ten days in advance of sentencing of the facts or issues she intends to raise.

## Obligations of the Parties

9.      At the time of sentencing, this Office and the Defendant will jointly recommend a sentence of probation and a fine of **$28,000** as the appropriate punishment in this case.

4

10.     The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

11.     This Office agrees not to pursue any civil claims against the Defendant so long as the Defendant fully satisfies the financial aspects of the judgment imposed by the Court at sentencing. Should the Court not order immediate payment of the restitution and fine imposed in this case, the parties agree to recommend a payment schedule that will result in full payment within the term of probation imposed by the Court. The Defendant understands that failure to make full payment within the probation term will constitute a violation of probation and may result in additional penalties.

### Restitution

12.     The Defendant agrees to the entry of a Restitution Order for the full amount of the Government's losses, which the parties agree is **$14,000**. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that she will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

### Collection of Financial Obligations

13.     The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court.

14.     In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

15.     The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

5

## Waiver of Appeal

16.    In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a.    The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

b.    The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: (I) the Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds the maximum term of imprisonment provided for by offense level **10**; (ii) and this Office reserves the right to appeal any term of imprisonment to the extent that it is below the range of imprisonment provided for by offense level **10**.

c.    Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d.    The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

17.    The Defendant agrees that she will not commit any offense in violation of federal, state or local law between the date of this agreement and her sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for her conduct by failing to acknowledge her guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that she may not withdraw her guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

6

## Court Not a Party

18.     The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw her guilty plea, and will remain bound to fulfill all of her obligations under this agreement. The Defendant understands that neither the prosecutor, her counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

19.     This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____
Adam K. Ake
Robert K. Hur
Assistant United States Attorneys

7

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

_4 - 30 - 13_
Date

Rachel Ondrik

I am Rachel Ondrik's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with her. she advises me that she understands and accepts its terms. To my knowledge, her decision to enter into this agreement is an informed and voluntary one.

_4 - 13 - 13_
Date

Thomas Abbenante, Esq.

8

FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

APR 3 0 2013

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____ DEPUTY

## ATTACHMENT A - STATEMENT OF FACTS: RACHEL ONDRIK

*The United States and the Defendant agree that if this case proceeded to trial, the United States would prove the following facts below beyond a reasonable doubt. They agree that these are not all of the facts that would be proved if this case proceeded to trial.*

Defendant **RACHEL ONDRIK ("ONDRIK")** was a Special Agent of the United States Department of Commerce ("DOC"), Office of the Inspector General ("OIG"). In this role, she was covered by the United States Office of Personnel Management's series 1811, which sets forth requirements for positions that supervise, lead, or perform work involving the planning, conducting, or managing of investigations related to violations of federal criminal laws. Work in this series requires knowledge of criminal investigative techniques, rules of criminal procedures, laws, and precedent court decisions concerning the admissibility of evidence, constitutional rights, search and seizure, and related issues in the conduct of investigations.

**ONDRIK's** first duty station was in Washington, D.C. In 2007, she transferred to the DOC OIG office in Atlanta, Georgia. In 2009, she returned to Washington, D.C. where she continued to work for DOC OIG. During and after this change of station from Georgia to Washington, D.C., **ONDRIK** defrauded and attempted to defraud the United States and the DOC by submitting false writings and making material misrepresentations to the DOC while seeking reimbursement for relocation expenses. **ONDRIK** submitted these false writings to National Institute of Standards and Technology ("NIST") Office of Financial Resource Management, a division of the DOC located in Gaithersburg, Maryland, which processed DOC OIG's travel claims.

On or after July 7, 2009, **ONDRIK** applied for and was granted relocation benefits from the DOC because her transfer from Atlanta to Washington, D.C. was determined to be in the government's interest. **ONDRIK's** authorized relocation benefits included reimbursement for a househunting trip, *en route* travel, and temporary quarters subsistence expenses ("TQSE"). Approval of these reimbursements was contingent on **ONDRIK's** adherence to the Federal Travel Regulation.

Contemporaneous e-mail communications between **ONDRIK** and **Kirk Yamatani**, a fellow DOC OIG agent also relocating from Atlanta to Washington at the same time, show that both agents were aware of the rules and regulations governing their relocations and reimbursements for related expenses, yet both **ONDRIK** and **Yamatani** nevertheless attempted to secure payment from the DOC in amounts exceeding that authorized by the governing regulations. For example, in an e-mail exchange on May 6, 2009, **Yamatani** and **ONDRIK** agreed that the Federal Travel Regulation permitted a certain method of reimbursement, known as the "fixed rate" method, for a period of time limited to 30 days, with no extensions permitted. Although **Yamatani** and **ONDRIK** agreed that their supervisors at OIG were unaware of the temporal limitation on this entitlement, they agreed to conceal these limitations from DOC OIG and to seek reimbursements in excess of what the regulation authorized.

1

Further, on or about August 20, 2009, **ONDRIK** knowingly submitted a false travel voucher seeking reimbursement for a ten-day househunting trip she claimed that she and her husband took to the Washington, D.C. area between July 22 and July 31, 2009.  On the voucher, **ONDRIK** claimed that they departed their Acworth, Georgia, home on the morning of July 22, 2009, drove their personal vehicle to Rockville, Maryland, and then later returned by car to Georgia on July 31, 2009.  In the voucher for this househunting trip, **ONDRIK** claimed reimbursement for various expenses, such as lodging, meals, mileage.  In fact, **ONDRIK** did not make a househunting trip during this period, nor did the actual househunting trip she took earlier in July last ten days, nor did she incur the claimed expenses.  **ONDRIK** nonetheless knowingly submitted the voucher containing that false statement to DOC OIG and NIST claiming reimbursement of $4058.75.

On or about August 10, 2009, **ONDRIK** submitted false travel vouchers seeking reimbursement of $1,531 for her official en route travel to her new duty station, and on or about September 26, 2009, **ONDRIK** submitted a false TQSE voucher claiming $33,973.50 in expenses, more than $20,000 over what the Federal Travel Regulation allowed.  In **ONDRIK's** en route voucher, she claimed that she and her family departed their Georgia home on August 5, 2009 at 8:00 am and drove their personal vehicle to Roanoke, Virginia, where they spent the night.  **ONDRIK** then claimed to have driven the rest of the trip to Clarksburg, Maryland, the following day.  On her voucher, **ONDRIK** claimed reimbursement for meals, hotel, mileage, and "miscellaneous expenses." In fact, **ONDRIK** and her family had traveled to Maryland on July 28, 2009, during the period she claimed they were househunting, and did not return to Georgia as her vouchers falsely claimed. **ONDRIK** was aware that both vouchers contained false information when she completed them and submitted them to DOC OIG and NIST.  Altogether, **ONDRIK** submitted at least three false vouchers seeking reimbursement from the United States for $39,563.25.

When a NIST examiner reviewed **ONDRIK's** TQSE voucher, she realized the amount claimed was far in excess of **ONDRIK's** actual entitlements under the Federal Travel Regulation, denied it, and instead paid only the $10,815 to which **ONDRIK** was entitled.  **ONDRIK**, however, persisted in her claim for reimbursement in the higher amount, despite the fact that she knew that her claim exceeded the 30 day period authorized by regulations.  On several occasions between 2009 and 2011, **ONDRIK** reaffirmed the earlier false statements in her vouchers and made false statements regarding the circumstances of her claims for reimbursement, which constituted obstructive conduct.

Between June 2009 and February 2011, **ONDRIK** further committed several instances of time and attendance fraud against her agency. The actual loss to the United States that was the direct and proximate result of **ONDRIK**'s knowing and intentional conduct was approximately $14,000.

I have read this statement of facts, and have carefully reviewed it with my attorney. I acknowledge that it is true and correct.

_4-30-13_
Date

_Rachel Ondrik_

I am Rachel Ondrik's attorney.   I have carefully reviewed the statement of facts with her.

_4-30 73_
Date

_Thomas Abbenante, Esq._

3

# Exhibit 3


AKA/RKH: USAO 2012R00039

FILED
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

'13 MAR 29  P 12 18

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *   CRIMINAL NO. **AW 13 CR 0 1 4** |
| | * |
| KIRK YAMATANI, | *   (Submission of False Official Writing, |
| | *   18 U.S.C. § 1018) |
| Defendant | * |
| | * |

\*\*\*\*\*\*\*

## INFORMATION

The United States Attorney for the District of Maryland charges that:

On or about June 10, 2009, in the District of Maryland, the defendant,

### KIRK YAMATANI,

a public officer of the United States, made and delivered as true a writing containing a statement

he knew to be false, that is, a voucher made and presented to the Department of Commerce's

National Institute of Standards and Technology which contained false information regarding a

house-hunting trip for which he claimed reimbursement.

18 U.S.C. § 1018

Rod J. Rosenstein
United States Attorney

Dated: March 29, 2013

APR 3 0 2013



**U.S. Department of Justice**  CLERK, U.S. DISTRICT COURT
AT GREENBELT
DISTRICT OF MARYLAND

BY _____ DEPUTY

*United States Attorney*
*District of Maryland*
*Southern Division*

---

*Rod J. Rosenstein*
*United States Attorney*

*Adam K. Ake*
*Assistant United States Attorney*

*400 United States Courthouse*
*6500 Cherrywood Lane*
*Greenbelt, MD 20770-1249*

*MAIN: 301-344-4433*
*FAX: 301-344-4516*
*TTY/TDD: 301-344-2426*
*Adam.Ake@usdoj.gov*

March 18, 2013

Steven H. Levin, Esq.
Levin & Curlett LLC
250 W. Pratt Street
Suite 1300
Baltimore, Maryland 21201

   Re: United States v. Kirk Yamatani,
     <u>Crim. No. [to be determined]</u>

Dear Mr. Levin:

  This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). This offer is contingent on the Defendant resigning his position with the Department of Commerce and withdrawing any pending administrative complaints he has lodged against the agency or its personnel. If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by March 25, 2013, it will be deemed withdrawn. The terms of the agreement are as follows:

<u>Offense of Conviction</u>

  1. The Defendant agrees to plead guilty to a criminal information that will charge him with submission of a false official writing by an officer of the United States, in violation of 18 U.S.C. § 1018, a Class A misdemeanor. The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court.

<u>Elements of the Offense</u>

  2. The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: (1) the defendant, an

Revised 11/5/09

officer of the United States, made and delivered as true a writing; and (2) the defendant knew the writing he submitted contained a false statement.

## Penalties

3.    The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: one year of imprisonment, one year of supervised release, and a fine of up to $100,000. In addition, the Defendant must pay $25 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked—even on the last day of the term—and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.    The defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.    If the defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the defendant, this Office, and the Court all agreed.

b.    If the defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the defendant could be found guilty of any count. The jury would be instructed that the defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.    If the defendant went to trial, the government would have the burden of proving the defendant guilty beyond a reasonable doubt. The defendant would have the right to confront and cross-examine the government's witnesses. The defendant would not have to present

---

[1]    Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

2

any defense witnesses or evidence whatsoever. If the defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d.     The defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e.     If the defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.     By pleading guilty, the defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g.     If the Court accepts the defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h.     By pleading guilty, the defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

5.     The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.    This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

      a.    The base offense level is **6**, pursuant to U.S.S.G. § 2B1.1(a)(2).

      b.    A **4**-level upward adjustment applies because the offense involved a loss that exceeded $10,000 but did not exceed $30,000, pursuant to § 2B1.1(b)(1)(C).

      c.    A **2**-level upward adjustment applies, pursuant to U.S.S.G. § 3C1.1, because the Defendant obstructed or impeded the administration of justice. The adjusted offense level is **12**.

      d.    This Office does not oppose a **2**-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty. The final offense level is **10**.

7.    The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8.    This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range and application of the 18 U.S.C. § 3553(a) factors, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines or in 18 U.S.C. § 3553(a) will be raised or are in dispute. If the Defendant wishes to argue for any factor that could take the sentence outside of the advisory guidelines range, he will notify the Court, the United States Probation Officer and government counsel at least ten days in advance of sentencing of the facts or issues he intends to raise.

## Obligations of the Parties

9.    At the time of sentencing, this Office and the Defendant will jointly recommend a sentence of probation and a fine of **$28,000** as the appropriate punishment in this case.

4

10.    The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

11.    This Office agrees not to pursue any civil claims against the Defendant so long as the Defendant fully satisfies the financial aspects of the judgment imposed by the Court at sentencing. Should the Court not order immediate payment of the restitution and fine imposed in this case, the parties agree to recommend a payment schedule that will result in full payment within the term of probation imposed by the Court. The Defendant understands that failure to make full payment within the probation term will constitute a violation of probation and may result in additional penalties.

Restitution

12.    The Defendant agrees to the entry of a Restitution Order for the full amount of the Government's losses, which the parties agree is **$14,000**. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

Collection of Financial Obligations

13.    The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court.

14.    In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

15.    The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

### Waiver of Appeal

16.    In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a.    The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

b.    The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: (I) the Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds the maximum term of imprisonment provided for by offense level **10**; (ii) and this Office reserves the right to appeal any term of imprisonment to the extent that it is below the range of imprisonment provided for by offense level **10**.

c.    Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d.    The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Obstruction or Other Violations of Law

17.    The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

### Court Not a Party

18.    The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

19.    This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By:_____

Adam K. Ake
Robert K. Hur
Assistant United States Attorneys

7

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

4/30/13
Date

Kirk Yamatani

I am Kirk Yamatani's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

30 Apl 2013
Date

Steve Levin, Esq.

8

_____ ENTERED
_____ LOGGED    _____ RECEIVED

APR 3 0 2013

CLERK, U.S. DISTRICT COURT    AT GREENBELT
DISTRICT OF MARYLAND

DEPUTY

## ATTACHMENT A - STATEMENT OF FACTS: KIRK YAMATANI

*The United States and the Defendant agree that if this case proceeded to trial, the United States would prove the following facts below beyond a reasonable doubt. They agree that these are not all of the facts that would be proved if this case proceeded to trial.*

Defendant **KIRK YAMATANI ("YAMATANI")** was a Special Agent of the United States Department of Commerce ("DOC"), Office of the Inspector General ("OIG"), from August 1998 through February 2013. In this role, he was covered by the United States Office of Personnel Management's series 1811, which sets forth requirements for positions that supervise, lead, or perform work involving the planning, conducting, or managing of investigations related to violations of federal criminal laws.   Work in this series requires knowledge of criminal investigative techniques, rules of criminal procedures, laws, and precedent court decisions concerning the admissibility of evidence, constitutional rights, search and seizure, and related issues in the conduct of investigations.

**YAMATANI**'s first duty station was in Washington, D.C.  In 2006, he transferred to the DOC OIG office in Atlanta, Georgia.  In 2009, he returned to Washington, D.C. where he continued to work for DOC OIG.  During and after this change of station from Georgia to Washington, D.C., **YAMATANI** defrauded and attempted to defraud the United States and the DOC by submitting false writings and making material misrepresentations to the DOC while seeking reimbursement for relocation expenses. **YAMATANI** submitted these false writings to National Institute of Standards and Technology ("NIST") Office of Financial Resource Management, a division of the DOC located in Gaithersburg, Maryland, which processed DOC OIG's travel claims.

On or about May 1, 2009, **YAMATANI** applied for and was granted relocation benefits from the DOC because his transfer from Atlanta to Washington, D.C. was determined to be in the government's interest. **YAMATANI**'s authorized relocation benefits included reimbursement for a househunting trip, *en route* travel, and temporary quarters subsistence expenses ("TQSE"). Approval of these reimbursements was contingent on **YAMATANI**'s adherence to the Federal Travel Regulation.

Contemporaneous e-mail communications between **YAMATANI** and **Rachel Ondrik,** a fellow DOC OIG agent also relocating from Atlanta to Washington at the same time, show that both agents were aware of the rules and regulations governing their relocations and reimbursements for related expenses, yet both **YAMATANI** and **Ondrik** nevertheless attempted to secure payment from the DOC in amounts exceeding that authorized by the governing regulations.  For example, in an e-mail exchange on May 6, 2009, **YAMATANI** and **Ondrik** agreed that the Federal Travel Regulation permitted a certain method of reimbursement, known as the "fixed rate" method, for a period of time limited to 30 days, with no extensions permitted.  Although **YAMATANI** and **Ondrik** agreed that their supervisors at OIG were unaware of the temporal limitation on this entitlement, **YAMATANI** and **Ondrik** agreed to conceal these limitations from DOC OIG and to seek reimbursements in excess of what the regulation authorized.

1

Further, on or about June 10, 2009, **YAMATANI** knowingly submitted a false travel voucher seeking reimbursement of $3,589 for a ten-day househunting trip he claimed for and his wife took to the Washington, D.C. area. On the voucher, **YAMATANI** claimed that they departed their Georgia home on the morning of May 28, 2009, drove their personal vehicle to Ashburn, Virginia, and then later returned by car to Georgia on June 6, 2009. In the voucher for this househunting trip, **YAMATANI** claimed reimbursement for various expenses, such as lodging, meals, mileage, and "parking, tolls, etc." In fact, **YAMATANI** did not make a househunting trip during this period, nor did the actual househunting trip he took last ten days, nor did he incur the claimed expenses. **YAMATANI** nonetheless knowingly submitted the voucher containing that false statement to DOC OIG and NIST.

On or about June 10, 2009, **YAMATANI** submitted false travel vouchers seeking reimbursement of $1,531 for his official en route travel to his new duty station, and on or about July 27, 2009, **YAMATANI** submitted a false TQSE voucher. **YAMATANI**'s en route voucher claimed that he and his family departed their Georgia home on June 7, 2009 at 12:00 p.m. and drove their personal vehicle to Ashburn, Virginia, arriving at 10:00 p.m. On his voucher, **YAMATANI** claimed reimbursement for mileage, "other travel," and "miscellaneous expenses." **YAMATANI** was aware that both vouchers contained false information when he completed them and submitted them to DOC OIG and NIST. Altogether, **YAMATANI** submitted at least three false vouchers seeking reimbursement from the United States for $36,305.57.

When NIST personnel discovered that initial payments made on **YAMATANI**'s vouchers were in excess of his actual entitlements under the Federal Travel Regulation, NIST denied them and began recouping overpayments. **YAMATANI**, however, persisted in his claims for reimbursement, despite the fact that he knew that all three vouchers contained false information. On several occasions from 2009 to 2011, **YAMATANI** reaffirmed the earlier false statements in his vouchers and made false statements regarding the circumstances of his claims for reimbursement, which constituted obstructive conduct.

Between June 2009 and February 2011, **YAMATANI** further committed several instances of time and attendance fraud against his agency. The actual loss to the United States that was the direct and proximate result of **YAMATANI**'s knowing and intentional conduct was approximately $14,000.

I have read this statement of facts, and have carefully reviewed it with my attorney. I acknowledge that it is true and correct.

_4/30/13_
Date

_____
Kirk Yamatani

I am Kirk Yamatani's attorney. I have carefully reviewed the statement of facts with him.

_30 Apr 2013_
Date

_____
Steven Levin, Esq.

2

# Exhibit 3

# Exhibit 4

Page 1 of 2

# AFFIDAVIT

STATE OF _NJ_

COUNTY OF _Mercer_

I, _Lee Goldberg_, being duly sworn, hereby make the following affidavit to KIRK M. YAMATANI, who has identified himself to me as a Special Agent with the U.S. Department of Commerce, Office of Inspector General, Office of Investigations.

I leant Dan Karron money as a normal matter of course as a part of a 30+ year friendship. The most recent occasions were $10,000 in 1996 and $10,000 in 1999. Dr. Karron made dilligent efforts to repay both loans, with the first one being paid off sometime before 1999 and had made a significant dent in the second loan. ~~I think the pay ~~ ~~went started~~ the payments were sporadic ~~The above sta~~ as Dr. Karron had the cash to make payments. This was a loan I made to Dr. Karron to help his business going.

I'd like to add that ~~both~~ in my 30+ years of knowing Dan, he has been one of the most honest people I know and that any misappropriation of government funds is, in my judgement, a matter of inexperience or lack of business expertise rather than deliberate deception or malice.

Affiant's Initials

Ex Libris Dr. Karron

Page 2 of 2

I have read the foregoing affidavit consisting of _2_ pages. I fully understand this affidavit and it is true, correct, and complete to the best of my knowledge and belief. I have initialed all the corrections and placed my initials at the bottom of each foregoing page.

I have made this affidavit freely and voluntarily, without any threats or rewards, or promises of reward having been made to me in return for it.

_____
Signature

Subscribed and sworn to before me this 25th day of _October_ 2004 at

_Princeton, New Jersey_

    _____
        Kirk M. Yamatani
        Special Agent

_____
    Rachel Garrison
    Special Agent

Affiant's Initials

Ex Libris Dr. Karron

# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL B. KARRON

      Petitioner,

-V.-

UNITED STATES OF AMERICA

      Respondent.

11-civ-1874 (RPP)
07-cr - 541 (RPP)

DECLARATION OF
LEE H GOLDBERG

STATE OF NEW YORK
COUNTY OF NEW YORK
SOUTHERN DISTRICT OF NEW YORK:

LEE H. GOLDBERG, pursuant to Title 28, United States Code, Section 1746[1], hereby declares under

penalty of perjury the following:

---

[1] **United States Code** § 1746. Unsworn declarations under penalty of perjury

Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

**(1)** If executed without the United States:[not applicable here]".

**(2)** If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)"

THE VISIT BY THE O. I. G. SPECIAL AGENTS


1.     On 25 October 2004, I was visited by three well dressed federal Special Agents.  I have since come to learn their names were Kirk M. Yamatani and Rachel Garrison, now known as Rachel Ondrik, along with at least one other special agent(s) at my home in 202 Mather Avenue, West Windsor, New Jersey.

2.     They arrived around 2:00 and left just before 3:00

3.     I noticed that the agents had positioned themselves around my door in a strategic fashion.  They were arrayed about my door in a manner that brought to mind tactics that police use when approaching a potentially armed and dangerous situation or subject.

4.     Among other things, the two agents furthest from my door appeared to be in a hands-ready stance that would allow them to quickly draw weapons.

5.     I noticed the agent's posture because I have several friends and acquaintances within the law enforcement community. In addition, I am a trained first responder and member of the Community Emergency Response Team (CERT) in West Windsor, New Jersey.

6.     Due to the aforementioned relationships and the exposure I've had during my activities with CERT, I am somewhat familiar with the hands-ready techniques used by military and law enforcement personnel.

7.     While my experience these matters is limited, the agents' stance, with relaxed shoulders and hands placed forward and close to the waist, gave every indication to me that they were in a hands-ready posture and prepared to draw weapons if needed.

8.     I do not know if the bulges I thought I saw on their clothing were real or just artifacts of my imagination coupled with my knowledge that active duty federal special agents are usually armed.

9.     They identified themselves as Department of Commerce Special Agents who wanted to ask some questions with regard to a criminal investigation of Dan Karron.

10.     I felt there must be a misunderstanding.

11.     I thought I could defuse the high tension inherent in having several potentially armed police agents arrayed in an assault formation at my door.

12.     I invited the special agent team into my home.

13.     I made tea for my guests with the intent of reducing tension and correcting any misunderstandings they held by providing them with whatever information that I could offer.

14.     I did this on the assumption that it could help put their concerns about Dr. Karron to rest.

15.     My assumption, in retrospect, was wrong.

THE INTERROGATION

16.    The agents questioned me at length about my relationship with Dr. Karron.

17.    They specifically asked about the nature of my relationship with Dr. Karron's and Dr. Karron's change in gender.

18.    At multiple times during the interrogation Mr. Yamatani asked me why I loaned Dr. Karron money.

19.    I repeatedly explained that we were friends from Jr. High School and that we had helped each other out many times over the years.

20.    They agents seemed unsatisfied with my answer.

21.    The agents pressed for more details.

22.    I did not feel there that there were any issues to hide.

INAPPROPRIATE QUESTIONS DURING INTERROGATION

23.    A question about any possible romantic involvement came from one of the two males (I think it was the non-Asian one) who accompanied Ms. Garrison.

24.    He specifically asked me if I'd had any romantic involvement with Karron.

25.    The agent asked me if I had sex with Dr. Karron.

26.    Ms. Garrison then asked me if I paid to have sex with Dr. Karron.

27.    I was surprised and confused at the insinuation of impropriety on my part or Dr. Karrons' part.

28.    I did not understand what this line of questioning had to do with their investigation.

29.    While I do not recall the exact words, but the male agent specifically implied that, my alleged romantic activities could have been with Dr. Karron in either of his/her two genders.

30.     I repeatedly answered to the effect that I had not been involved romantically with Dr. Karron at any time.

31.     I found this repeated line of questioning bizarre and unsettling.

32.     Their focus on this aspect of the case gave me the impression that they had an untoward interest in Dr. Karrons' sexuality and / or sexual preferences.

33.     I did not understand what it had to do with the criminal investigation and asked why they wanted to know this.

34.     They said that my loaning you these large sums of money with such loose conditions caused them to wonder how deep our relationship went.

## DISSATISFACATION WITH MY ANSWERS

35.     At some point after continuing to not accept my answers, Mr. Yamatani (the male Asian agent) asked me if I was paying for sex with Dr. Karron, or if Dr. Karron was paying to have sex with me.

36.     I clearly remember Mr. Yamatanis' sarcastic comment:

    i.   "Gee, I sure wish I had a friend like you."

37.     The tone and wording of Mr. Yamatani's response clearly indicated to me that he did not believe or like my answer.

38.     He then asked if I could be his friend (I do not remember the exact wording).

39.     I explained that I only had a few friends I trusted like that and it usually took 10 or 20 years before someone I knew earned that level of trust.

40.     In an attempt to further clarify the matter, I explained that over the course of my life I had made a few close and trusted friends and that we helped each other out from time to time in monetary and non-monetary ways.

    i.   In this context, I'd loaned significant sums of money to some members of my inner circle, mostly for the purpose of supporting their businesses.

    ii.  I also explained that these loans were almost always repaid in a timely manner.

    iii.  I shared a few stories about how my friends had helped me.

    iv.  I then re-iterated my previously-statement that I loaned money to Dr. Karron to help an old friend launch his business.

41.    The other special agents also seemed unsatisfied with that answer.

42.    They did not seem to accept my answer that I gave the money to Karron because (then he) asked me, and I believed in him and his business, and that he had paid me back when he was working.

43.    It was my impression that they wanted me to admit to reasons (a sexual *quid pro quo)* that I knew were not true.

44.    I hand wrote a statement and gave it to them.

45.    That affidavit I wrote on that day is attached as Exhibit 1

46.    I also gave the agents my records of the loans I made to Karron and Karrons' repayments to me.

47.    I re-affirm my statements made in 2004 again in 2011, under penalty of law.


SUBTLE COERCION

48.    While the agents did not overtly threaten myself, their tone and choice of words clearly indicated that were and unhappy with my answers.

49.    At the conclusion of the interrogation, they asked me to write up an affidavit.

50.    They indicated that if I did not submit it, I would probably called to their offices to testify and that there might be other, unspecified consequences.

51.    I was uncomfortable in their presence because

    b.   they were unhappy with my answers,

    c.   asked repeatedly about any romantic involvement with Dr. Karron, and

    d.   kept implying that I might be implicated if I did not cooperate.

52.    My impression was that they wanted the answers they wanted, not the truth.

## MY REQUEST FOR RETURN OF DOCUMENTS

53.    On November 16, 2004 and after the interrogation, I e-mailed Rachel Garrison (now known as Rachel Ondrik).

54.    In that e-mail I requested the original documents back and a copy of my affidavit for my records.

55.    A copy of that e-mail is attached as Exhibit 4

56.    November 17, I received back my original documents and a copy of my affidavit, attached here as Exhibit 1.

57.    Soon after the agents departed, I called Dr. Karron informing him of the interview.

58.    I wrote an e-mail to Dr. Karron memorializing the conversation with the Special Agents and the gender/sexual issues they raised.

59.    A copy of that email is attached as Exhibit 3.

## MY RELATIONSHIP WITH CASI AND DR. KARRON

60.    Although I never requested it, I was granted a one percentage ownership in CASI.

    i.    At the time, I was told it was an acknowledgement for my support of the company during its inception.

    ii.      As my testimony at Dr. Karron's trial indicates, my only involvement with CASI was occasionally reviewing proposals and technical documents and providing occasional technical consultation.

    iii.     All this was done on a pro-bono basis much as Dr. Karron had provided me with technical assistance in my own work.

    iv.     Although I was a minor shareholder, I never attended any internal l business meetings nor was I directly involved in any of CASI's day-to-day operations.

## SPECIAL AGENT ONDRIK DECLARATION OMITS MY EXCULPATORY AFFIDAVIT

61.    I most recently reviewed a copy of Special Agents Ondrik's Declaration provided to me by Dr. Karron.

62.    A copy that Declaration which is attached as Exhibit 2.

63.    My affidavit (Exhibit 1, submitted to Garrison/Ondrik), to the best of my knowledge, was not submitted by the Prosecution to the Karron defense lawyers prior to or at trial.

64.    I firmly believe that Mr. Rubinstein, Karron's defense counsel, would have asked me questions about the document had he been made aware of my affidavit and made it part of my direct examination as a witness at the trial.

65.    I was unaware of the Governments obligation to submit any exculpatory evidence in their possession prior to trial and prior calling witnesses during the trial.

66.    I did testify for the defense at Dr. Karrons' trial.

67.    I do not recall any specific conversation where I talked to Rubenstein about the above OIG agent's visit.

68.     I do not recall briefing Rubinstein about my old OIG affidavit.

69.    A copy of my trial testimony is included in Exhibit 5

70.    Therefore, I must conclude that Rubinstein and the Karron defense were unaware of its existence.

## SUPRESSION AND FUMBLEING OF EXCULPATORY ACCOUNTING

71.    I was present at several meetings with Dr. Karron's lawyer Mr. Rubenstein, and Mr. Spitz, Dr. Karron's forensic accountant.  Also present was Deborah Dunleavy, Dr. Karron's bookkeeper.  During these meetings we compared the accounting evidence being presented by the OIG and the independent forensic compilations prepared by Dunleavy and Spitz.

72.    These working sessions and conversations led me to conclude

v.    The accounting facts under discussion clearly proved that that the prosecution's evidence was factually tainted, and

vi.    that it appeared to have been deliberately misinterpreted by the prosecution.

vii.    If the misinterpretation was deliberate,

a.    the only reasonable motivation for deliberate suppression of the fact that almost all of monies received by Karron as salary / rent were used for the NIST grant were actually spent on program activities is prejudice against Dr. Karron.

## MY BELIEF IN DR KARRON AND THE PREJUDICE EXHIBITED BY THE GOVERNMENT

73.    I have since contributed more than $15,000 to the Karron defense fund for Mr. Rubinstein and on behalf of Dr. Karron, subsequent to the collapse of the CASI grant and over and above my loans to CASI.

74.    This is more than I ever loaned CASI and Dr. Karron.

75.    I believe, based on my personal experience with the Department of Commerce Special Agents,  that some of the Department of Commerce's motivation for its prosecution of Dr. Karron is because she is a Transsexual, and not because of any wrongdoing on her part.

76.    I have personally observed this prejudice in the Special Agents.

77. This prejudice resulted in

    e. an investigation which produced inaccurate and untruthful evidence

    f. that was presented at her trial and

    g. which resulted in the miscarriage of justice that is the conviction of Dr. Karron.

78. The failure of the of the Government to turn over **my** exculpatory evidence at trial is direct evidence of this prejudice.

INEFFECTIVE ASSISTANCE OF MR. RUBINSTEIN as DEFENSE COUNSEL

79. I believe that Dr. Karron's lawyer, Mr. Ron Rubenstein, was insufficiently knowledgeable about the accounting practices and regulatory statutes related to the case and therefore did not provide effective assistance in her defense.

80. In my observations of, and in my many conversations with Mr. Rubinstein, Ron seemed to devote nearly as much energy and concern regarding raising funds and getting paid for his work as for defending Dr. Karron.

81. A significant part of time I spent with Mr. Rubenstein involved discussing various aspects of getting more money from me and Dr. Karron's family.

82. I attended meetings with Mr. Rubinstein and Mr. Spitz and Ms. Dunlevy, for the purpose of obtaining their expert testimony on Karron's handleing of her own and the ATP funds.

83. These negotiations broke down because Mr. Rubinstein would not commit to funding these experts.

84. I can only surmise that this was because Mr. Rubinstein was not certain of his own funding from the Karron family.

    a. Mr. Rubinstein was clearly conflicted in his defense of his client, Dr. Karron.

    b. At that point the government had already seized

      i.       all of Dr. Karron's property and

      ii.      the computer equipment which contained all the  records relevant to his defense.

      iii.     Dr. Karron was broke, unemployed, and without funds.

## WHO I AM

85.    I am an electrical engineer and a technical journalist.

86.    I have known Dr. Karron since I was in the 9th grade, sometime around 1968, when we went to Sands Point Academy, a small private school on the North Shore of Long Island.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 12, 2011
West Windsor  NJ

_____

Lee H. Goldberg

# EXHIBIT
# 1

11/19/2004 21:37:59

Page 1 of 2

**AFFIDAVIT**

STATE OF __NJ__

COUNTY OF __Mercer__

I, __Lee Goldberg__, being duly sworn, hereby make the following affidavit to KIRK M. YAMATANI, who has identified himself to me as a Special Agent with the U.S. Department of Commerce, Office of Inspector General, Office of Investigations.

I leant Dan Karron money as a normal matter of course as a part of a 30+ year friendship. The most recent occasions were $10,000 in 1996 and $10,000 in 1999. Dr Karron made dilligent efforts to repay both loans, with the first one being paid off sometime before 1999 and had made a significant dent in the second loan. ~~I think the pay ner B started~~ the payments were sporadic ~~the above sta L y~~ as Dr Karron had the cash to make payments. This was a loan I made to Dr Karron to help his business going. ~~....~~

I'd like to add that ~~teh~~ in my 30+ years of knowing Dan, he has been one of the most honest people I know and that any misappropriation of government funds is, in my judgement, a matter of inexperience or lack of business expertise rather than deliberate deception or malice.

Affiant's Initials _____

Ex Libris Dr. Karron

Page 2 of 2

I have read the foregoing affidavit consisting of _2_ pages. I fully understand this affidavit and it is true, correct, and complete to the best of my knowledge and belief. I have initialed all the corrections and placed my initials at the bottom of each foregoing page.

I have made this affidavit freely and voluntarily, without any threats or rewards, or promises of reward having been made to me in return for it.

_____
Signature

Subscribed and sworn to before me this **25th** day of **October** _____ 2004 at

**Princeton, New Jersey** _____

_____
Kirk M. Yamatani
Special Agent

_____
Rachel Garrison
Special Agent

Affiant's Initials _____

Ex Libris Dr. Karron

[Page 1 of 2]

AFFIDAVIT

STATE OF NJ

COUNTY OF MERCER

I, Lee Goldberg, being duly sworn, hereby make the following affidavit to KIRT M. YAMATAMI, who has identified himself to me as a Special Agent with the U. S. Department of Commerce, Office of Inspector General, Office of Investigations.


I leant[sic] Dan Karron money as a normal matter of course as a part of a 30+ year friendship. The most recent occasions were $10,000 in 1996 and $10,000 in 1999.  Dr. Karron made diligent efforts to repay both loans, with the first one being paid off sometime before 1999 and had made a significant dent in the second loan. [LG]The payments were sporadic as Dr. Karron had the cash to make payments.  This was a loan I made to Dr. Karron to help his business going.  [LG].

I'd like to add that in my 30+ years of knowing Dan, he has been one of the most honest people I know and that any misappropriation of government funds is, in my judgment, a matter of inexperience of lack of business expertise, rather than deliberate deception of malice.

[Page 2 of 2]

I have read the foregoing affidavit consisting of 2 pages.  I fully understand this affidavit and it is true, correct, and complete to the best of my knowledge and belief.  I have initialized all corrections and placed my initials at the bottom of each foregoing page.

I have made this affidavit freely and voluntarily, without any threats or rewards, or promises of reward having been made to me in return for it.


<handwritten signature>

Lee H. Goldberg

Signature.


Subscribe and sworn to before me this 25th day of October, 2004 at Princeton, New Jersey

<blank signature line>

Kirt M. Yamatani

Special Agent


<handwritten signature>

Rachel Garrison

Special Agent

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x

DANIEL B. KARRON,                    :              **DECLARATION**

       Petitioner,          :              11 Civ. 1874 (RPP)
                                                    07 Cr. 541 (RPP)
    - v. -                          :

UNITED STATES OF AMERICA,            :

      Respondent.            :

- - - - - - - - - - - - - - - - - x

STATE OF NEW YORK                        )
COUNTY OF NEW YORK                       )  ss.:
SOUTHERN DISTRICT OF NEW YORK            )

    RACHEL ONDRIK, pursuant to Title 28, United States
Code, Section 1746, hereby declares under penalty of perjury:

    1.  I am a Special Agent with U.S. Department of
Commerce, Office of the Inspector General ("DOC-OIG").  I have
been employed by DOC-OIG for approximately ten years.

    2.  I was one of the lead case agents for the case of
United States v. Daniel B. Karron, 07 Cr. 541 (RPP).  As such, I
was personally involved in the investigation of this case.

    3.  As part of my responsibilities as one of the lead
case agents, I reviewed documents relevant to this case,
including all of the files maintained by the National Institute
for Science and Technology ("NIST") pertaining to the Advanced
Technology Program ("ATP") grant awarded to Dr. Karron's company,
Computer Aided Surgery, Inc. ("CASI"), in October 2001.  During
the course of the investigation, I thoroughly reviewed all of the

documents pertaining to CASI's ATP grant, including the files maintained by Hope Snowden, the grant specialist who handled budget and finance issues related to the grant, and the files maintained by Bettijoyce Lide and Jayne Orthwein, who handled the technical aspect of the grant, and did not find any exculpatory evidence.

4.    Also as part of the investigation, I contacted a number of potential witnesses and conducted several witness interviews.  Among the individuals that I interviewed were Marc Stanley, Jayne Orthwein, Chaya Levin, Peter Ross, and James Cox. I did not speak to or interview Amiee Karron, Nathaniel Karron, Jill Feldman, or Margaret Ferrand.  None of the witnesses that were interviewed, including Mr. Stanley, Ms. Orthwein, Ms. Levin, Mr. Ross, and Mr. Cox, provided any exculpatory evidence.

5.    At no time during any of the interviews or phone calls that I conducted, including the interviews of Mr. Stanley, Ms. Orthwein, Ms. Levin, Mr. Ross, and Mr. Cox, did I or any of the other DOC-OIG agents attempt to coerce, threaten, frighten, or intimidate the witnesses, nor did I or any of the other agents attempt to persuade them not to testify at trial.

6.    In addition to conducting the investigation of this case, I also assisted with the preparation for trial.  In or about May 2008, a few weeks before the trial began in June 2008, I sent the entire original grant file for the CASI ATP grant to

2

prosecutors in New York so that it could be available for trial.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    New York, New York
          July 15, 2011


          RACHEL ONDRIK
          Special Agent
          U.S. Department of Commerce
          Office of the Inspector General

AO 252
(2/75)

# CRIMINAL DOCKET SHEET

DOUGLAS F. EATON, U.S. MAGISTRATE JUDGE SDNY

M9-150

07 MAG 0970

DOCKET NUMBER _____

THE UNITED STATES VS.

ITEMS IDENTIFIED IN THE INVOICES ATTACHED AS EXHIBIT A HERETO FROM DATAVISION, GENERAL COMPUTER & SERVICE, HOMEFRONT HARDWARE, SILICON CITY, INC., AND SILICON GRAPHICS, INC., INCLUDING BUT NOT LIMITED TO, COMPUTER EQUIPMENT, COMPUTER PARTS, LAPTOP COMPUTERS, WEBCAMS, PRINTERS, MONITORS, PROJECTORS, SCANNERS, OTHER ELECTRONIC APPLIANCES, KITCHEN ITEMS, AND OTHER ASSORTED PERSONAL COMPUTER ITEMS

ATTORNEY FOR U.S.

AUSA STEVE KWOK

ATTORNEY FOR DEFENDANT

OFFENSE

SEIZURE WARRANT

U.S. CODE CITATION

[ ] C.J.A.  [ ] Pub. Def.  [ ] Retained  [ ] Waived

| PROCEEDINGS | MAG. | DATE |
|---|---|---|
| SEARCH WARRANT ISSUED | DOUGLAS F. EATON | 6/19/07 |
| SEARCH WARRANT RETURNED | GABRIEL W. GORENSTEIN | 6/27/07 |
| COMPLAINT FILED | | |
| ARREST WARRANT ISSUED | | |
| INITIAL APPEARANCE | | |

BAIL

AMOUNT SET

$

DATE POSTED

[ ] Personal Recog.   [ ] Unsecured Bond

**CONDITIONAL RELEASE**

[ ] 10% Deposit   [ ] Surety Bond

[ ] Collateral or Secured Bond   [ ] Third Party Custody

PRELIMINARY EXAMINATION OR REMOVAL HEARING   [ ] WAIVED   [ ] NOT WAIVED   SCHEDULED FOR _____

DATE CONDUCTED _____   TAPE NUMBER _____   [ ] INTERVENING INDICTMENT OR INFORMATION

| DATE | PROCEEDINGS | TAPE NUMBER |
|---|---|---|
| 6/19/07 | FLD. SEIZURE WARRANT. SO ORDERED U.S. MAGISTRATE JUDGE DOUGLAS F. EATON. | VB |
| 6/27/07 | FLD. RETURN OF SEARCH WARRANT SWORN TO BEFORE U.S. MAGISTRATE JUDGE GABRIEL W. GORENSTEIN.  CASE SEALED AND PLACED IN VAULT. | VB |

**OUTCOME**

[ ] Held for Action of District Court   [ ] Dismissed

[ ] Held to Answer to U.S. District Court at _____

[ ] Bond Exonerated   [ ] Bond to Transferee District

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: CHI T. STEVE KWOK (CK-5420)
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2415

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA       :    <u>Filed Under Seal</u>

                        AFFIDAVIT IN SUPPORT OF

         -v.-           :    SEIZURE WARRANT PURSUANT

                        <u>TO 18 U.S.C. § 981</u>

Items identified in the invoices   :
attached as Exhibit A hereto
from Datavision, General Computer &   :
Service, HomeFront Hardware,
Silicon City, Inc., and Silicon    :
Graphics, Inc., including, but not
limited to, computer equipment,    :
computer parts, laptop computers,
webcams, printers, monitors,     :
projectors, scanners, other
electronic appliances, kitchen items, :
and other assorted personal consumer
items,                       :
           Defendants <u>in rem</u>.
- - - - - - - - - - - - - - - - - - - -x

STATE OF NEW YORK         )
COUNTY OF NEW YORK       :ss.:
SOUTHERN DISTRICT OF NEW YORK   )

       RACHEL ONDRIK, being duly sworn, deposes and says:

<u>INTRODUCTION</u>

     1.   I am a Special Agent with the United States
Department of Commerce, Office of the Inspector General, Office
of Investigations, and have been so employed for approximately
the past six years. For the past four years, I have been
assigned to an investigation involving Dr. Daniel B. Karron, the
President and Chief Technical Officer of a company called

Computer Aided Surgery, Inc. ("CASI"), which was a recipient of a Federal research grant awarded by the National Institute of Standards and Technology ("NIST") under its Advanced Technology Program ("ATP"). The ATP grant began in 2001 but was suspended in 2003 due to suspicions that Dr. Karron was misapplying Federal grant funds toward the payment of unauthorized personal and other expenses, in violation of the terms and conditions of the ATP grant program, and in violation of Title 18, United States Code, Section 666.

2. I make this affidavit in support of the Government's application for the issuance of a warrant to seize and forfeit the items described in the invoices that are attached to this affidavit as Exhibit A (collectively the "Computer Equipment and Household Items").

3. This affidavit is based primarily upon my personal involvement in the investigation; my review of, among other things, audit reports prepared by the Department of Commerce, invoices from computer equipment and personal consumer goods vendors, and Dr. Karron's and CASI's financial documents; my personal observation of the Computer Equipment and Household Items during a consensual tour of Dr. Karron's apartment with Dr. Karron's then-defense counsel in or about January 2007; and my conversations with other law enforcement officers and others. Because this affidavit is being submitted for the limited purpose

-2-

of establishing probable cause for the issuance of a seizure warrant, it does not include all the facts that I have learned during the course of this investigation. Where the contents of documents and the actions and statements of others are reported herein, they are, unless otherwise indicated, reported only in substance and in part.

4. On June 13, 2007, a Grand Jury sitting in this District returned an Indictment, 07 Cr. 541, charging Dr. Karron with misapplying more than $5,000 in Federal funds from an ATP grant awarded to CASI toward the payment of unauthorized expenses, in violation of Title 18, United States Code, Section 666. The Indictment is attached to this affidavit as Exhibit B.

5. As set forth below, there is probable cause to believe that Dr. Karron used part of the misapplied Federal funds to purchase the Computer Equipment and Household Items. As shown in the documentary evidence I reviewed, virtually all the Computer Equipment and Household Items were neither approved in CASI's approved budget nor approved by NIST officials orally or in writing subsequent to the approval of the budget. All of the Computer Equipment and Household Items are subject to seizure and forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as the proceeds of theft concerning the Federal ATP program, in violation of Title 18, United States Code, Section 666.

## BACKGROUND

6.    This application arises from an investigation of
Dr. Karron and CASI in connection with an ATP grant awarded by
NIST.  The grant was designed to assist CASI in developing new
computer technologies and computer models for use in radiation
therapy and surgical planning.  Under the terms and conditions of
the grant, recipients must abide by the approved budget and
obtain written approvals before they deviate from the budget.  In
addition, absent express written approvals from NIST officials,
indirect costs — i.e., overhead expenses such as rent, meals,
Internet services, etc. — cannot be paid for using program funds.

7.    As President and Chief Technical Officer of CASI,
Dr. Karron agreed to abide by these terms and conditions by
signing various grant award documents and certifications.
Accordingly, beginning in 2001, CASI was awarded the ATP grant,
for a total of $2.1 million that was allocated over the course of
three years for the approved research.

8.    From reviewing financial and accounting documents
provided by Dr. Karron and CASI during the middle of the grant
period, NIST discovered that Dr. Karron was repeatedly violating
the terms and conditions of the grant program by, among other
things, using Federal grant funds to pay rent, to renovate his
apartment, to pay for restaurant meals, and to purchase computer
equipment and other personal items that were not approved items

-4-

in the budget and the purchase of which had never been approved by NIST. Moreover, from my interviews with CASI employees and NIST officials, I learned that Dr. Karron made these purchases against the repeated warnings of NIST officials and his own subordinates.

9. By the time NIST suspended the grant in June 2003, about $1.3 million had already been dispersed. According to a Department of Commerce audit after the suspension of the grant, approximately $390,280 was misapplied by Dr. Karron toward the payment of unauthorized expenses.

10. On June 13, 2007, a Federal Grand Jury sitting in this District returned an Indictment, 07 Cr. 541, charging Dr. Karron with knowingly misapplying more than $5,000 in Federal funds from the ATP grant awarded to CASI by NIST toward the payment of unauthorized expenses, in violation of Title 18, United States Code, Section 666.

## THE COMPUTER EQUIPMENT AND HOUSEHOLD ITEMS

11. From a review of CASI's approved budget and invoices that I obtained from various computer equipment and personal consumer goods vendors, I was able to determine that Dr. Karron had used part of the misapplied Federal funds to purchase the Computer Equipment and Household Items.

12. By way of illustration, from an invoice obtained from a company vendor known as Datavision, I learned that Dr. Karron bought, among many other things, items identified as "Cardscan Office USB 600C V6" (retail value: $425) and "Strobe XP 200 SheetFed 600dp" (retail value: $559.98). From a review of financial documents, I learned that these items were paid for using ATP funds awarded to CASI. These items do not fall into any category of approved expenditures. Nor did NIST give Dr. Karron approval to purchase these items.

13. As another example, from an invoice obtained from a hardware store known as HomeFront Hardware, I learned that Dr. Karron bought, among many other things, a "Duromatic 5.0 Liter Pressure Cooker" (retail value: $144.99), a "Cobalt Blue Prof Bar Blender" (retail value: $139.95), and a "Dust Buster 7.2v Cordless Hand Vac" (retail value: $80.95). From a review of financial statements, I learned that these items were paid for using ATP funds awarded to CASI. These items do not fall into any category of approved expenditures. Nor did NIST give Dr. Karron approval to purchase these items.

14. From my review of the terms and conditions of the grant, the invoices attached to this Affidavit, conversations with computer forensic experts and other persons knowledgeable about computer equipment, I learned that virtually all of the Computer Equipment and Household Items listed in the invoices

-6-

attached hereto do not relate to the research for which the ATP grant was approved.

15.   In or about January 2007, Dr. Karron's then-defense counsel, M. Scott Peeler of Arent Fox LLP, gave me and other law enforcement agents a consensual tour of Dr. Karron's apartment, located at 300 East 33rd Street, Suite 4N, New York, NY 10016.  I personally observed that the apartment was stockpiled with computers, computer-related equipment, electronic appliances, and other consumer items.  Mr. Peeler stated to me and other agents who accompanied me on the tour that virtually all the computer equipment and household items in the apartment were purchased with Federal funds.  Mr. Peeler further stated that additional items were stored in the apartment building's downstairs storage units assigned to Dr. Karron.

## STATUTORY BASES FOR FORFEITURE

16.   The statutory provisions pursuant to which the Computer Equipment and Household Items are subject to seizure and forfeiture are set forth below.

17.   Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture:

> [a]ny property, real or personal, which
> constitutes or is derived from proceeds traceable
> to . . . any offense constituting 'specific
> unlawful activity' (as defined in section
> 1956(c)(7) of this title), or a conspiracy to
> commit such offense.

18.  18 U.S.C. § 1956(c)(7)(D) provides that the term "specified unlawful activity" includes, among other things, "an offense under . . . section 666 [of Title 18, United States Code] (relating to theft or bribery concerning programs receiving Federal funds)."

19.  For the foregoing reasons, there is probable cause to believe that all of the Computer Equipment and Household Items are subject to seizure and forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as property constituting or derived from proceeds traceable to theft involving a grant program receiving Federal funds.  Had NIST known of the disallowed purposes to which Dr. Karron would put the ATP grant funds, contrary to Dr. Karron's multiple representations in the grant award documents, the grant application would have been denied and no money would have been disbursed.

20.  Section 981(b) provides that seizures pursuant to section 981(a) may be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure.

21.  For the reasons set forth above, I respectfully request that the Court issue a seizure warrant, pursuant to 18 U.S.C. § 981(b), for the Computer Equipment and Household Items, to be executed in the daytime between 6:00 A.M. to 10:00 P.M.

-8-

22. In addition, because the Computer Equipment and Household Items are located both at Dr. Karron's residence, located at 300 East 33rd Street, Suite 4N, New York, NY 10016 ("the apartment unit"), and in the apartment building's storage units assigned to Dr. Karron, I respectfully request that the Court grant authorized law enforcement agents the authority to enter the apartment unit and to access the apartment building's storage units assigned to Dr. Karron for the purpose of executing the warrant for seizure.

23. I have personally observed the area near and around the apartment building located at 300 East 33rd Street, New York, NY 10016, known as the Kips Bay Towers. The apartment building is a 20-story residential high-rise condominium building located between First and Second Avenue in Manhattan. The front of the building is comprised of exposed concrete and large picture windows.

24. I have also personally observed the apartment unit Suite 4N. Suite 4N is located on the 4th floor of the apartment building described above. The door to the apartment unit is clearly marked "4N." The apartment unit has a living room/office area, a small kitchenette, a bathroom, and one bedroom.

25. During a consensual tour of the apartment unit in January 2007, Dr. Karron's then-defense counsel, Mr. Peeler, informed me that the storage units assigned to Dr. Karron are

-9-

located within the apartment building described above in the
downstairs common storage area.

      26.  Because of the sensitive nature of the matters
described above, because the investigation is ongoing, and in
order to prevent the removal of the Computer Equipment and
Household Items prior to the execution of the warrant for
seizure, the Government respectfully requests that this Affidavit
be filed and kept under seal until further order of this Court.


                            _____

                            RACHEL ONDRIK
                            Special Agent
                            Department of Commerce
                            Office of the Inspector General
                            Office of Investigations


Sworn to before me
this 19th day of June, 2007


_____
Honorable Douglas F. Eaton
United States Magistrate Judge
Southern District of New York

-10-

# Exhibit 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

DANIEL B. KARRON,                  :        **DECLARATION**

       Petitioner,          :        11 Civ. 1874 (RPP)
                       07 Cr. 541 (RPP)

     - v. -                     :

UNITED STATES OF AMERICA,           :

       Respondent.          :

- - - - - - - - - - - - - - - - x

STATE OF NEW YORK          )
COUNTY OF NEW YORK         )  ss.:
SOUTHERN DISTRICT OF NEW YORK  )

     RACHEL ONDRIK, pursuant to Title 28, United States
Code, Section 1746, hereby declares under penalty of perjury:

     1.  I am a Special Agent with U.S. Department of
Commerce, Office of the Inspector General ("DOC-OIG").  I have
been employed by DOC-OIG for approximately ten years.

     2.  I was one of the lead case agents for the case of
United States v. Daniel B. Karron, 07 Cr. 541 (RPP).  As such, I
was personally involved in the investigation of this case.

     3.  As part of my responsibilities as one of the lead
case agents, I reviewed documents relevant to this case,
including all of the files maintained by the National Institute
for Science and Technology ("NIST") pertaining to the Advanced
Technology Program ("ATP") grant awarded to Dr. Karron's company,
Computer Aided Surgery, Inc. ("CASI"), in October 2001.  During
the course of the investigation, I thoroughly reviewed all of the

documents pertaining to CASI's ATP grant, including the files maintained by Hope Snowden, the grant specialist who handled budget and finance issues related to the grant, and the files maintained by Bettijoyce Lide and Jayne Orthwein, who handled the technical aspect of the grant, and did not find any exculpatory evidence.

      4.   Also as part of the investigation, I contacted a number of potential witnesses and conducted several witness interviews.  Among the individuals that I interviewed were Marc Stanley, Jayne Orthwein, Chaya Levin, Peter Ross, and James Cox. I did not speak to or interview Amiee Karron, Nathaniel Karron, Jill Feldman, or Margaret Ferrand.  None of the witnesses that were interviewed, including Mr. Stanley, Ms. Orthwein, Ms. Levin, Mr. Ross, and Mr. Cox, provided any exculpatory evidence.

      5.   At no time during any of the interviews or phone calls that I conducted, including the interviews of Mr. Stanley, Ms. Orthwein, Ms. Levin, Mr. Ross, and Mr. Cox, did I or any of the other DOC-OIG agents attempt to coerce, threaten, frighten, or intimidate the witnesses, nor did I or any of the other agents attempt to persuade them not to testify at trial.

      6.   In addition to conducting the investigation of this case, I also assisted with the preparation for trial.  In or about May 2008, a few weeks before the trial began in June 2008, I sent the entire original grant file for the CASI ATP grant to

prosecutors in New York so that it could be available for trial.

     I declare under penalty of perjury that the foregoing is true and correct.

Dated:    New York, New York
          July 15, 2011

                                   *Rachel Ondrik*

                              RACHEL ONDRIK
                              Special Agent
                              U.S. Department of Commerce
                              Office of the Inspector General

# Exhibit 6

X-Sieve: CMU Sieve 2.2
From: "Garrison, Rachel" <RGarrison@oig.doc.gov>
To: "McNerney, Angela" <angela.mcnerney@nist.gov>,
    "Goldstein, Marilyn"
        <marilyn.goldstein@nist.gov>,
    "Snowden, Hope D." <hope.snowden@nist.gov>,
    "Rubin, Michael R." <michael.rubin@nist.gov>,
    "Stanley, Marc G."
        <marc.stanley@nist.gov>, mstanley@nist.gov,
    "Lide, Bettijoyce B."
        <bettijoyce.lide@nist.gov>, bjlide@nist.gov,
    sharnim@nist.gov
Cc: "Yamatani, Kirk" <KYamatani@oig.doc.gov>,
    "Riley, Belinda"
        <briley@oig.doc.gov>,
    "Mckevitt, Kathleen" <KMckevitt@oig.doc.gov>,
    "Sebben, Greg" <gsebben@oig.doc.gov>
Subject: CASI Investigation
Date: Fri, 1 Oct 2004 15:25:43 -0400
X-Mailer: Internet Mail Service (5.5.2653.19)
X-MailScanner:
X-MailScanner-From: rgarrison@oig.doc.gov


The Department of Justice (DOJ) has formally initiated a Grand Jury
Investigation regarding the NIST ATP award made to Computer Aided Surgery.
In order to ensure that DOJ and the Inspector General's Office are able to
complete a thorough and timely investigation, we are requesting that ALL
NIST personnel cease contact with Computer Aided Surgery (CASI), Dr. Karron,
and all CASI representatives. Inquiries from those parties should be
directed to myself or SA Kirk Yamatani.

Additionally, please do not proceed with the Audit Resolution for CASI. It
is extremely important that a bill not be generated for the funds that CASI
misappropriated from the award.

Please contact me if there are any further concerns or questions. I look
forward to working with all of you over the next few months. Thank you.

Rachel A. Garrison
Special Agent
United States Department of Commerce
Office of the Inspector General, Office of Investigations
Arlington Virginia Field Office
Crystal Plaza One, Suite 509
Phone: 202-438-1749
Fax: 202-482-2803


3501-FF

# Exhibit 7

8637KAR5                    Lide - redirect

1    cautionary requirement may not exceed 30 percent of the

2    nonfederal share of the total project costs.  And I had said a

3    third.

4         THE COURT:  You remember that of your own knowledge,

5    not just reading it.

6         THE WITNESS:  No, no, sir, I answered -- I believe you

7    would find it -- I said I believed it was a third, so ...

8    Q.  Ms. Lide, you remember Mr. Rubinstein asking you questions

9    about multiple communications to NIST, including yourself, from

10   Dr. Karron?

11   A.  I do.

12   Q.  After the grant was suspended, what was the reason that you

13   yourself stopped meeting with him?

14   A.  At the beginning -- we were instructed by our general

15   counsel to stop meeting with him after the suspension of the

16   award.

17        MR. KWOK:  May I approach, your Honor?

18        THE COURT:  Yes, you may.

19   Q.  I am showing you what's been marked as Defendant's Exhibit

20   I believe 2, 3501-FF?

21        DEPUTY COURT CLERK:  That's B.

22        THE COURT:  B as in boy.

23   Q.  Ms. Lide, Mr. Rubinstein asked you a moment ago to read a

24   portion of that e-mail.  Can you read the e-mail in its

25   entirety?

8637KAR5                    Lide - redirect

1              THE COURT:  Actually what he read -- he read a portion

2       of it.

3       Q.  He read a portion of it.  Can you read the entirety of that

4       e-mail?

5       A.  Certainly.  The date is October 1, 2004.  "The Department

6       of Justice has formally initiated a grand jury investigation

7       regarding the NIST ATP award made to Computer Aided Surgery.

8       In order to ensure that DOJ and the Inspector General's office

9       are able to complete a thorough and timely investigation, we

10      are requesting that all NIST" -- "all" is all in caps -- "NIST

11      personnel cease contact with Computer Aided Surgery (CASI), Dr.

12      Karron and all CASI representatives.  Inquiries from those

13      parties should be directed to myself or SA Kirk Yamatani.

14      Additionally" --

15              Shall I continue?

16      Q.  Yes.

17      A.  "Additionally please do not proceed with the audit

18      resolution for CASI.  It is extremely important that a bill not

19      be generated for the funds that CASI misappropriated from the

20      award.  Please contact me if there are any further concerns or

21      questions.  I look forward to working with all of you over the

22      next few months.  Thank you."

23      Q.  And who wrote that e-mail?

24      A.  Rachel A Garrison, special agent.

25              THE COURT:  For the Department of Commerce?

                    SOUTHERN DISTRICT REPORTERS, P.C.

                            (212) 805-0300

8637KAR5                    Lide - redirect

1            THE WITNESS:  Sorry.  Yes, United States Department of

2    Commerce.

3    Q.  And do you see Rachel Garrison in this courtroom?

4    A.  I do.

5    Q.  Can you point her out?

6    A.  She is at the front table with a dark suit and a blue

7    blouse under it.

8            MR. KWOK:  No further questions.

9            THE COURT:  Recross.

10           MR. RUBINSTEIN:  Yes, your Honor.

11   RECROSS EXAMINATION

12   BY MR. RUBINSTEIN:

13   Q.  Is it fair to say that --

14           MR. KWOK:  Objection.

15           THE COURT:  Let's rephrase the question.

16   Q.  Thank you, Judge.

17           Are you -- is cofunding part of your job?  Are you

18   involved in cofunding and advise on cofunding?

19           THE COURT:  I don't --

20   A.  No, I don't believe it is.

21           THE COURT:  I don't see the relevance of this.

22           MR. RUBINSTEIN:  He just asked her on cross.  He

23   showed her a document.

24   Q.  Didn't you say when you first answered that question that

25   it was one third -- that one third?

# Exhibit 8

# POPA NEWS

Patent Office Professional Association

www.popa.org

February 2007  Vol. 07  No. 1

## USPTO Enacts Flat Goal Program; POPA Challenges

The USPTO is launching its flat goal pilot program after mischaracterizing the union's proposals to practically avoid negotiating on the program altogether. POPA has filed a grievance challenging the legality of this program and declaring that the USPTO is committing an unfair labor practice by unilaterally implementing the program without completing collective bargaining.

The flat goal program requires a flat goal of production units per quarter per examiner based on the examiner spending 80 percent of his/her time examining. It also raises the production level required for a fully successful performance rating from 95 percent to 100 percent. Examiners must complete 100 percent of the assigned goal to maintain a fully successful rating. Historically, however, the patent corps averages 70-75 percent examining time, with the remaining time used for training, appeals conferences, interviews, leave time, etc. The USPTO's assumptions of time needed by examiners to perform non-examining functions were not based on actual examination data. The program makes only limited provisions to deal with sick leave or leave without pay for family or medical reasons and makes no provisions for the use of annual leave carried over from previous years.

The USPTO tried to strong-arm POPA by stating in a Nov. 16 memo to the union:

> "Unless you limit your proposals in this bargaining to the procedures and appropriate arrangements in response to management's decision to implement a Flat Goal Pilot by next Wednesday, November 22, 2006, and agree in writing that you will not further claim that the entire topic is permissive, we will conclude that you have no interest in bargaining over these issues and will begin the implementation process for the pilot, based upon our last best offer."

(continued on page 2)

## Inspector General's Witness Intimidation of Examiners

In an apparent case of witness intimidation, an agent from the Department of Commerce Inspector General's Office—with cooperation from the USPTO Office of the General Counsel (OGC)—investigated, questioned and pressured two patent examiners who had been subpoenaed as defense witnesses in the trial of a former employee for time and attendance abuse, but were under no suspicion of wrongdoing themselves. POPA is seeking assurances from the USPTO that it will prevent such workplace intimidation in the future.

In one case, a paralegal in the OGC sent Primary Examiner Manual Mendez an e-mail directing him to a mandatory "interview" with the IG at 11 a.m. that same day. Mendez was on sick leave that morning and didn't come to the office until about 3 p.m., missing the mandatory interview. Upon his arrival at the office, Mendez read the e-mail and replied to the OGC explaining his absence, asking to reschedule, and inquiring about the nature of the interview. Mendez did not receive a reply to his request.

Two business days later, IG Special Agent Rachel Ondrik appeared unannounced at Mendez's USPTO office door. Mendez invited her in. She closed the door, notified Mendez that she was conducting a formal investigation and that he must truthfully answer her questions. She did not notify Mendez of his rights, including his right to have representation present. Her questioning began with a statement similar to, "You spend a lot of time here, Mr. Mendez." This indicated to Mendez that Ondrik had

(continued on page 3)



**A Typical Inspector General Interview, the 800-Pound Gorilla in the Room**

# Flat Goal Program
*(continued from page 1)*

This appears to be an agency attempt to twist POPA's intent as a way to bulldoze its way into the program without required bargaining.

The agency's program, however, is illegal because statute and case law require that a federal employee's performance appraisal plan "to the maximum extent possible, permit the accurate evaluation of job performance on the basis of objective criteria." 5 U.S.C. § 4302(b)(1).

For years, the current examiner performance appraisal plans have measured examiners' performance in six-minute intervals. The flat goal would no longer account for all the actual duties performed by an examiner and, thus, would not be measuring performance "to the maximum extent feasible."

The flat goal program is also illegal because it denies employees their statutory entitlement to use their accrued sick and annual leave. The flat goal program only accounts for the use of annual leave accrued during a particular quarter. If an employee has accrued leave and desires to take additional leave in a quarter, the examiner would still be responsible for achieving 100 percent of his/her assigned flat goal. This effectively denies the employee the right to use annual leave.

Similarly, an examiner's flat goal would only be adjusted for the use of sick leave if the sick leave becomes "long term." Again, under the agency's flat goal program, examiners are expected to achieve the flat goal even when sick for short periods, effectively denying employees the benefit of sick leave.

POPA will continue to report developments on this program and cautions examiners to thoroughly review the details of the flat goal program before enrolling—this program can be harmful to an examiner's career health.

## Numbers Don't Lie

USPTO statistics on examining-time percentages suggest that, if the flat goal program had been enacted in fiscal year 2006, many examiners' performance would have been less than fully successful.

Using FY 2006 production numbers, the agency calculated that, of more than 40 art units in one technology center, only 6 averaged 80 percent or better examining time. Thus, the vast majority of employees in that technology center were averaging less than 80 percent examining time. The benchmark for fully successful performance under the flat goal program, however, is based on the agency's arbitrary determination that an examiner will have 80 percent examining time.

In another technology center of more than 15 art units, not one averaged more than 80 percent examining time in FY 2006.

Using fiscal year 2005 numbers, in a third technology center of more than 30 art units, only one art unit accomplished an 80 percent average examining time.

If the USPTO institutes the flat goal program throughout the examining corps, as it proposes to do in its 2007-2012 Strategic Plan, the numbers indicate that some individuals may meet their goals, but most examiners will fail.

## 2006 POPA Election Results and 2007 Executive Committee Roster

| | Telephone | Art Unit | Office |
|---|---|---|---|
| Union Office | 571-272-7161 | – | *RND-1D61* |
| | 571-272-7162 | | |
| | 571-272-2690 | | REM-2A48 |
| **Officers** | | | |
| *President* | | | |
| Robert D. Budens | 571-272-0897 | 1648 | REM-3A35 |
| *Vice President* | | | |
| Lawrence J. Oresky | 571-272-6930 | 3652 | KNX-3B11 |
| *Secretary* | | | |
| Howard J. Locker | 571-272-0980 | 1661 | REM-2C81 |
| *Assistant Secretary* | | | |
| Pamela R. Schwartz | 571-272-1528 | 1774 | REM-10C75 |
| *Treasurer* | | | |
| Randall P. Myers | 571-272-7526 | 2646 | KNX-6B81 |
| **Chemical Area Delegates** | | | |
| Renee Berry | 571-272-1459 | 1762 | REM-8D54 |
| Dr. Kathleen Duda | 571-272-1383 | 1756 | REM-9A65 |
| Dr. Patricia Duffy | 571-272-0855 | 1645 | REM-3B05 |
| G. R. Ewoldt | 571-272-0843 | 1644 | REM-3C83 |
| Jennifer Graser | 571-272-0858 | 1645 | *hoteling* |
| Adrienne Johnstone | 571-272-1218 | 1733 | REM-7B19 |
| Christine Saoud | 571-272-0891 | 1647 | REM-4E81 |
| Dr. Larry Tarazano | 571-272-1515 | 1773 | REM-6A69 |
| Geraldina Visconti | 571-272-1334 | 1752 | REM-9D55 |

| | Telephone | Art Unit | Office |
|---|---|---|---|
| **Electrical Area Delegates** | | | |
| Vincent Boccio | 571-272-7373 | 2621 | KNX-6D15 |
| Azizul Choudhury | 571-272-3909 | 2145 | RND-4C65 |
| Bill Deane | 571-272-7484 | 2642 | KNX-7D77 |
| Albert Gagliardi | 571-272-2436 | 2878 | JEF-5C83 |
| Kim Lockett | 571-272-2067 | 2837 | JEF-10C73 |
| Adnan Mirza | 571-272-3885 | 2145 | RND-4A15 |
| B. James Peikari | 571-272-4185 | 2189 | *hoteling* |
| Michael Shingleton | 571-272-1770 | 2817 | JEF-5D19 |
| Scott J. Sugarman | 571-272-2340 | 2873 | JEF-3D11 |
| Jeff Swearingen | 571-272-3921 | 2145 | RND-4C61 |
| Julie Anne Watko | 571-272-7597 | 2627 | KNX-8A75 |
| Howard Weiss | 571-272-1720 | 2814 | JEF-5A15 |
| **Mechanical Area Delegates** | | | |
| Ella Colbert | 571-272-6741 | 3694 | KNX-5D61 |
| David Isabella | 571-272-4749 | 3738 | RND-6D15 |
| Vinh Luong | 571-272-7109 | 3682 | KNX-3C03 |
| David Reip | 571-272-4702 | 3731 | RND-6B81 |
| David Shay | 571-272-4773 | 3735 | RND-7A75 |
| **Designs and Others** | | | |
| Melanie H. Tung | 571-272-2613 | 2911 | REM-5B87 |

**POPA NEWS**

# Witness Intimidation

*(continued from page 1)*

obtained and reviewed his badge-in/badge-out turnstile records before the interview. She then questioned Mendez's own time recording practices with questions similar to, "Can you certify that your timesheets are correct?" Ondrik also questioned Mendez about his conduct with questions like, "Could you describe any problems or issues of conduct that you had in the past?"

This investigative interview lasted approximately 2.5 hours. Ondrik also made a closing statement similar to, "I checked you out, and you're okay," referring to Mendez's time and attendance. This showed that Ondrik also obtained Mendez's 690E timesheets for comparison with the turnstile records.

In the second examiner's case, Ondrik called the examiner and demanded that the examiner meet with her that day for an interview. The examiner asked to make an appointment on another day because of prior job commitments. Ondrik then called the examiner's group director, who called the examiner to say that the interview was mandatory. This disrupted the examiner's work schedule and caused embarrassment in front of the group director and supervisor.

After setting an interview time, the examiner contacted POPA Vice President Larry Oresky to be present at the interview. With a POPA rep present, Ondrik did not question the examiner about time accounting practices. Ondrik did question the examiner about what had been said to the attorney of the examiner under criminal investigation for time fraud.

At the time of their interviews with Ondrik, neither examiner was suspected of wrongdoing. It appears the only reason for singling out these examiners for IG investigation and questioning was that they both were subpoenaed to appear as witnesses for the defense in a criminal case stemming from irregularities between a former employee's timesheets and turnstile records.

This looks like blatant intimidation of defense witnesses and misuse of official position by an agent of the U.S. government. It appears that the USPTO clearly cooperated with Ondrik's unwarranted investigation of these two employees by providing turnstile records and 690E timesheets.

POPA agrees with Mendez's suggestion, in the following letter to Director Dudas, for better training on timekeeping to avoid mistakes. This would demonstrate a concern for employee success, rather than the agency's current "gotcha" atmosphere. The same is true for the USPTO Office of General Counsel, which needs to protect the rights of agency employees.

The overzealous attention to badge-out details furthers the agency's on-site management by fear and punishment. USPTO office workers face criminal prosecution and the possibility of being subpoenaed to testify against colleagues. Employees are, in effect, punished for coming to work, while those off site on telework or hoteling don't have that intimidation. If the USPTO is not concerned about badge-in/badge-out requirements for employees working off campus, why should it worry so about those who choose to work on campus?

POPA urges any bargaining unit member who is called to a meeting with a representative of the Inspector General's Office to contact a POPA representative immediately. ▼

## An Open Letter to Director Dudas

Dear Mr. Dudas:

I am a primary examiner who was interrogated by Department of Commerce Inspector General (IG) personnel after being subpoenaed by the defense [in an ongoing criminal prosecution of a former examiner on time fraud charges].

In the pursuit of justice, the USPTO must recognize that every examiner has constitutional rights that must be respected during investigations on our premises. Clear guidelines need to be established so that all examiners in this office understand their rights and responsibilities, especially in an IG investigation.

It is very disappointing that after my almost 20 years of federal service, no department within this office cares about my rights as an employee. The USPTO General Counsel should be required to do more than just provide information about examiners to the IG. At least, the General Counsel attorneys should ensure constitutional fairness in the IG fact-finding activities instead of justifying their inaction under the false assumption that they cannot interfere with this process. Such inaction will inevitably result in the collection of tainted evidence as the courts recognize the illegalities of these activities.

Finally, based on my interrogation, this agency and the Commerce Department IG expect perfection concerning timekeeping reporting requirements. Unfortunately, this standard cannot be achieved unless the electronic security system is linked to the "timesheet" software. More importantly, the USPTO should update the April 2000 memorandum that abolished the sign-in/sign-out sheets to delineate clear disciplinary guidelines based on the perfection standard and requiring supervisors to provide yearly training about timekeeping requirements. It is presently impossible to meet the perfection standard since the security system does not provide instant and verifiable "time in/time out" data, easily accessible by each employee. To bring criminal actions against employees having time discrepancies without offering counseling, rehabilitation, and/or progressive discipline is simply abusive and will inevitably affect the productivity and retention goals of this office.

Very respectfully,
Manuel Mendez, Primary Patent Examiner

**POPA NEWS**

# Examiner Not Guilty of Criminal Time Reporting Charges

A Virginia jury acquitted a former patent examiner of criminal larceny charges for allegedly collecting pay for work not done. The charges were based on discrepancies between the examiner's turnstile records and her time sheets. Following a two-and-a-half day trial, the jury returned the verdict after deliberating only 15 minutes. The jury foreman later apologized to the examiner, saying the jury was sorry she'd had to go through the ordeal.

The Department of Commerce Inspector General's Office (IG), with USPTO assistance, initiated the criminal investigation against the examiner, who holds a medical degree, a law degree, and who consistently produced at a level above 130 percent for the agency. For three years (2003-2005) the employee was awarded outstanding job evaluations with commendable quality by two supervisors.

Then she got a new supervisor and her work life took a decided turn for the worse. Difficulties with new supervisor Kevin Sirmons began the first biweek after he took over her art unit in October 2005. Sirmons was often away from his office during that time. As previous supervisors had authorized and without any indication to the contrary from Sirmons, the examiner had a senior primary examiner review and sign applications in Sirmons' absence and submitted them for production credit. Sirmons held them until "count Monday," the submission deadline day when, without a word to the examiner, he left them in her office with the primary examiner's approving signature crossed out. She, as a result, had abysmally low production that biweek. He told her he was upset she had gone to the primary examiner and that, on his watch, everything had to go through him.

The relationship was off to a rocky start. The examiner tried to get out but was not allowed to transfer to another art unit. Two months of continuous difficulties with Sirmons brought the examiner to a level of frustration she could not tolerate. She went on annual leave in December 2005 and subsequently resigned from the USPTO in January 2006.

In June 2006 IG Special Agent Rachel Ondrik paid a surprise visit to the examiner at home and asked about her time accounting. Ondrik indicated that there were a number of discrepancies between the examiner's badge-in, badge-out turnstile records and the time she reported on her time and attendance forms. Ondrik questioned other USPTO examiners in their offices about this case in ways that they described as witness intimidation. (See *POPA News*, Jan. 2007.) The Commonwealth of Virginia arrested the examiner in July 2006 on charges of obtaining money, and attempting to obtain money, under false pretenses. The trial was held in January 2007.

Ondrik testified at the trial that one of the examiner's earlier supervisors "had warned her that those turnstile records could be audited and her time sheets should match them." The examiner testified that she had never been so warned. Interestingly, USPTO Director of Security and Safety J. R. Garland testified at the trial that the turnstile design was not intended for time keeping purposes. (See following article.)

Trial evidence and testimony showed that the defendant had spent some mornings working from her parents' home because of difficulties with her pregnancy. She would then go into the agency in the late mornings or early afternoons to complete her work. She would claim the full number of hours she had worked, even though witnesses testified that she had not received prior approval to telework (*continued on page 8*)

## Turnstiles — For Security, Not Time Keeping

The Commonwealth of Virginia called USPTO Director of Security and Safety J. R. Garland as a prosecution witness during the trial of an examiner for alleged theft through improper time reporting. On cross examination, as noted in the following verbatim excerpt from the trial transcript, Mr. Garland explained the intent of the turnstile design versus its current time keeping use.

*Q:* How do you use this system for time and attendance records?
*Garland:* I don't know what you mean, sir. I don't use it for time and attendance records. I use it as a security system.
*Q:* It's a security system.
*Garland:* Yes, sir.
*Q:* It's not a time and attendance system?
*Garland:* No, sir. It just records times people come and go.
*Q:* And you are the person who is in charge of this system; correct? Were you part of the—were you involved in the

implementation of the system at the new Carlyle complex?
*Garland:* Yes, sir.
*Q:* And it was never intended to be a time and attendance system, was it?
*Mr. Casey [the prosecutor]:* Judge, objection to relevance.
*Mr. Schertler [the defense attorney questioning Garland]:* That's what they're using it for.
*The Court:* Overruled.
*Garland:* I can't speak to everybody's intentions.
*Q by Mr. Schertler:* You're the man in charge of it.
*Garland:* I didn't intend on it for time and attendance. For security. Not for people's times.
*Q:* And you don't give this out every two weeks to the patent examiners and PTO employees, so that they can prepare their time and attendance sheets using the security system, do you?
*Garland:* No, sir. I do not.

## Examiner Not Guilty of Criminal Time Reporting Charges

(*continued from page* 7)

(the hoteling program didn't exist at the time). During the times in question, the examiner maintained an outstanding production level in excess of 130 percent, the maximum percentage for which the USPTO pays examiners.

Other evidence at trial established that some of the turnstile records did not represent an accurate record of employees' time and attendance. Testimony showed that, on more than one occasion, the examiner was logged in and working on USPTO computers (something she could not have done remotely) while turnstile records indicated that she was not in the buildings. The evidence proved that the turnstile records, while perhaps useful for security purposes, could not be relied upon for employee attendance.

The jury recognized that, while the examiner may have violated an agency policy on telework, her actions were not criminal. The examiner had indeed given the USPTO every bit of work it paid her for plus more.

After the verdict, the jury foreman approached the defendant to say that he and the jury were sorry that the examiner and her family had to go through the trial.

## International Examiners' Reps Appeal to Patent Offices

(*continued from page* 4)

- The role of incentives within organizations and the extent to which different kinds of incentives are appropriate for the EPO.
  The main findings of the report are:
- The standard of patentability is a key element in the system.
- Too high or too low of a standard will have adverse consequences on the system.
- There is an inherent relationship between quality and quantity and it is important to achieve an appropriate balance.
- A decline in quality has the potential for increasing workload. Applicants' perception of a lowered standard of patentability may induce a rise in the number of low-quality applications.
- Examiners are interdependent. Speeding up the work of one could slow down the work of others.
- There needs to be an appropriate balance between implicit incentives that function via performance appraisal and the esteem of peers and explicit incentives such as extra payments for higher production.

POPA's impression of the bottom line of this report is: It is in the best interest of the patent system to give examiners sufficient time to do a quality job.

A complete copy of the SUEPO study is available at http://idea.fr/doc/by/seabright/ report_epo.pdf.

## Impasses Panel Supports POPA's Take on Negotiations Ground Rules

POPA-USPTO contract negotiations are about to begin since the Federal Service Impasses Panel (FSIP) recently determined not to decide a ground rules dispute between the two parties.

The USPTO had asked the panel to rule that, if the agency head disapproved parts of the resulting negotiated contract, those parts would be renegotiated while the rest of the contract was implemented. POPA objected to such a ground rules change because it would enable the USPTO to pick out and eliminate those parts more favorable to employees while maintaining and implementing those parts more favorable to the agency. In essence, the agency wanted a line-item veto over any contract provision it didn't like. This would negate the collective bargaining process.

Current federal labor law requires that, if a contract provision is disapproved on agency head review, the *entire agreement* does not go into effect, not just the disapproved provision. Then the parties need to go back to negotiations with the entire agreement open for discussion. This process insures that the final agreement represents a balance of give-and-take compromises for both the agency and employees.

POPA and the USPTO previously reached agreement on all other ground rules provisions, but remained at impasse over the agency's proposed process for agency head review. POPA argued to the FSIP that the agency's proposed ground rule would waive the union's statutory right to renegotiate the agreement — a right the FSIP did not have the authority to waive.

The FSIP found for POPA by refusing to take jurisdiction of the impasse. The remaining ground rules stand, putting contract negotiations on track for this summer.



## JOIN POPA

### Patent Office Professional Association

Letters from readers are welcome. Address to:
The Editor, Patent Office Professional Association,
P.O. Box 2745, Arlington, VA 22202

**Officers**

Robert D. Budens, *President*, (571) 272-0897

Lawrence J. Oresky
*Vice President/Director of Grievances*, (571) 272-6930

Howard Locker, *Secretary/
Director of Adverse Action Challenges*, (571) 272-0980

Pamela R. Schwartz, *Assistant Secretary/
Director of Unfair Labor Practices*, (571) 272-1528

Randy Myers, *Treasurer*, (571) 272-7526

**Visit us on the Web at http://www.popa.org**

© 2007 Patent Office Professional Association

# POPA NEWS

Patent Office Professional Association

www.popa.org

April-May 2007  Vol. 07  No. 2

# Examiners Vote with Their Feet on Flat Goal Pilot Program

## POPA Encourages Productivity Incentive Alternatives

When the USPTO announced its Flat Goal Pilot program in April 2006, it set a goal of enrolling 300 examiners by this year's sign-up deadline of Feb. 23. After multiple employee briefings and e-mailed Commissioner's Corner endorsements of the program, by the end of February the pilot had only 105 volunteers. Even after extending the deadlines, management has only convinced approximately 180 employees to sign up—not a rousing vote of confidence in management's program.

Examiners have voted with their feet.

The agency worked hard to inform all 5,000+ examiners about the program. The first three of nine Flat Goal Pilot employee briefings by USPTO managers were standing room only, with about 300 examiners attending each briefing. The crowds had diminished by half as of the fourth briefing, as word spread through the examining corps, and attracted far fewer by the last one. Examiners' questions about production dominated every session.

"If this had been the laptop pilot program seeking volunteers, management would've had 300 sign up on the first day," commented one senior primary examiner.

> ### The Famous Engineering Formula
>
> $$Flat^{goal} = Flat^{no}$$

### Examiners Do the Math

Examiners are smart about their careers. As the following letters show, many did the math and learned that the Flat Goal program would penalize, rather than promote, their production and career success, so they didn't sign up. On the other hand, those who volunteered for the program likely calculated that they'd do well. With both trends, this self-selected sample will produce pilot results that can only rightly be used for a future voluntary program and not extrapolated to the examining corps as a whole.

However, as one of the letter writers aptly noted, the USPTO intends to use the results of the pilot to support its move to a flat goal production system for all examiners. The first objective outlined in the USPTO Strategic Plan for 2007-2012 includes an initiative to "Develop alternatives to the current performance and bonus systems." (www.uspto.gov/web/offices/com/strat2007/stratplan2007-2012.pdf)

### Cut Losses and Move Forward

The USPTO has more and better options for providing production incentives to examiners. POPA agrees with the employee who wrote that an employee-friendly program "that rewards instead of punishes" is well within the agency's reach.

For example, POPA has repeatedly recommended creating more levels of production awards. Currently examiners receive a production award if they achieve 110 percent of their production goal. If, after striving for a while, they realize they can't make that goal, they naturally think, "Why knock myself out with all this voluntary overtime if I can't get something for my effort?" So their production drops to a fully successful level.

If the USPTO creates one or more intermediate production awards—say at 105 percent or at every percentage point over 100 percent—it encourages examiners to try their best throughout the quarter, rewarding them for every ounce of production effort. The cumulative effect of so many examiners giving so many extra ounces every quarter would equal tons more production—and a big boost to employee morale.

POPA stands ready to work with USPTO leaders to design cost-effective production programs that reduce the patent backlog while encouraging, rewarding and respecting employees. ▽

## Examiners Speak Out on Flat Goal Pilot

*The names of the examiners who authored the following letters were withheld for their protection.*

I won't be going on the Flat Goal Pilot because, had I done so last quarter, I would have been fired.

Using the flat rate calculations presented [by the USPTO], I decided to see how I would have fared under the proposed pilot.

Last quarter I used a fair amount of my accumulated annual leave. I took nine days at the beginning of the quarter and four days at the end, with perhaps a few days or half days here and there.

I also had 69 hours of other time, which I used:
■ training two junior examiners (one probationary);

*(continued on page 2)*



**UNITED STATES DEPARTMENT OF COMMERCE**
**The Inspector General**
Washington, D.C. 20230

January 7, 2013

The Honorable Frank R. Wolf
Chairman, Subcommittee on Commerce, Justice, Science,
  and Related Agencies
Committee on Appropriations
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

This responds to your correspondence of December 18, 2012, in which you requested that we address the current issues involving the Office of Special Counsel (OSC) and the Commerce Office of Inspector General (OIG). The OSC issues concern the language and circumstances of settlement and separation agreements with three former OIG law enforcement managers and two staff attorneys in 2010 and 2011. We recognize the important oversight role of the Subcommittee and wish to cooperate with the Subcommittee in any way we can.

To provide a full accounting of the actions our office has taken regarding this matter, we have provided detailed information, along with certain enclosed documents, addressing the interrelated areas of: (1) settlement and separation agreements with five former OIG employees; and (2) performance and conduct deficiencies in OIG's Office of Investigations that we have been addressing since 2011. Our actions include an ongoing personnel matter, and while that matter is related to our efforts to address mismanagement and misconduct in our Office of Investigations, we are unable to report on the details at this time. We are hopeful that this personnel matter will be resolved in the near future, at which point we would be at greater liberty to provide additional details to the Subcommittee. The enclosed documents have been redacted for privacy purposes, but unredacted copies will be provided to the Subcommittee upon request.

### *OIG has already taken action to address OSC's concerns about the employee settlement and separation agreements*

First, we have great respect for the mission and purpose of OSC and the statutes enforced by that office. In this case, however, OSC's actions, in particular citing their concerns about our use of non-disparagement and non-disclosure clauses in two separation agreements from 2011, were taken without providing us any opportunity to respond. Such agreements have commonly been used in both the private and public sectors to resolve employee relations matters. For example, as referenced in the enclosure, in early 2010, prior to transferring to Commerce OIG, a senior member of our organization signed a resolution agreement with the leadership of another federal OIG including non-disclosure terms comparable to those in the agreements in question.

We now understand that there has been concern and controversy surrounding the interpretation of these types of clauses and the lack of commonly understood definitions of such terms. In consideration of the fact that Congress has now provided clear guidance on the interpretation of such agreements through the recently enacted *Whistleblower Protection Enhancement Act of 2012*, we have taken steps in accordance with provisions of the Act for the agreements in question, to include, as discussed below, sending letters to the former employees and posting a notice on our public website. Further, we have directed that such language not be used in future settlement or separation agreements with Commerce OIG employees.

While we respect OSC's mission and purpose, OSC's initial legal actions were, in our view, unnecessary. As soon as we learned of OSC's interpretation and concerns about the language used in the settlement agreements, we offered, in writing, to modify or amend the agreements to address any concerns of OSC. We offered to take this action as a measure of good faith, even though these agreements are legally binding contracts signed by the former employees after consulting, or being encouraged to consult, personal counsel. Three of the agreements, negotiated and countersigned by the employees' retained attorneys, contained non-disparagement clauses[1] that referred to Congress and OSC. The two other agreements did not include such references.

We received no prior notice that OSC intended to file a petition with the Merit Systems Protection Board seeking a stay and make public their allegations concerning my office. If we had been given the opportunity, we could have provided OSC with substantial documentation and context under which these agreements were reached. Had we been given the opportunity to share this information with OSC in advance of their filing, it may have allowed OSC to reconsider its approach to this matter and demonstrated that the separation agreements in question were not motivated by ill intent, but instead were the result of our effort to manage through a very difficult set of personnel matters involving federal law enforcement officers.

***OIG senior leadership found significant mismanagement, performance deficiencies, and misconduct within the Office of Investigations***

As you know, my office has devoted considerable resources to address allegations against the National Oceanic and Atmospheric Administration's (NOAA) law enforcement program over the past few years. Our efforts to address performance and conduct issues present in our own law enforcement program required no less effort, and in certain respects the issues we found in our own operation are more serious than those we found at NOAA. However, unlike improprieties in NOAA's law enforcement program, some of which were disclosed to us by whistleblowing NOAA employees, none of the former OIG employees was a whistleblower and each had clearly documented performance and/or conduct issues preceding their agreements. Our use of non-disclosure clauses in these agreements was not intended to inhibit the reporting of alleged wrongdoing, but instead, consistent with the EEOC's standard definition of "disparagement," to protect against the reporting of false allegations. Additionally, in an effort to be fully transparent to the Department, I kept the Acting Secretary informed of

---

[1] Consistent with the Equal Employment Opportunity Commission's (EEOC) standard definition of "disparagement," these clauses were intended to protect against the reporting of false allegations.

our efforts in addressing these difficult matters involving our law enforcement personnel, through memoranda and regular meetings.

As further detailed in the enclosure to this letter, in February 2011, I reviewed the closing documentation for approximately 50 investigative cases (criminal, civil, and administrative) reported to me by the Office of Investigations management to have been closed in the previous month. The case closing documents reflected a significant lack of due professional care. For example, one Report of Investigation identified a subject of investigation where the individual's status as a non-executive branch official would have triggered notification to the Department of Justice (DOJ) in accordance with the Attorney General Guidelines, yet the existence of this was unknown to both me and the then-Deputy Inspector General.[2] The report was left unsigned by the Special Agent-in-Charge and contained no indication that the proper notification had been made as required by the Attorney General Guidelines. When asked for an explanation, the then-Assistant Inspector General for Investigations expressed his lack of awareness, which, for a senior law enforcement manager in charge of the Office of Investigations, was unacceptable and another indication that there were larger problems in our investigative operations.

In another example, a Report of Investigation was not signed as required and the signature block contained the names of individuals as the "Case Agent" and "Approving Official" who never even worked for Commerce OIG. In that instance, we found that a report template from another investigative agency had somehow been used, containing the names of that agency's staff rather than those of our agent and approving manager as required. OIG investigative reports are critical federal records of evidentiary value, and such unacceptable lack of due professional care contributed to my concern about management within the Office of Investigations. There were multiple other deficiencies with the reports.

Consequently, the then-Deputy Inspector General and I subsequently conducted a 100 percent case review between February and March 2011, where we emphasized compliance with investigative standards[3] such as due professional care, timely case completion, and proper reporting and documentation of the case file and results. Our review of the full inventory of cases, where we found systemic deficiencies, led to examination of other aspects of the management of OIG's investigative operations over the next six months, including firearms, government vehicles, policies, case management and case file maintenance, and accountability of special agent (criminal investigator) time. We found significant deficiencies in each of those areas as well.

Of greatest concern, in June 2011, during our review of OIG firearms, we discovered that Office of Investigations managers had acquired five fully automatic submachineguns in late 2009, without required Inspector General approval, and shortly thereafter unilaterally modified OIG's firearms policy by deleting this approval requirement. Beyond these plainly improper

---

[2] In early 2012, the then-Deputy Inspector General became Inspector General at another federal agency.

[3] Investigative standards include the *Quality Standards for Investigations* issued by the Council of Inspectors General for Integrity and Efficiency (CIGIE).

management actions, there was no justification or business case establishing the need for such weaponry, and none of our special agents were trained or qualified in the use of these firearms. As the previous Inspector General had done, I would have disapproved their acquisition. Office of Investigations management then spent $3,000 to secure the submachineguns that were improperly acquired in the first place. Further troubling, Office of Investigations management procured 60 semiautomatic pistols for a workforce of fewer than 20 special agents, an excessive three-to-one ratio, and improperly participated in a pistol trade-in program with the manufacturer contrary to federal law enforcement practice.

Inquiries into these circumstances were underway when two managers signed separation agreements that appear to be at the center of OSC's filing. In addition, unbeknownst to us and during our review of this matter, personnel under the supervision of the two managers used specialized law enforcement equipment (commonly known as a "body wire") to surreptitiously audio-record at least two meetings I and the then-Deputy Inspector General held with the Office of Investigations staff in June 2011 to explain the purpose of our ongoing reviews and address questions and concerns of the staff. This serious violation of Departmental and OIG policy was not discovered until November 2011, by which time those believed to be responsible had left OIG. As a result, we do not yet know the full extent of the secret and improper audio recordings conducted by these former mangers or their staff member(s). Also, it should be noted that such surreptitious recordings are unlawful in many jurisdictions, and in this case clearly represents abuse of their law enforcement positions.

Our review efforts were also carried out in preparation for the triennial external peer review which was scheduled for the Fall of 2011. The peer review is required pursuant to the Attorney General Guidelines for OIG's with statutory law enforcement authority (i.e., those whose special agents have 24/7 authority to carry firearms and perform searches and arrests, including Commerce OIG.) We sought to identify and self-disclose to the peer review team from the Office of Personnel Management OIG any and all deficiencies in our investigative operations. Although we passed the peer review, the OPM OIG noted in its report that they "seriously considered a report rating of "non-compliant," due to the repetition of multiple findings from prior [peer reviews]."[4] We note that the two managers who signed the separation agreements, along with a manager who signed a settlement agreement, had responsibility for correcting the deficiencies identified in prior peer reviews. One of those managers had represented to OIG's leadership that corrective actions had been taken, producing a report reflecting same, but ultimately those statements of compliance and the report turned out to be false.

---

[4] A "non-compliant" rating is tantamount to a failure of the peer review and may result in suspension of the OIG's law enforcement authority, the potential adverse impact of which would include OIG's inventory of open criminal investigations.

**Employees were not coerced and performance appraisals were not "manufactured" or "dishonest" as alleged**

We entered into two separation agreements because the managers were transferring to other law enforcement agencies while our inquiry into their involvement in the unauthorized acquisition of the submachineguns and subsequent policy alteration was underway. While we do not share OSC's interpretation of these agreements as "gag orders," or that they were coerced, we have written letters to the former employees and the private attorneys who represented them in these matters, waiving the agency's rights under the provisions and including written modification of the original agreements, to clarify that the former employees are in no way inhibited from communicating with Congress, OSC, or other parties.

As further explained in the enclosure, non-disparagement clauses in settlement agreements are, consistent with the EEOC's definition of "disparage," intended to protect agencies against *false* accusations, not to squelch individuals from legitimately blowing the whistle on fraud, waste, and abuse. Further, we dispute any assertion that the employees who signed the separation agreements were coerced and that their performance appraisals were manufactured and dishonest. OIG's attorneys negotiated these agreements with the employees' attorneys, not the employees themselves (i.e., at arm's length), and, as further addressed in the enclosure, their performance appraisals were accurate and justified based on the results of the management reviews we carried out dating back to February 2011 showing significant performance and conduct deficiencies for which they were responsible. The performance appraisals reflected the reality of their performance and the mismanaged and disorderly state of Office of Investigations operations for which they were accountable.

We also note that the then-Deputy Inspector General contributed to and approved the performance appraisals for these two managers, as well as particulars in support of potential personnel action against one of those managers. However, absent from OSC's filing is any reference to the involvement of the then-Deputy Inspector General in the management actions and performance appraisals.[5] This further underscores that OSC's filing did not rely on complete information about this matter.

When OSC becomes involved in a matter, it is commonly presumed that their involvement is based on credible allegations of retaliation against whistleblowers or other egregious prohibited personnel practices. In the circumstances of this matter, none of the employees involved was a whistleblower and each had clear, contemporaneous, and accurately documented performance and/or conduct issues preceding their departure from the OIG and the resulting agreements. We recognize that law enforcement officers and government attorneys, by virtue of their positions, inherently carry an imprimatur of presumed integrity and credibility, but they likewise are subject to the highest standards of ethical conduct and performance, which we are obligated to uphold.

---

[5] OSC's filing inaccurately refers to OIG's Counsel to the Inspector General as the "Deputy IG and Counsel to the IG." The filing makes no reference to the then-Deputy Inspector General, who had substantial involvement in our reviews and resultant actions.

Again, notwithstanding the foregoing circumstances, we have waived the agency's rights under the provisions in question and sent the former employees signed modified separation and settlement agreements, clarifying that they are in no way inhibited from communicating with Congress or OSC.

In closing, despite these very complicated and challenging circumstances, we are making every effort to be as transparent as possible about our actions. If I can answer any questions or be of further assistance, please contact me at 202-482-4661.

Sincerely,

Todd J. Zinser

**Enclosures**

1. Copies of five redacted settlement and separation agreements.

2. Detailed information addressing the foregoing matters, along with documents pertaining to OIG's review of investigative operations and management.

Enclosure to January 7, 2013, letter to House Appropriations Subcommittee Chair

## I. Settlement and separation agreements

Attached are the five settlement and separation agreements in question.  While serving the same purpose, each agreement was tailored to the individual employee and the circumstances surrounding their departure from the OIG.  Since 2010, the OIG has entered into five agreements with individual employees.  Of the five, four contained some form of non-disclosure or non-disparagement language.  Of the four with such language, one was so generic as to only state that the employee agrees, "not to disparage the Agency in any communications" and beyond that is silent.  The remaining three agreements contain the language that appears to be at the center of this controversy.

We note that such legal agreements, including non-disclosure provisions, have been common in both the private and public sectors, including the federal OIG community.  For example, an April 2010 resolution agreement between the senior leadership of another OIG in a large Department and a departing executive presently with Commerce OIG, who was represented by a former Member of the MSPB, stipulated the employee abide by the following:

> "Waive, release, and forever discharge the Agency, its officers, agents, employees, and representatives (in their official and/or personal capacities) from any claims, demands, or causes of action, which [the employee] has or may have, arising from [the employee's] employment with the Agency…This release includes, but is not limited to, a **release of any right to administrative (e.g., MSPB appeal or EEO complaint process), judicial, or congressional relief, or any other type of relief…"**   [emphasis added]

> "Not to disclose the nature and terms of this Agreement, except to [the employee's] immediate family, [the employee's] legal representative, as required by law, as necessary to implement the terms of the Agreement, or as ordered by a court or administrative body of competent jurisdiction."

We note that this employee specifically requested that the foregoing information be included in this response to the Subcommittee, in keeping with the employee's rights under the new disclosure provisions of the Whistleblower Protection Enhancement Act of 2012.

The circumstances of each of the attached five settlement and separation agreements in question are summarized as follows:

1. Employee A (staff attorney)

    Agreement signed in July 2010, including clear language suggesting that the employee consult with an attorney and the employee acknowledged this provision via signature.  The agreement was countersigned by two representatives of the Commerce Department's Office of General Counsel.

Significant performance and ethics-related deficiencies:  employee agreed to improperly change a formal legal opinion at the request of an OIG special agent.  The opinion concerned whether or not a complainant met the criteria under the Recovery Act to be considered a whistleblower.  The attorney had been persuaded by an OIG special agent to change the legal opinion to exclude the complainant's eligibility as a whistleblower.

Employee agreed to seek other employment over the following five months, at which point the employee would resign from federal employment, to avoid potential performance or disciplinary action and in order to keep the employee's performance record unblemished by potential performance and conduct related actions and documentation.

2. Employee B (senior criminal investigative manager)

   Agreement signed in February 2011; employee advised OIG that a personal attorney had been consulted—this was explicitly acknowledged in the agreement.

   Significant performance deficiencies.  Employee requested and voluntarily accepted reassignment, was permitted to retain an Assistant IG title, and subsequently transferred to another OIG as a GS-15, Step 10.

3. Employee C (staff attorney)

   Agreement signed in August 2011; represented by counsel who signed the agreement, along with a representative of the Department of Commerce's Office of General Counsel.

   Long standing performance problems.  Unsuccessful on two performance improvement plans, informal and formal.  Employee was eligible and permitted to retire under the early retirement program and also received a buyout the same as several other employees who participated in the early retirement program.

4. Employee D (senior criminal investigative manager)

   Agreement signed in August 2011; represented by counsel who signed the agreement.

   Unsatisfactory management of the Office of Investigations and potential misconduct.  Performance deficiencies documented extensively in May and June 2011, including a June 21, 2011, list of performance deficiencies prepared by the then-Deputy Inspector General to support an adverse administrative action.

   Employee subsequently transferred to another federal law enforcement agency as a criminal investigator.  The transfer occurred during the pendency of a review of the unauthorized acquisition of 5 submachineguns by members of Office of Investigations management, including the after-the-fact, unilateral alteration of OIG's policy to eliminate the requirement for Inspector General approval for such weapons, and participation in

the trade-in of OIG pistols with the manufacturer, contrary to federal law enforcement practice.

5.  Employee E (senior criminal investigative manager)

Agreement signed in September 2011; represented by counsel who signed the agreement.

Unsatisfactory management of the Office of Investigations and potential misconduct. Performance deficiencies documented extensively in May and June 2011.

Employee subsequently transferred to another federal law enforcement agency as a criminal investigator. The transfer occurred during the pendency of a review of the unauthorized acquisition of 5 submachineguns by members of Office of Investigations management, including the after-the-fact, unilateral alteration of OIG's policy to eliminate the requirement for Inspector General approval for such weapons, and participation in the trade-in of OIG pistols with the manufacturer, contrary to federal law enforcement practice.

The Subcommittee's correspondence asked why the OIG felt it necessary to propose non-disclosure provisions in the agreements. The OIG's mission relies on truthful and informative disclosures from concerned employees and whistleblowers within and outside of the Department. Without these critical disclosures, our oversight work would be much more challenging and countless instances of waste, fraud, and abuse could go unreported. The OIG understands the value of these protections and has always supported their use in the Department and within the OIG. Government processes such as whistleblower protections and access to EEO grievance procedures, access to the Congress and the media are in place for good reasons and serve to protect employees who make protected disclosures or complaints against coworkers or managers. These valuable processes are shields intended to safeguard employee rights and are not intended to confound valid personnel actions based on either performance or conduct. Unfortunately, some employees choose to use these processes to retaliate against management when they become subjects of performance or conduct action by management. Here, the OIG was managing through extremely difficult times involving senior-level employees with significant conduct or performance issues.

The non-disparagement provision was first proposed in a settlement agreement with an employee in 2011.[1] This provision was drafted with the EEOC's definition of non-disparagement in mind. The EEOC's example settlement agreement posted on their website includes a standard definition of non-disparagement as *"false information or the communication of information with the reckless disregard to its truth."* The three agreements that contain non-disparagement provisions specifically mentioning Congress, OSC and the media were negotiated fairly, openly and at arm's length between the Agency and each employee's private counsel. The OIG values an employee's access to the Congress, OSC and the EEO grievance

---

[1] Although the settlement and separation agreements contain both non-disparagement and non-disclosure clauses, they are often viewed interchangeably.

process. Use of those valuable processes, however, must be based on integrity, honesty, and transparency, otherwise those processes are reduced in effectiveness.

The OIG felt that, in order to ensure the accuracy and integrity of communications to third parties, the agreements must take into consideration the OIG's concerns with the past performance, conduct, and actions of these employees. In the three agreements that contain language regarding non-disparagement of the agency to third parties, each of the employees had either issued written threats of baseless complaints against the agency after facing performance and conduct issues, included false or inaccurate information in grievances against the agency after facing a potential performance based action, or had clear veracity issues as demonstrated during an internal inquiry regarding the unauthorized procurement of unneeded submachineguns for the OIG.

It was never the intent of the OIG to quell communications with any third party. Consistent with the EEOC definition of "disparage," our only intent was to ensure that those communications, if they occurred, would be fact-based, honest and not contain one-sided hyperbole. It is our view that the agreements permitted the employees to report allegations against officials in the OIG and Department. Given the fact that the agreements were negotiated by their attorneys, it is reasonable to expect that if an employee had a question about interpreting the agreement, the employee would have consulted their retained attorney. It is also reasonable to expect that an employee would have had the attorney raise allegations on behalf of the employee if the employee had any concerns about doing so. In no way were these provisions coerced or intended to inhibit whistleblowing to Congress or OSC, and they were entered into only after transparent and balanced arm's length negotiations with the employee's attorney.

Finally, the Subcommittee's correspondence asked that we describe the contents of the agreements, if permissible. The OIG seeks to be transparent in this matter and in all our interactions with the Subcommittee. To that end, we have included the ones discussed above with all employee-identifying information redacted for privacy. Additionally, we are allowed to share these agreements with your office as a result of the Subcommittee's written request and the express terms of the agreements.

## 2. *Performance and conduct deficiencies in the Office of Investigations*

Summarized below, and with several key documents attached, are the efforts taken by OIG's senior leadership to address serious performance and conduct issues within the Office of Investigations—preceding any claim of whistleblowing by the involved law enforcement managers.

In February 2011, during its regular monthly meeting with the Inspector General and then-Deputy Inspector General, the Office of Investigations management provided data showing that approximately 50 investigations had been closed in the preceding month (a very high number for OIG). The following day, the Inspector General requested closing documents (investigative reports, memoranda, etc.) for those 50 cases reported closed since January 1, 2011. The documentation reflected numerous deficiencies in case management. For example, one Report

of Investigation identified a subject of investigation where the individual's status as a non-executive branch public official would have triggered notification to the Department of Justice (DOJ) in accordance with the Attorney General Guidelines, yet the existence of this was unknown to the Inspector General, the then-Deputy Inspector General, and the then-Assistant Inspector General for Investigations.

Based on the numerous observed case record deficiencies, along with the upcoming external peer review, the Inspector General and then-Deputy Inspector General jointly reviewed 100 percent of cases, including previously closed cases from June 2010 forward (the period covered by the peer review), personally meeting with each case agent and their supervisor in February and March 2011. This review disclosed systemic deficiencies in how cases were being opened, conducted, and managed. The review of the full inventory of cases led to our examination of other aspects of the management of OIG's investigative operations over the next six months, including firearms, government vehicles, policies, case management and case file maintenance, and accountability of special agent time. We found significant deficiencies in each of those areas as well.

An associated review of all OIG Computer Crimes Unit cases disclosed even more troubling deficiencies, including that the group's caseload of open investigations was inflated; more specifically, that many open cases should have been closed, in some instances years earlier. This fostered, at a minimum, an appearance that the caseload was high in order to justify staffing resources or to evade review by the peer review (only closed cases are subject to peer review). Consequently, in May 2011, the Inspector General recommended that performance and/or conduct action should be considered for the then-Director of the Computer Crimes Unit.

In June 2011, the then-Deputy Inspector General and Principal Assistant Inspector General for Investigations met with the then-Director of the Computer Crimes Unit, advising that the review of the Computer Crimes Unit revealed performance shortcomings on the part of the then-Director in the areas of case management, documentation of investigative activities, non-adherence to CIGIE Quality Standards, and poor use of the case management system. The then-Director was further advised that if rated that day, the then-Director's performance would be rated at less than satisfactory. The then-Director was also informed that the Computer Crimes Unit was being disbanded based on the review finding of a very small actual workload.

On June 16, 2011, the Inspector General, then-Deputy Inspector General, and recently appointed Principal Assistant Inspector General for Investigations met with Office of Investigations staff to explain the status of the ongoing organizational performance review and address any questions or concerns of the staff. The Inspector General followed-up this meeting on June 30, 2011, by meeting alone with the staff, without management present, to update them on the ongoing review and answer questions. These meetings with the staff were meant to be transparent and provide assurances that our efforts were intended to strengthen the operation and not sweep deficiencies under the rug. However, it was later discovered, in November 2011 by an OIG special agent, that other agent(s) in attendance had surreptitiously audio-recorded both of these meetings with an undergarment microphone and recorder (commonly

referred to as a "body wire")—a serious violation of Departmental and OIG policy. We believe these improper recordings were carried out by agent(s) assigned to the Computer Crimes Unit, underscoring the serious cultural problems that existed within the Office of Investigations.

In reviewing records of OIG's firearms inventory, the Principal Assistant Inspector General for Investigations discovered apparent improprieties involving the Office of Investigations acquisition of 5 fully automatic submachineguns. Based on this troubling finding, on June 17, 2011, the Principal Assistant Inspector General for Investigations requested OIG's Office of Counsel to conduct an internal inquiry.

On July 1, 2011, the Inspector General sent a memorandum to the then-Deputy Inspector General, Principal Assistant Inspector General for Investigations, and Counsel to the Inspector General outlining 12 current elements of the review of performance and conduct issues in the Office of Investigations, and requesting that the review be completed and corrective action be initiated by the end of the fiscal year. (Attachment 6)

Based on discrepancies concerning the Office of Investigations management of Government-owned vehicles, which were identified by an OIG audit yet never corrected by management of the Office of Investigations, an internal inquiry was initiated in July 2011.

On August 12, 2011, the Principal Assistant Inspector General for Investigations sent a letter to OPM OIG, assigned to conduct the triennial peer review of the Office of Investigations in Fall 2011, providing pre-site materials and an overview of the results of an internal quality assurance review. The overview, prepared by the Principal Assistant Inspector General for Investigations and the then-Deputy Inspector General, included the following:

"…[W]e note that during the peer review period, OIG's Office of Investigations (OI) underwent significant changes in management due, in large part, to program performance shortcomings identified by OIG senior leadership in a close examination of OI's case management. The results of that examination have led to a number of changes, some of which are ongoing, to OI's case management policies, procedures, and systems, along with changes in personnel, including senior management within OI."

On August 26, 2011, the Inspector General sent a memorandum to the Acting Secretary concerning the management review of the Office of Investigations. (Attachment 7)

On September 29, 2011, the then-Deputy Inspector General and Principal Assistant Inspector General for Investigations provided a memorandum to the Inspector General summarizing the results of the management review of the Office of Investigations, in response to the Inspector General's July 1, 2011, memorandum. (Attachment 8)

Based on the numerous case management deficiencies disclosed by the review, and a finding that the Office of Investigations internal quality assurance review in preparation for the peer review was seriously flawed, the then-Deputy Inspector General carried out a detailed examination of case closings. On October 28, 2011, the then-Deputy Inspector General sent a

memorandum to the Inspector General reporting numerous significant deficiencies he found in his review.  (Attachment 9)

In November 2011, OIG's Office of Counsel completed its administrative inquiry regarding the Office of Investigations acquisition of submachineguns.  The inquiry found serious violations of OIG policy, including the unilateral alteration of OIG's formal policy to eliminate the requirement for Inspector General approval for such weapons, and lack of credible explanations.  The responsible and culpable Office of Investigations managers left OIG prior to completion of the inquiry.

In April 2012, OPM's Inspector General transmitted the final peer review report to the Commerce Inspector General, which included identification of four deficiencies.  While issuing an overall rating of "compliant," the Conclusion section of the report included the following:

> "We seriously considered a report rating of "non-compliant," due to the repetition of multiple findings from prior [peer reviews]."

The three Office of Investigations managers who signed separation and settlement agreements had responsibility for correcting the deficiencies from the prior peer reviews, including the preceding one in 2008.

**Attachments (redacted)**

- Settlement and separation agreements.

  1. July 2010 settlement agreement with staff attorney.

  2. February 2011 settlement agreement with senior criminal investigative manager.

  3. August 2011 settlement agreement with staff attorney.

  4. August 2011 separation agreement with senior criminal investigative manager.

  5. September 2011 separation agreement with senior criminal investigative manager.

- Documents pertaining to OIG's review of investigative operations and management.

  6. July 1, 2011, memorandum from Inspector General to then-Deputy Inspector General and Principal Assistant Inspector General for Investigations, captioned "Current Elements of OI Management Review."

  7. August 26, 2011, memorandum from Inspector General to Acting Secretary, captioned "Management Review of OIG Office of Investigations."

  8. September 29, 2011, memorandum from then-Deputy Inspector General and Principal Assistant Inspector General for Investigations, captioned "Response to Current Elements of OI Management Review."

  9. October 28, 2011, memorandum from then-Deputy Inspector General to Inspector General and Principal Assistant Inspector General for Investigations, captioned "Analysis of OI Case Closings from May 2010 to September 2011."

## U.S. DEPARTMENT OF COMMERCE

### RESOLUTION AGREEMENT

1) **PARTIES.** The parties, ▮▮▮▮▮▮▮▮ and the <u>Office of Inspector General, U.S. Department of Commerce</u> (hereinafter the Agency or OIG), voluntarily agree to resolve any appeals or any other issues resulting from ▮▮▮▮▮ employment with the Agency.

2) ▮▮▮▮▮ In consideration of the Agency taking the actions described in Paragraph 3 below, ▮▮▮ agrees to the following:

   a) **RESIGNATION.** Voluntarily and irrevocably resign from employment with the Agency. Concurrently with signing this Agreement, ▮▮▮▮ will complete, sign, and date Part E of the attached Standard Form (SF) 52 effecting his voluntary, irrevocable resignation from his employment with the Agency. ▮▮▮▮ agrees to execute any conforming copies or other forms necessary to effectuate his resignation and will receive a copy of the final, executed SF 52 and any other forms he signs to effectuate this agreement. The effective date of his resignation will be January 9, 2011. The reason provided for his resignation will be "voluntary resignation."

   b) Enter into a full-time alternative worksite or telework agreement with the Agency until the effective date of his voluntary resignation. ▮▮▮▮ will make himself available to perform duties assigned to him at his management's discretion. By entering into this Agreement, ▮▮▮▮ waives any right to grieve or appeal his management's right not to assign him work if it so chooses.

   c) ▮▮▮▮ waives his right to a performance appraisal for the 2010 Performance year and any accompanying claim to a monetary performance award or performance-related increase in his salary.

   d) Refer those seeking employment references to ▮▮▮▮▮

   e) Except as otherwise provided herein, waive, release, and forever discharge the Agency, its officers, agents, employees, and representatives (in their official and/or personal capacities) from any claims, demands, or causes of action that ▮▮▮▮ has or may have, arising from his employment and any management actions pertaining to his employment at the Agency. This provision includes but is not limited to a release of any right to administrative (e.g. MSPB appeal or EEO complaint process), judicial or congressional relief or any other type of relief; or any claim for back pay, attorney's fees, compensatory damages, and costs, or other forms of compensation, except what is specifically set forth in Paragraph 3 below. However, by entering into this Agreement, ▮▮▮▮ does not waive prospective rights or claims.

Initials: ▮▮▮ Employee         ▮▮▮▮ Management Official

                                          Agency Representative

3) **AGENCY.** In consideration of ▊▊▊ taking the actions described in Paragraph 2 above, the Agency agrees to the following:

   a) Refrain from placing ▊▊▊ on a performance improvement plan (PIP) or proposing or taking any other performance-related or conduct-related action against ▊▊▊ Management waives its right to propose and take performance-based or other action against ▊▊▊ based on management's exercise of its right not to assign ▊▊▊ work under this Agreement. In entering into this Agreement, the Agency does not waive its right to propose and take a disciplinary action against ▊▊▊ should he engage in misconduct subsequent to the effective date of this Agreement.

   b) Process ▊▊▊ voluntary resignation effective January 9, 2011. In the event that ▊▊▊ finds employment outside of OIG prior to the effective date of his resignation, the Agency will process the necessary paperwork to effect his transfer (if the new position is with the Federal government) or separation.

   c) In response to future employment inquiries, ▊▊▊ will provide the following only: the dates of ▊▊▊ employment, his title, series, grade, and salary. Any disclosure beyond that contemplated here made by any employee of the Agency other than ▊▊▊ ▊▊▊ including employees unfamiliar with the terms of this Agreement, will not be considered a breach of this Agreement.

4) **NON-ADMISSION.**

   a) This Agreement does not constitute an admission by the Agency of any liability, fault or error by the Agency, its employees or its agents in regard to its treatment of ▊▊▊

   b) This Agreement does not constitute an admission by ▊▊▊ that any of the allegations against him have merit or that he is at fault or error as alleged.

5) **NOT PRECEDENT.** The parties agree that this Agreement has no precedential effect. Specifically, neither the agreement, nor any term(s) will be used as a basis by any person, or persons to justify similar terms in any subsequent matter. It shall not be used, cited or relied upon by any party in connection with any other judicial or administrative proceeding.

6) **NON-DISCLOSURE.** Both parties agree to keep the nature and terms of this Agreement confidential as described in this paragraph. The terms of the Agreement may not be disclosed to any person or entity beyond the persons signing below, except to ▊▊▊ spouse and immediately family, as required by law, as necessary to implement the terms of the Agreement, or as ordered by a court or administrative body of competent jurisdiction.

Initials: ▊▊▊ Employee



Management Official

Agency Representative

Page 2 of 4

7) **TOTALITY OF AGREEMENT.** This Agreement constitutes a fair, full and final resolution of all aspects of ████████ employment with the Agency, and contains all terms and conditions of the agreement between the parties. No other conditions or assurances, expressed or implied, are included.

8) **RIGHT TO REPRESENTATION.** ████████ is aware of the right to representation by an attorney and is encouraged to have ████████ representative review this Agreement prior to signing.

9) **EFFECT OF SIGNATURE.** By signing this Agreement, ████████ agrees that he has read and understands the entire Agreement, the effect(s) of each provision, especially the provisions relating to his voluntary resignation, and that ████████ has signed this Agreement and the attached SF-52 voluntarily and was in no way coerced.

   ████████ shall have twenty-one (21) days from the date of receipt of this Agreement to consider its terms. Should ████████ sign this Agreement before the twenty-one (21) day time period has expired, ████████ attests that ████████ decision to accept such a shortening of this period is knowing and voluntary, and was not induced by the Agency through fraud, misrepresentation, and/or threat to withdraw or alter the terms of the Agreement. ████████ has seven (7) days from the date all parties have provided signatures to this Agreement to revoke the Agreement. The Agreement shall not become effective or enforceable until the revocation period has expired.

10) **JOINT PRODUCT.** This Agreement is a joint product and will not be construed against any party on the grounds of sole authorship.

Initials: ████████ Employee



Management Official

Agency Representative

Page 3 of 4

11) **EFFECTIVE DATE.** This Agreement becomes effective after the seven (7) day revocation period has expired. The revocation period begins when the Agreement is fully executed by the signatories designated below to include all concurrences.



Employee

Date

Management Official

Date

Agency Representative

Date

Concurrences:

Human Resources Officer

Date

Office of General Counsel

Date



Initials:           Employee                    Management Official

Agency Representative

Page 4 of 4

# Settlement Agreement

### PRELIMINARY STATEMENT

In the interest of closure and in the mutual resolution of their differences, the <u>Office of Inspector General, U.S. Department of Commerce</u> (hereinafter the Agency or OIG) and ▇▇▇▇▇ (hereinafter ▇▇▇▇▇ entered into this Settlement Agreement on February 17, 2011.

### TERMS AND CONDITIONS

1) In exchange for the promises made by the Agency in this Agreement except as otherwise provided herein, ▇▇▇▇▇ agrees to waive, release, and forever discharge the Agency, its officers, agents, employees, and representatives (in their official and/or personal capacities) from any claims, demands, or causes of action that ▇▇▇▇▇ has or may have, arising from his employment to date and any management actions pertaining to his employment at the Agency to date. This provision includes but is not limited to a release of any right to administrative (e.g. MSPB appeal or EEO complaint process), judicial or congressional relief or any other type of relief; or any claim for back pay, attorney's fees, compensatory damages, and costs, or other forms of compensation. However, by entering into this Agreement, ▇▇▇▇▇ does not waive prospective rights or claims.

2) ▇▇▇▇▇ further agrees:

   a) to voluntarily remove himself from the Senior Executive Service and ▇▇▇▇▇ ▇▇▇▇▇ position no later than March 27, 2011;

   b) not to disparage the Agency in any communications; and

   c) that the Agency may advertise for his replacement at any time prior to March 27, 2011.

3) In consideration of ▇▇▇▇▇ taking the actions described in Paragraph 2 above, the Agency agrees:

   a) to expunge all references to poor performance during the current appraisal period from ▇▇▇▇▇ official personnel file;

   b) to place ▇▇▇▇▇ in a ▇▇▇▇▇ position, the title of which will be determined prior to March 27, 2011;

   c) In entering into this Agreement, the Agency does not waive its right to propose and take a disciplinary action against ▇▇▇▇▇ should he engage in misconduct subsequent to the effective date of this Agreement.

4) This Agreement does not constitute an admission by the Agency of any liability, fault or error by the Agency, its employees or its agents in regard to its treatment of ▇▇▇▇▇ Nor does this

1

Initial ▇▇ Initial _

Agreement constitute an admission of poor performance or improper conduct by 

5) The parties understand the terms of this Agreement and enter into it voluntarily.

6) This document constitutes a final and complete statement of the Agreement between the parties. There shall be no modification or amendments to this Agreement unless they are in writing, signed by the parties.

7) The parties agree that this Agreement has no precedential effect. Specifically, neither the agreement in its entirety, nor any term(s) will be used as a basis by any person, or persons to justify similar terms in any subsequent matter. It shall not be used, cited or relied upon by any party in connection with any other judicial or administrative proceeding.

8) ⬛⬛⬛⬛ and the Agency agree to keep the nature and terms of this Agreement confidential. The terms of the Agreement may not be disclosed to any person or entity beyond the persons signing below, except as required by law, or as necessary by the Agency to implement the terms of the Agreement, or as ordered by a court or administrative body of competent jurisdiction.

9) This Agreement is a joint product and will not be construed against any party on the grounds of sole authorship.

10) This Agreement becomes effective when it has been signed by all signatories, including concurrences.

11) Having been advised to consult with an attorney and having done so, ⬛⬛⬛ knowingly and voluntarily waives all rights under the Age Discrimination in Employment Act of 1967 (ADEA) arising from his employment to date and waives the 21-day review period for this Agreement provided by Federal law.

12) ⬛⬛⬛ may revoke this agreement within seven (7) days of its effective date.



Date

Employee

Date

Management Official

2



Date

OGC
Agency Representative

Concurrences:

Date

Human Resources Officer

Date

Office of General Counsel

3

VOID    VOID

CWMCO /    **Settlement Agreement**    /

VOID    **PRELIMINARY STATEMENT**

VOID    VOID

**WHEREAS** the Office of Inspector General (OIG), the U.S. Department of Commerce (collectively, the Department) and ▮▮▮▮ (hereinafter ▮▮▮ wish to resolve their differences amicably;

**THEREFORE** in the interest of closure and in the mutual resolution of their differences, the Department and ▮▮▮▮ voluntarily enter into this Settlement Agreement (Agreement) on the *19* day of August 2011. The essence of this Agreement is to utilize voluntary early retirement authority (VERA) that is currently being sought from the Office of Personnel Management (OPM) and the Office of Management and Budget (OMB) under 5 U.S.C. § 8336 and 5 C.F.R. § 842.213 and to stay further action on the Proposal until ▮▮▮▮ VERA retirement is resolved under this Agreement.

**TERMS AND CONDITIONS**

1) ▮▮▮ In consideration of the Department taking the actions described in Paragraph 2 below, ▮▮▮ agrees to the following:

   a) His signature on this Agreement constitutes his application for any VERA opportunity for which he qualifies. At this time, the Department's data suggests that ▮▮▮ qualifies for VERA under the criteria of 5 U.S.C. § 8336(d)(2) and 5 C.F.R. § 842.213(k).

      i.   If the OIG receives VERA and ▮▮▮ application is approved ▮▮▮ shall retire pursuant to VERA at the earliest possible date. This date will be determined by the OIG based upon the VERA authority approved by OPM.

      ii.  If the OIG receives VERA, ▮▮▮ will promptly respond to any request for information relating to his application for VERA from Departmental personnel, including but not limited to his management or human resources staff, but he shall respond no later than one business day after receiving such a request.

      iii. On the effective date of this Agreement, ▮▮▮ agrees to request administrative leave and remain in that status until the exhaustion of 120 hours of administrative leave, which will be granted by the OIG.

         (1) After the administrative leave described in Paragraph 1(a)(iii) has been exhausted, ▮▮▮ agrees to request annual leave and remain in that status until the exhaustion of all annual leave.

      iv.  ▮▮▮ agrees that administrative leave is not an entitlement under this Agreement and if the OIG receives VERA and ▮▮▮ application is approved, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

For the OIG



██████ shall retire pursuant to VERA at the earliest possible date as described in Paragraph 1(a)(i) even if that date is during the period that ██████ has been placed in annual or administrative leave status.

v.  In the event the that OIG receives VERA from OPM and OMB and ██████ attempts to rescind his voluntary early retirement described above, this Agreement shall form the basis for the Department processing ██████ voluntary resignation from the Federal service. The parties agree that this paragraph is void if ██████ rescinds his voluntary early retirement for the purpose of accepting another Federal position.

b)  In the event that ██████ separates from the Federal service pursuant to Paragraph 1(a)(i), above, he agrees neither to apply for nor accept employment with the Department for a period of five years from the effective date of his separation unless the OIG waives this limitation in writing.

c)  Except as otherwise provided herein, ██████ agrees to waive, release, and forever discharge the Department, its officers, agents, employees, and representatives (in their official and/or personal capacities) from any claims, demands, or causes of action that ██████ has or may have, arising from his employment prior to the effective date of this Agreement and any management actions pertaining to his employment at the Department to date. This provision includes but is not limited to a release of any right to administrative (e.g., a Merits Systems Protection Board (MSPB) appeal or the Equal Employment Opportunity complaint process), judicial or congressional relief or any other type of relief; or any claim for back pay, attorney's fees, compensatory damages, and costs, or other forms of compensation, except what is specifically set forth in Paragraph 2 below. However, by entering into this Agreement, ██████ does not waive prospective rights or claims.

d)  In the event that, subsequent to the period in which a final decision is held in suspension subject to this Agreement, the OIG issues a final decision in the form of an appealable adverse action, ██████ will retain his right to appeal the adverse action to the MSPB. ██████ agrees as part of an MSPB appeal to waive any defense that the OIG unreasonably delayed issuing the Decision after he submitted his Reply to the Proposal.

e)  In addition to the waiver and release in Paragraph 1(c), above, ██████ knowingly and voluntarily waives all rights under the Age Discrimination in Employment Act of 1967 (ADEA) and any claims, demands, or causes of action that ██████ may have relating to age discrimination arising from his employment to date and any management actions pertaining to his employment at the Department prior to the effective date of the Agreement. Federal law provides that ██████ may have 21 days from receipt of the Agreement to review and consider this Agreement before signing it. ██████ acknowledges that the OIG has provided him with more than 21 days to review and consider this Agreement. Federal law also requires us to advise ██████ to consult an attorney before signing this Agreement. ██████ acknowledges that he has consulted with an attorney before signing this Agreement. Federal law further provides that ██████

Page 2 of 6

For the OIG

_____ may revoke this Agreement within seven (7) calendar days of signing this Agreement.

2) **OIG.** In consideration of _____ taking the actions described in Paragraph 1 above, the OIG agrees to the following:

a) To seek VERA from OPM and OMB.

b) To approve _____ application for VERA if the legal requirements are met.

c) To suspend its decision on the proposed action recommended by _____ first-line supervisor from the effective date of this Agreement until:

    i. _____ retires from Federal service pursuant to VERA, in which case the OIG will rescind the Proposal; or

    ii. OPM or OMB denies the OIG's VERA application; or

    iii. The OIG determines the decision regarding VERA from OPM or OMB will be unreasonably delayed. The determination of whether the decision will be unreasonably delayed shall be at the sole discretion of the OIG.

d) If the OIG revokes its suspension of the final decision and the deciding official issues an adverse action, the Department and the OIG agree that:

    i. This Agreement does not impact _____ ability to defend himself in any subsequent appeal to the MSPB, except as provided in Paragraph 1(d) above;

    ii. The waivers included in Paragraphs 1(e) and 1(e) no longer apply; and

    iii. The non-disparagement clause (Paragraph 4) no longer applies.

e) If _____ retires pursuant to VERA under this Agreement, after a reasonable period of time, but no later than 60 days after _____ retires, the OIG and the Department will remove from all official supervisory personnel files in the possession and control of the _____ and _____

    i. All documents concerning _____ Performance Improvement Plan (PIP) (both informal and formal PIPs);

    ii. The formal and informal PIP memoranda;

    iii. All documents, including the SF-50, relating to _____ suspension; and

For the OIG

Page **3** of **6**

iv. All documents concerning the proposed removal from Federal service issued to ▓

f) The Department agrees that it will not rely upon records or documents described in Paragraph 2(e) in any action against ▓ *provided*, however, that the OIG is permitted to retain a copy of such documents in its Counsel's office for use only in the event that ▓ initiates any claim or matter against the Department contrary to this Agreement.

g) If ▓ retires pursuant to VERA under this Agreement, the Department agrees to waive, release, and forever discharge all claims, demands and causes of action which the Department has or may have against ▓ arising from his employment at the Department prior to the effective date of this Agreement.

h) In response to any and all prospective employers who may seek job references regarding ▓ in the future, the OIG agrees to confirm the dates of ▓ employment with the Department and to say nothing inconsistent with the Fiscal Year (FY) 2011 performance rating issued to ▓ pursuant to Paragraph 2(i), below.

i) The OIG agrees that after ▓ retires, but no later than 45 days after the close of the FY 2011 performance year, it will generate an FY 2011 performance rating with scores identical to the rating of ▓ FY 2009 performance, i.e., an overall rating of 4 and a 5 for professional effectiveness.

j) If the OIG decides to seek voluntary separation incentive payment (VSIP) authority, and if this authority is granted, the OIG agrees to treat ▓ application no differently than any other OIG employee who may qualify at the time of his application. In the event that ▓ retires pursuant to VERA, the OIG will pay ▓ the difference between $25,000 and the amount of any VSIP paid to ▓ under VERA. Under this Agreement, the combined maximum amount payable to ▓ is $25,000 gross.

5) NON-ADMISSION.

a) This Agreement does not constitute an admission by the Department of any liability, fault, or error by the Department, its employees or its agents in regard to its treatment of ▓

b) This Agreement does not constitute an admission by ▓ of any misconduct or less than fully successful performance during his tenure in the OIG.

Page 4 of 6

For the OIG

4) **NON-DISPARAGEMENT.**

a) ▮▮▮▮ agrees:

   i. To not disparage the Department, its officers, agents, employees, and representatives (in their official and/or personal capacities) in any form of communication to any person or entity including, but not limited to, Members of Congress and their staff, the Office of Special Counsel, and the media. However, nothing in this Agreement shall prevent or inhibit ▮▮▮▮ from responding truthfully to direct questions posed to him in writing or in the course of a formal hearing before any legislative, executive, or judicial body.

b) The Department agrees:

   i. To not disparage ▮▮▮▮ in any form of communication except as required by law or in response to direct questions posed in writing or in the course of a formal hearing before any legislative, executive, or judicial body.

5) **NOT PRECEDENT.** The parties agree that this Agreement has no precedential effect. Specifically, neither the Agreement, nor any term(s) will be used as a basis by any person or persons, to justify similar terms in any subsequent matter. It shall not be used, cited or relied upon by any party in connection with any other judicial or administrative proceeding.

6) **NON-DISCLOSURE.** ▮▮▮▮ and the Department agree to keep the nature and terms of this Agreement confidential. The terms of the Agreement may not be disclosed to any person or entity beyond those represented by the signatures below, except; ▮▮▮▮ counsel; his tax advisor; and his immediate family, as necessary, by the Department to implement the terms of the Agreement; as required by law or agency policy or procedure; or as ordered by a court, legislative, or administrative body of competent jurisdiction.

7) **TOTALITY OF AGREEMENT.** This document contains all terms and conditions of the agreement between the parties. There are no other conditions or assurances, expressed or implied. There shall be no modifications or amendments to this Agreement unless they are in writing and signed by all parties.

8) **EFFECT OF SIGNATURE.** By signing this Agreement, the parties agree that they have read and understand the entire Agreement, including the effect(s) of each provision. The parties further agree they have signed this Agreement voluntarily and in no way under duress or coercion.

9) **JOINT PRODUCT.** This Agreement is a joint product and will not be construed against any party on the grounds of sole authorship.

Page 5 of 6

For the OIG



(1) **EFFECTIVE DATE.** The effective date of this Agreement is the date on which ███████ revocation period expires, i.e., the 8th calendar day after the Agreement has been fully executed.

Date

Employee

Date

Employee's Representative

Date

Management Official

OGC
Date
Department Representative

Concurrences:

Date
Human Resources Officer

Date
Office of General Counsel

Original Copy # 1 (OIG)

## Separation Agreement

### PRELIMINARY STATEMENT

In the interest of closure and in the mutual resolution of their differences, the Office of Inspector General (the OIG) and ████████████ entered into this Separation Agreement (Agreement) on August 24, 2011.

### TERMS AND CONDITIONS

1) In exchange for the promises made by the OIG in this Agreement, except as otherwise provided herein, ████████ agrees to waive, release, and forever discharge the Agency, its officers, agents, employees, and representatives (in their official and/or personal capacities) from any relief arising from any claims, demands, or causes of action that ████ may have arising from his employment to date and any management actions pertaining to his employment at the Agency to date, to the extent such waiver, release, and discharge are permitted by law. This provision specifically includes but is not limited to the release of any pending request that ████ has submitted to the OIG under the Freedom of Information Act and the informal Equal Employment Opportunity complaint that ████ initiated on June 14, 2011 (collectively "Claims"), and by signing below, ████ is agreeing to withdraw these Claims. This provision further includes but is not limited to a release of any right to administrative (e.g., a Merit Systems Protection Board appeal or the Equal Employment Opportunity complaint process), judicial or congressional relief or any other type of relief, or any claim for back pay, attorney's fees, compensatory damages, and costs, or other forms of compensation. However, by entering into this Agreement, ████ does not waive rights or claims that may arise in the future.

2) ████ further agrees:

   a) not to disparage the Agency in any communications to any person or entity, including but not limited to Members of Congress and their staff, the Office of Special Counsel, and the media. However, nothing in this Agreement shall prevent or inhibit ████ from responding truthfully to direct questions posed to him in writing or in the course of a formal hearing before any legislative, executive, or judicial body; and

   b) that the Agency may advertise for his replacement at any time after execution of this Agreement.

3) In consideration of ████ taking the actions described in Paragraph 2 above, the OIG agrees:



For the OIG          For

Original Copy # 1 (OIG)

a) to effectuate ███████ transfer from his position in OIG on August 28, 2011 to permit him to enter onto duty in a new federal position effective that day; and

b) to only confirm the dates of ███████ employment and grade and step level with the Department in response to any and all prospective employers who may seek job references regarding ███████ in the future.

c) to stay and withhold any adverse action against ███████ until after ███████ has separated from his employment with the OIG.

d) to refrain from placing any copies of the close out appraisal completed upon ███████ separation from the OIG in his Official Personnel File; copies of the close out appraisal will be maintained in the file of ███████ OIG manager and in the Office of Counsel.

4) In entering into this Agreement, the Agency does not waive its right to propose and take disciplinary action against ███████ should he engage in misconduct subsequent to the effective date of this Agreement.

5) This Agreement does not constitute an admission by the Agency of any liability, fault or error by the Agency, its employees or its agents in regard to its treatment of ███████

6) The parties understand the terms of this Agreement and enter into it voluntarily.

7) This document constitutes a final and complete statement of the Agreement between the parties. There shall be no modification or amendments to this Agreement unless they are in writing, signed by all parties.

8) The parties agree that this Agreement has no precedential effect. Specifically, neither the Agreement in its entirety, nor any term(s) will be used as a basis by any person, or persons, to justify similar terms in any subsequent matter. It shall not be used, cited or relied upon by any party in connection with any other judicial or administrative proceeding.

9) ███████ and the Agency agree to keep the nature and terms of this Agreement confidential. The terms of the Agreement may not be disclosed to any person or entity beyond the persons signing below and those persons and entities represented by the persons signing below, except as required by law, as necessary to implement the terms of the Agreement, or as ordered by a court or administrative body of competent jurisdiction.

10) This Agreement is a joint product and will not be construed against any party on the grounds of sole authorship.

11) This Agreement becomes effective on the date on which ███████ revocation period expires, i.e. the 8th calendar day after it has been signed by ███████

Page 2 of 4



For the OIG      For ███████

Original Copy # 1 (OIG)

12) In addition to the waiver and release in Paragraph 1, ▓▓▓▓ knowingly and voluntarily waives all rights under the Age Discrimination in Employment Act of 1967 (ADEA), as amended, and any claims, demands, or causes of action that ▓▓▓▓ may have relating to age discrimination arising from his employment to date and any management actions pertaining to his employment at the Department prior to the effective date of the Agreement. Federal law provides that ▓▓▓▓ may have 21 days from receipt of the Agreement to review and consider this Agreement before signing it. Federal law also requires the OIG to advise ▓▓▓▓ to consult an attorney before signing this Agreement. ▓▓▓▓ acknowledges that he has consulted an attorney before signing this Agreement and has knowingly waived his right to review and consider the Agreement for 21 days. Federal law further provides that ▓▓▓▓ may revoke this Agreement within seven (7) calendar days of signing this Agreement. Any such revocation must be submitted in writing to the Office of Counsel clearly stating ▓▓▓▓ intent to revoke this Agreement.

13) In the event that ▓▓▓▓ exercises his right to revoke this Agreement in writing during the revocation period contemporary with or after his transfer from employment with the OIG, the OIG may deliver a full accounting of ▓▓▓▓ performance over the last performance year to his new employer.

14) In the event that ▓▓▓▓ attempts to rescind in writing his transfer from OIG to another agency, this Agreement shall form the basis for the OIG processing ▓▓▓▓ voluntary resignation from the federal service.

_____       _____
                                    Date
Employee

_____       _____
                                    Date
Counsel for Employee

_____       _____
                                    Date
Management Official

Page 3 of 4



Original Copy # 1 (OIG)

Human Resources Officer

Counsel to the Inspector General

## Separation Agreement

### PRELIMINARY STATEMENT

In the interest of closure and in the mutual resolution of their differences, the Office of Inspector General (the OIG or the Agency) and ███████████████ entered into this Separation Agreement (Agreement) on September 6 , 2011.

### TERMS AND CONDITIONS

1) In exchange for the promises made by the OIG in this Agreement, except as otherwise provided herein, ███████ agrees to knowingly and voluntarily waive, release, and forever discharge the Agency, its officers, agents, employees, and representatives (in their official and personal capacities) from any relief arising from any claims, demands, or causes of action that ███████ may have arising from his employment to date and any management actions pertaining to his employment at the Agency to date, to the extent such waiver, release, and discharge are permitted by law. This provision specifically includes but is not limited to the release of any pending request that ███████ has submitted to the OIG under the Freedom of Information Act (FOIA), as well as requests submitted on his behalf, including the August 10, 2011 request submitted by ███████████ consequently, by signing below, ███████ agrees to withdraw all current FOIA requests. This provision further includes but is not limited to a release of any right to administrative (e.g., a Merit Systems Protection Board appeal or the Equal Employment Opportunity complaint process), judicial or congressional relief or any other type of relief, or any claim for back pay, attorney's fees, compensatory damages, and costs, or other forms of compensation. However, by entering into this Agreement, ███████ does not waive rights or claims that may arise in the future.

2) ███████ further agrees:

   a) not to disparage the Agency in any communications to any person or entity, including but not limited to Members of Congress and their staff, the Office of Special Counsel, and the media. However, nothing in this Agreement shall prevent, prohibit or impair ███████ from responding truthfully to direct questions posed to him in writing or in the course of a formal hearing before any legislative, executive, or judicial body; and

   b) that the Agency may advertise for his replacement at any time after execution of this Agreement.

3) In consideration of ███████ taking the actions described in Paragraph 2 above, the OIG agrees:



For the OIG

a) to effectuate ▮▮▮▮ transfer from his position in OIG by no later than October 9, 2011 to permit him to enter into duty in a new federal position effective that day;

b) to respond to any and all prospective employers who may seek job references regarding ▮▮▮▮ by only confirming the dates of ▮▮▮▮ employment, and his grade and step level with the Department;

c) to refrain from proposing and/or taking any adverse action against ▮▮▮▮ for his conduct or job performance, and further refrain from placing documentation of such proposed or effectuated adverse action or any references to any proposed or effectuated adverse action in ▮▮▮▮ Official Personnel File; copies of such documentation may be maintained in the file of ▮▮▮▮ OIG manager and in the Office of Counsel; and

d) to reflect that any transfer by ▮▮▮▮ from the Agency to another agency will be reflected as voluntary and for personal reasons and to process all relevant personnel actions so that ▮▮▮▮ transfer out of the Agency is reflected as "voluntary and for personal reasons" or its equivalent.

4) In entering into this Agreement, the Agency does not waive its right to propose and take disciplinary action against ▮▮▮▮ should he engage in misconduct subsequent to the effective date of this Agreement.

5) This Agreement does not constitute an admission by the Agency of any liability, fault or error by the Agency, its employees or its agents in regard to its treatment of ▮▮▮▮ or his experience while employed with the OIG.

6) The parties understand the terms of this Agreement and enter into it voluntarily.

7) This document constitutes a final and complete statement of the Agreement between the parties. There shall be no modification or amendments to this Agreement unless they are in writing, signed by all parties.

8) The parties agree that this Agreement has no precedential effect. Specifically, neither the Agreement in its entirety, nor any term(s) will be used as a basis, or for any other purpose, by any person, or persons, to justify similar terms in any subsequent matter. It shall not be used, cited or relied upon by any party in connection with any other judicial or administrative proceeding.

9) ▮▮▮▮ and the Agency agree to keep the nature and terms of this Agreement confidential. The terms of the Agreement may not be disclosed to any person or entity beyond the persons signing below and those persons and entities represented by the persons signing below, except as required by law, as necessary to implement the terms of the Agreement, or as ordered by a court or administrative body of competent jurisdiction.


For the OIG

Page 2 of 4

10) This Agreement is a joint product and will not be construed against any party on the grounds of sole authorship.

11) ███ acknowledges that he is not otherwise entitled to the consideration listed in paragraph 3 of this Agreement.

12) ███ understands and agrees that pursuant to the Older Worker Benefit Protection Act (OWBPA) he has 7 calendar days to revoke this Agreement; however, he further agrees that for purposes of efficiency, the effective date of the Agreement will be upon his signature.

13) In addition to the waiver and release in Paragraph 1, ███ knowingly and voluntarily waives all rights under the Age Discrimination in Employment Act of 1967 (ADEA), as amended, and any claims, demands, or causes of action that may have relating to age discrimination arising from his employment to date and any management actions pertaining to his employment at the Department occurring prior to the effective date of the Agreement. Federal law provides that ███ may have 21 calendar days from receipt of the Agreement to review and consider this Agreement before signing it. Federal law also requires that the OIG advise ███ to consult an attorney before signing this Agreement. ███ acknowledges that he has consulted an attorney before signing this Agreement. Federal law further provides that ███ may revoke this Agreement within seven (7) calendar days of signing this Agreement. Any such revocation must be submitted in writing to the Office of Counsel clearly stating ███ intent to revoke this Agreement.

14) In the event that ███ exercises his right to revoke this Agreement in writing during the revocation period contemporary with or after his transfer from employment with the OIG, the OIG will deliver a full accounting of ███ performance over the last performance year to his new employer.

15) In the event that ███ attempts to rescind in writing his transfer from OIG to another agency, this Agreement shall form the basis for the OIG processing ███ voluntary resignation from the federal service. A delay of no more than two months in total from the effective date of this Agreement in ███ transfer stemming from circumstances beyond his control will not be construed as an attempt to rescind his transfer from OIG to another agency; however, a delay of more than two months in ███ transfer from the effective date of this Agreement shall be interpreted by the OIG as ███ rescinding his transfer from OIG to another agency and shall form the basis for OIG processing ███ voluntary resignation from the federal service.

16) An executed copy of this Agreement will be maintained in the Office of Counsel.

17) This Agreement may be signed in counterparts and transmitted by facsimile and/or electronic copy, each of which counterparts will be deemed to be an original and which taken together will constitute one Agreement, binding upon all parties hereto.



For the OIG

Page 3 of 4



Employee                                              Date

Counsel for Employee                                  Date

Management Official                                   Date

Human Resources Officer                               Date

                                                      Date



For the OIG



**UNITED STATES DEPARTMENT OF COMMERCE**
**The Inspector General**
Washington, D.C. 20230

July 1, 2011

MEMORANDUM FOR:     Scott Dahl
                         Deputy Inspector General

                         Rick Beitel
                         Principal Assistant Inspector General for Investigations

FROM:                     Todd J. Zinser
                         Inspector General

SUBJECT:               Current Elements of OI Management Review

This is to memorialize the current elements comprising our review of OI management to ensure common understanding of these elements and the basis for our review. I appreciate the input you have provided over the past week.

The OIG Office of Investigations is budgeted at $5.2 million for FY11 with a current staff of approximately 26.

We have been conducting a management review of OI for the last several months that has continued to evolve based on serious deficiencies in the operation we have identified. You held an All Hands meeting with OI staff on June 16th during which you discussed many of these deficiencies with the staff.

In ▮▮▮ 2011, the ▮▮▮▮▮▮▮▮▮▮▮▮ stepped down ▮▮▮▮▮▮▮▮▮▮▮ position after being confronted with significant performance deficiencies. ▮▮ has since left the agency via a transfer to ▮▮▮▮▮▮▮▮▮▮▮▮▮ Another ▮▮▮▮▮ has transferred to a non-investigative position in another agency, reportedly ▮▮▮▮▮▮▮ A▮ ▮▮▮▮▮ hired within ▮▮▮▮▮ resigned from federal service and a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as taken a downgrade to a ▮▮▮ in transferring to a ▮▮▮▮▮

The current elements of our review are as follows:

1. **Mismanagement and alleged misconduct by** ▮▮▮▮▮▮▮▮▮▮▮▮ Our Office of Counsel (OC) is investigating circumstances concerning how OIG obtained 5 automatic submachine guns without the required approval of the Inspector General. Preliminary review indicates that the weapons were obtained contrary to existing policy and that the policy was subsequently changed, after the fact, to delete the requirement for IG approval. OC is also reviewing the significant performance deficiencies of ▮▮▮▮▮▮▮▮▮▮▮▮▮ which I outlined in an email to you on May 26, 2011 (attached) to determine what, if any, action is warranted.

2. **Mismanagement of the government vehicles:** There are two activities underway: 1) right-sizing the type of vehicles and the number of vehicles the OIG leases, and 2) attempting to reconstruct significant lack of documentation concerning the use of the vehicles and reviewing questionable charges on the fuel credit cards.

3. **Mismanagement of weapons:** Eliminating the excessive number of Glock handguns, and properly disposing of all automatic submachine guns and all shotguns.

4. **Mismanagement of OI Policies:** The policies are in disarray, must be fixed, and have been in a "draft" state for an unacceptable amount of time, despite OI management being told by the FO last year to move forward on processing the policies.

5. **QAR/Peer Review:** Past OI management's neglect to appy appropriate resources to the upcoming peer review required OIG Leadership to step in and procure the services of a retired federal OIG official from the ▮▮▮▮▮ to assist in the preparation for the peer review. ▮▮▮ is reviewing the universe of cases and aspects of the operation that will be subject to the peer review and is preparing a report for Leadership. This report is necessary because the QAR conducted by ▮▮▮▮▮ was wholly deficient.

6. **Review of current case inventory:** Identifying and resolving aged and completed cases that should be closed and removed from the active inventory. A FO case review conducted in February/March 2011 identified numerous cases that needed to be closed. A FO follow-up in May on IGCIRTS found multiple cases that were resolved in some instances years ago yet remained as open investigations, giving rise to at least an appearance that the caseload was greater than it really was or, worse, in order to keep cases from being examined during the upcoming peer review, which will review only closed cases.

7. **Disbanding the CCU:** The review documented significant non-performance and under performance by the unit, ▮▮▮▮▮ n May 2011, the unit had only 10 open matters divided among ▮▮ staff. As a result, the unit has been disbanded and the staff is now integrated into the staff of the ▮▮▮▮ Field Office.

8. **Case opening procedures:** New procedures are being put in place for opening investigations, including case designations, prioritization and assignments. A recent review found that some of the "preliminary" matters had been open for a year or more without being converted to a full investigation.

9. **Mismanagement of case files and investigative records:** OI transitioned to an electronic case file system in October 2009, but even with this electronic system, OI must still have a system for maintaining paper records, files and documentation. There are serious indications, including potentially inadequate controls around the handling of 6(e) information, that the filing system and procedures are in significant disarray and must be fixed. In addition, a FO review on IGCIRTS found numerous documents that were not dated or had other deficiencies, including references to documents that were not in the electronic case file. When the FO informed OI managers about the failure to date investigative documents, ▮▮▮▮▮ stated that having the agents date documents would require a policy change.

10. **Accountability for Special Agent time:** The productivity of OI is unacceptable. The FO case review established a serious lack of case management and for many agents raised obvious questions about how they were spending their time. As a result, the Inspector General

instructed the Principal AIGI to establish a requirement that OI staff document their work on an hourly basis in order to provide a greater level of transparency and accountability for their time, including the 25% salary premium received by the special agents.

11. **New management and processes for the Hotline:** The ▮▮▮▮▮▮ is transferring to another agency. Unlike ▮▮▮▮▮▮▮▮ who have already transferred, ▮▮▮▮▮▮ departure is not related to performance issues. At the same time, we have issued a contract for Hotline intake which requires that updated processes and procedures for complaint intake and processing be in place. Management and staffing for the Hotline must be addressed. In the past, the Hotline has been a significant source of cases that should have never been opened as investigations.

12. **IG-CIRTS:** Our management review determined that IG-CIRTS is not an adequate management information system. We have decided not to invest anymore time, resources or efforts into further developing or modifying the system. Requirements and a plan for a new system are needed. The software being used to develop systems for OC and the OIG help desk will be used if possible.

I would like to meet with you on these items on a weekly basis to the maximum extent our schedules will allow with an objective of resolving as many of these items as possible by the end of the fiscal year.

Attachment

Cc: Wade Green

#

3

**Zinser, Todd**

| | |
|---|---|
| **From:** | Zinser, Todd |
| **Sent:** | Thursday, May 26, 2011 9:12 AM |
| **To:** | Beitel, Rick |
| **Cc:** | Dahl, Scott; Green, Wade |
| **Subject:** | Review of OI cases |

Each day this week I have been reviewing selected OI cases. I requested a current list of open cases and began reviewing that report. My initial intent was to try to compare the list of cases against the cases we reviewed in February/March to determine what progress had been made on those cases since our review.

On Tuesday I identified 4 cases assigned to ███████████ three cases assigned to ███████ and one case assigned to ████████ that I instructed be closed by Friday 5/27/11.

Based on the information provided to me, these cases represented all cases assigned to ███████████ and half of ████ caseload.

Yesterday I looked at ████████ caseload and found two cases that ████ had reviewed on Tuesday and identified them for closing by 6/15/11. I instructed that they be closed by the end of the week. In one case, for example, (HQ-CC-10-0018-I) an allegation of child porn was received from PTO in march 2007. By June 2007, we determined that the computer contained no evidence of child porn and that something (not documented in the file) was referred back to PTO. There is no indication why the case remained opened for almost 4 years. The ROI is also devoid of any information about the disposition of any administrative action taken by PTO. The ROI is not dated and the author is not indicated. IG_Cirts is showing this morning that the case was closed yesterday.

In the second case I reviewed yesterday (HQ-CC-10-0174-M), the file shows that in June 2008, a NOAA employee was arrested in Arlington County, VA for soliciting a 13 year old girl over the internet. We were asked to seize his computer. The employee resigned from NOAA in ███████ 2009. The SF-50 was entered into IG-CIRTS on 5/24/11. Case is not yet closed.

Today I looked at a case assigned to ███████████ (HQ-CC-10-0021-I). In that case, we received an allegation in August 2006 that a NOAA employee was suspected of viewing child pornography at work. In November 2006, it was determined that there was no evidence on the employee's computer that pornography he was viewing included child pornography. On 7/15/2010, the employee's SF-50 showing his retirement in ████████████ was entered into IG-CIRTS. On July 20, 2010, a "FINAL IRF" was entered into IG-CIRTS. On 5/24/2011, agent notes and a ROI was entered into IG_CIRTS. The ROI is not dated and the author is not indicated. The case listing we used in our February/March case reviews shows this case closed on 7/21/10. A report I received dated 5/24/11 is still showing the case opened.

I have not yet reviewed the other two cases assigned to ████

In summary, I've looked at cases assigned to ███████████ and each of the ████ special agents assigned to ████ unit. There are a total of 13 cases. The cases I've reviewed exhibit, at a minimum, unacceptable performance. I am recommending that disciplinary and/or performance action be considered with respect to ██████

Todd J. Zinser
Inspector General
U.S. Department of Commerce
Room 7898c
1401 Constitution Ave., NW

1

On the morning of 5/24/ 11, I reviewed IG-CIRTS for ████████████ cases.

The list of cases assigned to ██████ included four cases, as follows:

HQ-CC-10-0017-I:  This was a case involving alleged sexual harassment using government email and alleged drug trafficking by a Census employee. It had been opened since 2008. The subject was removed in March 2009. Case remained opened for over 2 years with no activity and no report of investigation. On March 24, 2011, I directed ███ o close the case. The final ROI indicates that the AIGI at the time told the reporting agent that OIG lacked investigative jurisdiction for the drug allegation and directed that all investigative activity cease.  There is no contemporaneous documentation of this discussion and this information is not consistent with case file documentation of a June 2010 case review during which the reporting agent was directed to: "1) follow up with CEN on subject's employment status; 2) check status of any narcotics related investigation; 3) close case."

HQ-CC-10-0023-I: This was a case involving a NOAA employee in Boulder Colorado viewing adult pornography. It had been opened since 2006. The computer forensic analysis was conducted in 2006. The subject interview was conducted in September 2007. Information was provided to NOAA for administrative action but it is not clear from records in IG-CIRTS what was provided, when or with whose approval. The subject resigned in September 2010. Case remained opened until I directed it be closed in May 2011, five years after the complaint came in. The ROI is dated May 2011 so it is unknown what information was provided to NOAA, in what format and with whose approval.

HQ-CC-10-1311-I: This case involved alleged child pornography. It was opened in August 2010. Information was referred to NOAA at some point during 2010 but what information was referred, when and with whose approval is not indicated in IG-CIRTS. The computer forensic analysis conducted between August 2010 and November 2010 did not disclose child pornography. The subject resigned in January 2011. Nonetheless, the case remained opened for 5 months until I directed it be closed in May 2011.

HQ-CC-1037-V: This was a special project assigned to ████████ There is only one document in the file and that document does not contain a true and accurate description of the assignment. In May 2010 I directed the AIGI to conduct an analysis of OIG employees to check for any misuse of the internet, specifically using OIG IT systems to surf the internet for pornography.  I did this in anticipation of a possible Congressional request pertaining to the Department similar to publicity concerning the SEC. I wanted to be sure that OIG did not have a problem should we be asked to look at other parts of the Department. IG-CIRTS indicates that this matter was not assigned until July 2010. As of May 2011, it remained unfinished with no documentation in IG-CIRTS such as case review notes or agent's notes.  It is unknown why this matter was not properly documented in IG-CIRTS and why the assignment was misrepresented in such a way. On the May 24, 2011, the matter was reassigned from ████████ o ████ he basis for the reassignment is not included in IG-CIRTS,

**UNITED STATES DEPARTMENT OF COMMERCE**
**The Inspector General**
Washington, D.C. 20230

August 26, 2011

MEMORANDUM TO THE ACTING SECRETARY

FROM:     Todd J. Zinser
          Inspector General

SUBJECT: Management Review of OIG Office of Investigations

Over the past six months, I have personally carried out a management review of the OIG Office of Investigations (OI). I have been aided in that review by the Deputy Inspector General, Counsel to the Inspector General and the current Principal Assistant Inspector General for Investigations whom I appointed to that position in March 2011.

On February 11, 2011, I requested that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ provide me with the documents supporting 50 cases that ▮▮▮ reported having closed since January 1, 2011. As a result of my review of those documents, I conducted a 100% case review with each of the Special Agents and their supervisors. On March 27, 2011, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ voluntarily stepped down from ▮▮▮ position and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ has since transferred to another agency.

My review of cases led to my review of other aspects of our management of investigative operations including but not limited to weapons, government vehicles, policies, maintenance of case files, case management, including case opening procedures, and accountability of Special Agent time. Since I have undertaken this review, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ have accepted downgraded positions at ▮▮▮▮▮▮▮▮ with other agencies.

We have streamlined the management of our Office of Investigations and have worked diligently for the past 6 months to address the issues uncovered in my management review. In October 2011, our investigative operation will be peer reviewed by another Federal OIG. I fully expect the peer review to highlight the areas for improvement we have already identified for ourselves. The peer review will determine whether there is reasonable assurance that our investigations are carried out according to standards established by the IG community and the Attorney General guidelines. We will provide a copy of the peer review results to you for your information as soon as they are available.

No matter the results of the peer review, the performance of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ selected to manage the operation, did not meet my standards. Accordingly, new management has been installed and our investigative operations continue to be reviewed under new leadership.

Please let me know if I can provide any further information.

Confidential

Contains Information Subject to the Privacy Act. Any request for disclosure or further dissemination should be referred to the Counsel to the Inspector General.





**UNITED STATES DEPARTMENT OF COMMERCE**
**Office of Inspector General**
Washington, DC 20230

September 29, 2011

MEMORANDUM FOR:    Todd J. Zinser
                   Inspector General

FROM:              Scott Dahl
                   Deputy Inspector General

                   Rick Beitel
                   Principal Assistant Inspector General
                    for Investigations & Whistleblower Protection

SUBJECT:           Response to Current Elements of OI Management Review

This sets forth the response to your memorandum dated July 1, 2011, memorializing the current elements comprising our review of the Office of Investigation (OI) management. The response is highlighted in red after each element. The actions addressing each element were the result of discussions and decisions made at weekly meetings with the Inspector General and Counsel.

The current elements of our review are as follows:

1. **Mismanagement and alleged misconduct by** ▮▮▮▮▮▮▮▮▮▮▮ Our Office of
   Counsel (OC) is investigating circumstances concerning how OIG obtained 5 automatic
   submachine guns without the required approval of the Inspector General. Preliminary review
   indicates that the weapons were obtained contrary to existing policy and that the policy was
   subsequently changed, after the fact, to delete the requirement for IG approval. OC is also
   reviewing the significant performance deficiencies of ▮▮▮▮▮▮▮▮▮▮▮▮▮ which I
   outlined in an email to you on May 26, 2011, to determine what, if any, action is warranted.

   > The ▮▮▮▮▮ referenced in this element have since left the OIG. Prior to ▮▮▮▮
   > departures, ▮▮▮ were notified that ▮▮ had performed at an unacceptable level.

   An inquiry conducted by OC involving the procurement of submachine guns has been
   completed and an internal report is being drafted. The basic finding in the inquiry is that
   the weapons were procured in contravention of the then applicable OI policy section on
   firearms requiring IG approval and that subsequent to the procurement, the requirement
   for IG approval was improperly deleted from the policy. The ▮▮▮▮▮▮▮▮▮▮▮▮▮
   responsible for the change to the policy section when asked for ▮▮ explanation for why
   ▮▮ made the change ▮▮ responded that the change was an "error" and was not intentional.

U.S. Department of Commerce – Office of Inspector General
FOR OFFICIAL USE ONLY
(Public availability to be determined under 5 U.S.C. 552)

For ▮▮▮▮▮▮ who had the significant performance deficiencies referenced in your May 26 email ▮▮▮ was provided a memorandum outlining these deficiencies.

2. **Mismanagement of the government vehicles:** There are two activities underway: 1) right-sizing the type of vehicles and the number of vehicles the OIG leases, and 2) attempting to reconstruct significant lack of documentation concerning the use of the vehicles and reviewing questionable charges on the fuel credit cards.

An OIG special investigator conducted an inquiry into OI's management of the vehicles and the agents' use of the vehicles. A report of that inquiry will be completed in October 2011. The basic findings of that inquiry are that agents were instructed by ▮▮▮▮▮▮ ▮▮▮▮ not to continue to ask for approval each time that they wanted to take the vehicles home, despite the requirement of supervisory approval in the then applicable policy on use of government vehicles. The OI's policy on use of a government vehicle is under revision to address the issues raised in the internal inquiry.

3. **Mismanagement of weapons:** Eliminating the excessive number of Glock handguns, and properly disposing of all automatic submachine guns and all shotguns.

The excess Glock handguns, the automatic submachine guns, and the shotguns have been properly disposed of in accordance with General Services Administration regulations.

In addition, the ▮▮▮▮▮▮ who served as ▮▮▮▮▮▮▮▮▮▮▮ has been relieved of ▮▮▮ duties and will be leaving the OIG in ▮▮▮▮▮ This agent led OIG's 2010 trade-in to Glock of the OIG's 60 9mm Glock pistols, with ▮▮▮ verbal, undocumented understanding at the time from Glock that OIG's traded-in pistols would not be resold to the public. Glock has informed OIG that, consistent with a disclaimer on its price quote, it made no such representation to the ▮▮▮▮▮▮ and, in fact, reconditioned OIG's traded-in pistols (by law retaining the original serial number, traceable to OIG) and provided them to distributors and dealers, including pawn shops, which in turn have sold multiple pistols to private individuals.

4. **Mismanagement of OI Policies:** The policies are in disarray, must be fixed, and have been in a "draft" state for an unacceptable amount of time, despite OI management being told by the FO last year to move forward on processing the policies.

The current OI Policies that have been on the shared drive for all agents to follow have also been placed in the OIG intranet. Many policies have been revised to address deficiencies found during the case reviews, and these policies are under review by senior management to be approved in October 2011. OI management will host one or more training sessions on the revised policies. OI will continue to follow the policy development process set forth in the OIG Policy on Policies and will continue to post the policies in force on the intranet.

5. **QAR/Peer Review:** Past OI management's neglect to apply appropriate resources to the upcoming peer review required OIG Leadership to step in and procure the services of ▮▮▮▮▮▮ retired federal OIG official from the ▮▮▮▮▮▮ to assist in the preparation for the peer review ▮▮ is reviewing

U.S. Department of Commerce – Office of Inspector General
FOR OFFICIAL USE ONLY
(Public availability to be determined under 5 U.S.C. 552)

the universe of cases and aspects of the operation that will be subject to the peer review and is preparing a report for Leadership. This report is necessary because the OAR conducted by ███████████ was wholly deficient.

> ███████████ conducted and prepared a quality assessment review that was provided to the OPM Peer Review Team for the peer review scheduled to begin on October 31, 2011. ███ and others reviewed closed cases and the policies to determine what needed to be changed to address the identified deficiencies. A memorandum from OI management will be provided to the OI staff discussing the deficiencies in these reviews and what steps have been taken to address them.

6. **Review of current case inventory:** Identifying and resolving aged and completed cases that should be closed and removed from the active inventory. A FO case review conducted in February/March 2011 identified numerous cases that needed to be closed. A FO follow-up in May on IG-CIRTS found multiple cases that were resolved in some instances years ago yet remained as open investigations, giving rise to at least an appearance that the caseload was greater than it really was or, worse, in order to keep cases from being examined during the upcoming peer review, which will review only closed cases.

> OI and Front Office leaders have reviewed the current case inventory to identify cases that should be closed using a variety of factors, including age of the case and lack of investigative activity. OI management has met with each agent to conduct a case review on all open cases using a checklist to determine if further investigative activities are justified and to set forth parameters and schedule for further work.

> We notified the Peer Review Team that we have closed and will be closing additional cases that we invited the team to include in their selection sample. A revised list of the cases to be considered by the team was sent on September 23, 2011.

7. **Disbanding the CCU:** The review documented significant non-performance and under performance by the unit, ███████████ In May 2011, the unit had only 10 open matters divided among the staff. As a result, the unit has been disbanded and the staff is now integrated into the staff of the ███████ Field Office.

> The CCU was disbanded in May 2011. ███████████ who had been assigned to the CCU ███ reassigned to the ███ to handle normal investigative cases and provide computer forensics assistance to other cases as needed. ███████████ was assigned to provide forensic assistance in other cases. ███████████ subsequently left the OIG in ███████████

8. **Case opening procedures:** New procedures are being put in place for opening investigations, including case designations, prioritization and assignments. A recent review found that some of the "preliminary" matters had been open for a year or more without being converted to a full investigation.

> A new procedure was developed for case opening in July 2011. A checklist with criteria is now used to evaluate each new matter to determine the best disposition. In addition, in June 2011, all preliminary cases that had been open for longer than 60 days were

U.S. Department of Commerce – Office of Inspector General
FOR OFFICIAL USE ONLY
(Public availability to be determined under 5 U.S.C. 552)

4

converted to investigations. Now, preliminary cases are automatically converted after 30 days to either an investigation, a referral, or closed.

9. **Mismanagement of case files and investigative records:** OI transitioned to an electronic case file system in October 2009, but even with this electronic system, OI must still have a system for maintaining paper records, files and documentation. There are serious indications, including potentially inadequate controls around the handling of 6(e) information, that the filing system and procedures are in significant disarray and must be fixed. In addition, a FO review on IGCIRTS found numerous documents that were not dated or had other deficiencies, including references to documents that were not in the electronic case file. When the FO informed OI managers about the failure to date investigative documents ███████████████ ated that having the agents date documents would require a policy change.

> OI moved to a paper-based case management system in August 2011.
> Agents were also instructed on what documents had to be included in the case file and on the proper storage of 6(e) materials, with corresponding changes made to OI policies. The incoming complaints, intake, case assignment and designation, and case disposition
> · continue to be uploaded in IG-CIRTS, which will continue to be used to capture, track, and report data on OI cases.

10. **Accountability for Special Agent time:** The productivity of OI is unacceptable. The FO case review established a serious lack of case management and for many agents raised obvious questions about how they were spending their time. As a result, the Inspector General instructed the Principal AIGI to establish a requirement that OI staff document their work on an hourly basis in order to provide a greater level of transparency and accountability for their time, including the 25% salary premium received by the special agents.

> Starting in August· 2011, agents were instructed to account for each half hour of their time. On a periodic basis, the time records are run for OI management.

11. **New management and processes for the Hotline:** The ███████████ s transferring to another agency. Unlike ███████████ who have already transferred ███████ eparture is not related to performance issues. At the same time, we have issued a contract for Hotline intake which requires that updated processes and procedures for complaint intake and processing be in place. Management and staffing for the Hotline must be addressed. In the past, the Hotline has been a significant source of cases that should have never been opened as investigations.

> The new Hotline Director has worked with the contractor to improved the complaint intake process and make it more responsive to OI needs. In addition, new procedures· have been put in place for case opening listing specific criteria that will be used for vetting each complaint. The Hotline Director and ███ staff also have been tracking the trends and types of complaints received for each of the DOC bureaus. This information has been forwarded to the bureaus on a quarterly basis.

12. **IG-CIRTS:** Our management review determined that IG-CIRTS is not an adequate management information system. We have decided not to invest anymore time, resources or efforts into further

U.S. Department of Commerce – Office of Inspector General
FOR OFFICIAL USE ONLY
(Public availability to be determined under 5 U.S.C. 552)

developing or modifying the system. Requirements and a plan for a new system are needed. The software being used to develop systems for OC and the OIG help desk will be used if possible.

We have gone to a paper-based system for case management, but we continue to use IG-CIRTS for the tracking of incoming complaints and disposition. We are still exploring and evaluating other systems to possibly replace IG-CIRTS.

cc: Wade Green

Attachments
        Exhibits

U.S. Department of Commerce – Office of Inspector General
FOR OFFICIAL USE ONLY
(Public availability to be determined under 5 U.S.C. 552)



**UNITED STATES DEPARTMENT OF COMMERCE**
**Office of the Inspector General**
Washington, DC  20230

October 28, 2011

MEMORANDUM FOR:     Todd J. Zinser
                                   Inspector General

                                   Rick Beitel
                                   Principal Assistant Inspector General
                                    for Investigations & Whistleblower Protection

FROM:                     Scott Dahl
                                   Deputy Inspector General

SUBJECT:               Analysis of OI Case Closings from May 2010 to September
                                 2011

      This memorandum is a summary of an analysis I conducted on 58 closed cases from the Office of Investigations during the time period from May 1, 2010 to September 30, 2011.

**Background**

      During a meeting on OI management in August 2011, you asked me to conduct a review of a sample of the closed cases that will be on the list provided to the CIGIE Peer Review Team for its review during the week of October 31.  My review of 58 cases covers slightly less than half of the list we provided to the Peer Review Team.  The objective of my review was for us to ascertain what our deficiencies and vulnerabilities are with the closed cases so that we could address them through policy and process changes.

      OI management had completed a closed case review in March 2011 Quality Assessment Review (QAR) led by a former OI manager.  The Front Office found deficiencies in this March QAR, including the closed case review in which only 5 out of the 39 cases reviewed identified significant shortcomings in the diligence and timeliness of investigations (4 out of the 5 by one reviewer).  My review of those same 39 found that 20 were not investigated with due diligence and in a timely manner, with some cases having periods of a year or more with no investigative activity. The QAR identified significant problems with periodic supervisory case reviews (15 out of 39) and lack of investigative plans (26 out of 39).  My review of those same 39 found even more cases that failed in the two categories.

U.S. Department of Commerce – Office of Inspector General
FOR OFFICIAL USE ONLY
(Public availability to be determined under 5 U.S.C. 552)

**Methodology**

In my analysis, I used the "CIGIE Peer Review Individual Closed Case Review Checklist" to examine the closed cases. I started with the original 39 included in OI's March QAR and expanded the list, after consulting with Rick Beitel, to include 19 additional cases, for a total of 58. After reviewing dozens, patterns and themes emerged that made further review unnecessary and repetitive.

At the outset of my review, I went into IG CIRTS to review the closed case file, but I found that it was cumbersome and appeared at the time for some cases not to include agents' case notes or e-mail communications with supervisors or others, including prosecutors. I therefore asked           to send a message to all agents to upload any case related materials from their files into IG CIRTS.      then pulled the materials from IG CIRTS and placed them in single PDF files following an outline that we developed with case opening materials in the front and the ROI closing memorandum at the back.

I reviewed the materials electronically and then printed relevant parts of the file to be included in binders for me to make notes on and as a record of my assessment. The completed checklist is placed on top of each case file.

The factors that I considered in making my determinations for when a case was not diligently investigated or timely completed with a report included the following:

- Significant periods of time of 6 months or more when little or no investigative activity occurred.
  - o I did not include that time that the closing ROI was under supervisory review, which was sometimes extensive and unacceptably long.
  - o I also did not include the time that the matter was pending with an AUSA, so long as there was some indication in the file that the agent was making an effort, however small, to push the case along.
- Delays of 3 months or more in drafting the ROI or closing memorandum.
  - o I did not include time that agents were noting that they had other priority matters to work on, as directed by their supervisors.
- I looked for milestones, such as criminal declination, termination or separation of the subject employee, or administrative action taken against the subject.

U.S. Department of Commerce – Office of Inspector General
FOR OFFICIAL USE ONLY
(Public availability to be determined under 5 U.S.C. 552)

## Summary of Significant Deficiencies and How OI is Addressing Them

The significant deficiencies in the closed OI cases fall into three categories:

1. Lack of due diligence in conducting the investigation and timely drafting a report.
2. No investigative plan.
3. Insufficient supervisory review of the case.

### 1. Lack of Due Diligence and Failure to Timely Complete Report

Below is a chart showing the number of cases that fall into the first category that is captured in 3 related questions on the CIGIE Checklist (1, 17, and 23). These questions go to the heart of what an investigations function should be doing for each case. The fact that some of these cases sat dormant for a year or more with little or no investigative activity is inexcusable, and both the agent and the supervisor were therefore negligent in the handling of the case. In defense of many of the newer agents, they were given most of the legacy cases that were aged at the time and asked to close them, mostly in the late 2010 and early 2011 time period, and for the most part, these agents did work diligently to close them. So including their names in the chart below should not be an indication that they acted negligently in closing the cases, but it is such an indication for the agents who have been here longer.

**Question 1: Diligent, complete, & all appropriate criminal, civil, contractual, or administrative remedies considered?**

Out of 58 cases, 27 were "no."

Agents:



U.S. Department of Commerce – Office of Inspector General
FOR OFFICIAL USE ONLY
(Public availability to be determined under 5 U.S.C. 552)

**Question 17: Investigative results documented in a timely, accurate, and complete manner?**

Out of 58 cases, 24 were "no."



**Question 23: All relevant aspects of investigation were addressed, and reports were accurate, clear, complete, concise, logically organized, timely, and objective?**

Out of 58 cases, 32 were "no."



U.S. Department of Commerce – Office of Inspector General
FOR OFFICIAL USE ONLY
(Public availability to be determined under 5 U.S.C. 552)

To address this significant deficiency, we developed several policies that are directed at ensuring the agents conduct investigations with diligence and prepare timely reports. For example, the initial period for conducting a preliminary inquiry is now 30 days to make a decision on disposition (convert to full investigation, refer to bureau, or close), instead of open ended as it was previously. In addition, we now have a policy for completing an investigation within 180 days so that employees are not left in limbo for years in some cases or cases being held open long after the employee left Commerce. We also have shorter time periods specified for writing the reports (60 days following completion of investigative activities). Furthermore, there is now a requirement that there should be no more than 30 days between investigative activities.

### 2. *No Investigative Plan*

Few of the cases had investigative plans. **Of the 58 cases, I found 16 investigative plans.** What was often marked in the "Investigative Plan" file in IG CIRTS was the "Investigative Action Form," which merely checks the category for the matter – whether it is an investigation or a preliminary. That is not an investigative plan in any sense. When I asked several OI managers about the omission of investigative plans, they told me that the policy was not to prepare an investigative plan if the agent was senior or if the matter was a simple one.

In our new policies, we have a section mandating the creation of an investigative plan in the first 24 hours after the case is assigned. The policy also provides a template and sets forth what the contents of the investigative plan needs to be so that we have greater consistency and better understanding of planned investigative activities.

### 3. *Insufficient Supervisory Review*

OI supervisors were with few exceptions derelict in providing periodic and sufficient review for the cases. In the rare event that a supervisory case review was conducted, it was generally in early 2011 as OI was preparing for the Peer Review by conducting the case review. **Out of the 58 cases, only 13 had documented periodic case reviews by the supervisor,** and this was generally ▮▮▮▮▮▮ supervisors.

We have addressed this deficiency in our new policies by requiring that ASACs conduct supervisory reviews after the first 30 days and then every 60 days thereafter.

U.S. Department of Commerce – Office of Inspector General
FOR OFFICIAL USE ONLY
(Public availability to be determined under 5 U.S.C. 552)

## Summary of Other Deficiencies

I found the following additional deficiencies in my case review:

- In almost all cases that did not result in the referral for administrative action, the investigative findings were not shared with the bureau.
- Many of the ROIs in IG CIRTS were undated, unsigned, or omitted the name of the case agent and supervisor.
- Many files did not contain FBI notifications.
- Some cases did not document consultation with the prosecutor.

### *Failure to Share Findings with Bureaus*

In not sharing the results of our investigations, we deprived the bureaus of an opportunity to receive sometimes important findings dealing with employees or processes. The CIGIE checklist includes this question at the bottom of the checklist: "If applicable, were systemic weaknesses identified during investigation reported to agency officials? The answer was almost always no.

We have addressed this issue with a policy change that requires agents to send the ROIs to bureaus with appropriate redactions for privacy interests or for protecting identities.

### *Undated and Unsigned ROIs*

The failure to date and sign the ROIs and RFIs made it difficult to determine when or by whom they were drafted. Most of the undated or unsigned were from last year or the early part of this year. It appears to have been remedied this summer. Nevertheless, the policy now requires that the ROIs and other documents be dated and signed. It seems rather silly to have to put this requirement in our policy, but that is the state of affairs for OI.

### *No Documented Notification to FBI or Consultation with Prosecutor*

Many cases did not have notification letters to the FBI. Obviously, same cases that are clearly administrative do not require this. However, I did not find notification letters in some criminal cases, even in several for which we were working the matter jointly with the FBI. Likewise, I found scant documentation in some cases of any consultation with prosecutors, other than a reference to a declination in the ROI.

The policy now requires notification letters to the FBI at the outset of criminal investigations and documentation of interactions with prosecutors.

cc: Wade Green

U.S. Department of Commerce – Office of Inspector General
FOR OFFICIAL USE ONLY
(Public availability to be determined under 5 U.S.C. 552)

# Exhibit 3



**UNITED STATES DEPARTMENT OF COMMERCE**
The Inspector General
Washington, D.C. 20230

May 1, 2013

The Honorable Frank R. Wolf
Chairman, Subcommittee on Commerce, Justice, Science,
 and Related Agencies
Committee on Appropriations
U.S. House of Representatives
Washington, DC 20515-6015

Dear Mr. Chairman:

This further responds to your correspondence of December 18, 2012, in which you requested that we address the current issues involving the Office of Special Counsel (OSC) and the Commerce Office of Inspector General (OIG). On January 7, 2013, we responded, indicating that our actions to address mismanagement and misconduct in our Office of Investigations included an ongoing personnel matter that we were not at liberty to report about at the time. We are now able to provide additional information concerning this matter.

On April 30, 2013, the U.S. Attorney for the District of Maryland announced that two former Commerce OIG special agents pleaded guilty to submitting false claims for relocation expenses and time and attendance fraud. The investigation was carried out by the FBI and my office. This is another serious consequence of the mismanagement we found in our Office of Investigations, which we detailed in our January 7, 2013 response.

The U.S. Attorney's press release is attached for your information. If you have any further questions about this matter, please contact me at (202) 482-4661.

Sincerely,

Todd J. Zinser

**Attachment**





**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

---

| | | |
|---|---|---|
| *Rod J. Rosenstein*<br>*United States Attorney* | *36 South Charles Street*<br>*4th Floor*<br>*Baltimore. Maryland 21201* | *410-209-4800*<br>*TTY/TDD: 410-962-4462*<br>*410-209-4885* |
| *Vickie E. LeDuc*<br>*Public Information Officer* | | *FAX 410-962-3091*<br>*Vickie.LeDuc@usdoj.gov* |

**April 30, 2013**
**FOR IMMEDIATE RELEASE**          **Contact AUSA VICKIE E. LEDUC or**
www.justice.gov/usao/md                  **MARCIA MURPHY at (410) 209-4885**

### TWO FORMER SPECIAL AGENTS WITH DEPARTMENT OF COMMERCE OFFICE OF INSPECTOR GENERAL PLEAD GUILTY TO SUBMITTING FALSE CLAIMS FOR RELOCATION EXPENSES AND TIME AND ATTENDANCE FRAUD

*Greenbelt*, Maryland –Two former Special Agents with the U.S. Department of Commerce, Office of Inspector General, Rachel Ondrik, age 35, of Frederick, Maryland, and Kirk Yamatani, age 38, of Ashburn, Virginia, pleaded guilty today to submitting false claims for relocation expenses.  Ondrik and Yamatani resigned their positions with the Department of Commerce on March 29, 2013, as required by their plea agreements.

The guilty plea was announced by United States Attorney for the District of Maryland Rod J. Rosenstein; Special Agent in Charge Stephen E. Vogt of the Federal Bureau of Investigation; and Todd Zinser, Inspector General for the U.S. Department of Commerce (DOC).

"Today's announcement is the result of significant efforts by the U.S. Attorney's Office, the FBI and my office to hold law enforcement agents accountable for years of criminal misconduct," said Inspector General Todd Zinser of the U.S. Department of Commerce. "In addition to the fraud perpetrated on the U.S. taxpayers, these now former employees also retaliated by carrying out a destructive campaign of disparagement and false allegations against the Office of Inspector General (OIG)."  Mr. Zinser added, "I commend the U.S. Attorney's Office and the FBI for their diligent efforts and perseverance in conducting this investigation."

According to their plea agreements, in 2009, Ondrik and Yamatani, transferred from the DOC OIG's Atlanta, Georgia office to Washington, D.C.  Ondrik and Yamatani were authorized relocation benefits, including a househunting trip, en route travel, and temporary quarters living expenses.  Emails between Ondrik and Yamatani show that both agents were aware of the rules governing their relocations and reimbursements for related expenses, yet both attempted to secure payment from the DOC in amounts significantly exceeding what was authorized and submitted claims for relocation related trips they did not take.

For example, Ondrik and Yamatani claimed $4,058.75 and $3,589, respectively for househunting trips, when in fact, they did not make a househunting trip during the time claimed.  Ondrik and Yamatini each also falsely claimed more than $1,500 for travel to their new duty station and falsely claimed reimbursement for temporary quarters living expenses in an amount that was approximately three times what they were authorized.   In all, Ondrik and Yamatani each submitted at least three false vouchers seeking reimbursement for $39,563.25 and $36,305.57,

respectively.   When Ondrik and Yamatani's claims for reimbursement were denied as being over what the travel regulations allowed, Ondrik and Yamatani persisted in their claims.   On several occasions between 2009 and 2011, Ondrik and Yamatani reaffirmed the earlier false statements in their vouchers and made false statements regarding the circumstances of their claims for reimbursement.

Between June 2009 and February 2011, Ondrik and Yamatani also committed time and attendance fraud against DOC OIG, claiming to have worked hours that they did not actually work. The loss to the government attributable to each defendant's conduct was approximately $14,000.

The defendants and the government have agreed that if the Court accepts the plea agreement Ondrik and Yamatani will each be sentenced to a term of probation and ordered to pay a fine of $28,000.   In addition, each defendant will be required to pay $14,000 in restitution to the government.   U.S. Magistrate Judge Charles B. Day has scheduled sentencing for June 19, 2013 at 2:30 p.m.

United States Attorney Rod J. Rosenstein praised the FBI and DOC OIG for their work in the investigation.  Mr. Rosenstein thanked Assistant U.S. Attorneys Adam K. Ake and Robert K. Hur, who are prosecuting the case.